# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Civil Action No. _____

| | |
|---|---|
| CHARLES GRESHAM<br>123 W. Ridge Ave., Apt. C, Harrison, AR  72601 | )<br>)<br>) |
| CESAR ARDON<br>1613 E. Tahlequah St., Siloam Springs, AR 72761 | )<br>)<br>) |
| MARISOL ARDON<br>1613 E. Tahlequah St., Siloam Springs, AR 72761 | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| ALEX M. AZAR II<br>SECRETARY, UNITED STATES DEPART-<br>MENT OF HEALTH AND HUMAN SERVICES<br>in his official capacity<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| SEEMA VERMA<br>ADMINISTRATOR, CENTERS FOR MEDI-<br>CARE AND MEDICAID SERVICES<br>in her official capacity<br>7500 Security Boulevard<br>Baltimore, MD 21244 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| UNITED STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>) |
| CENTERS FOR MEDICARE AND MEDICAID<br>SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

## PRELIMINARY STATEMENT

1.      This case challenges the ongoing efforts of the Executive Branch to bypass the legislative process and act unilaterally to "comprehensively transform" Medicaid, the cornerstone of the social safety net. Purporting to invoke a narrow statutory waiver authority that allows experimental projects "likely to assist in promoting the objectives" of Medicaid, the Executive Branch has instead effectively rewritten the statute, ignoring congressional restrictions, overturning a half century of administrative practice, and threatening irreparable harm to the health and welfare of the poorest and most vulnerable in our country.

2.      The Medicaid program provides health insurance coverage to more than 75 million low-income people in the United States. Medicaid enables states to provide a range of federally specified preventive, acute, and long-term health care services to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." As described in more detail below, the core populations covered by Medicaid include children; pregnant women; the aged, blind, or disabled; and, as added by the Affordable Care Act ("ACA"), adults with household incomes of less than 133% of the federal poverty level (currently $12,140 for an individual; $16,460 for a family of two).

3.      The Medicaid program offers a deal for states. If a state chooses to participate in the program, the federal government will contribute the lion's share of the cost of providing care. In return, the state agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states cannot pick and choose among individuals within a covered population group.

4.      The Social Security Act, of which Medicaid Act is a part, does permit the Secretary of Health and Human Services ("HHS") to waive certain federal Medicaid requirements, but only in narrow circumstances — when necessary to allow a state to carry out an experimental or pilot program that is likely to promote the objectives of the Medicaid Act.

5.      In 2014, the State of Arkansas obtained such a waiver to expand its Medicaid program to cover the adults made eligible through the ACA by using private health plans. In 2016, this waiver was renewed and extended through 2021. Consistent with previous agency actions, HHS denied Arkansas' request to impose a work requirement as a condition of eligibility, finding such a requirement was not consistent with the objectives of the Medicaid Act.

6.      Early in 2017, the current HHS abruptly reversed course, signaling to states that it would revise its use of the waiver authority in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. On June 30, 2017, Arkansas Governor Asa Hutchinson submitted the "Arkansas Works Amendment," a request to the Secretary of HHS to implement a work requirement as a condition of Medicaid eligibility in order to "promot[e] personal responsibility and work, encourage[e] movement up the economic ladder, and facilitate[e] transitions from Arkansas Works" to private coverage.

7.      While the Arkansas Works Amendment was pending, HHS announced its new Medicaid waiver policy through a letter to State Medicaid Directors. Reversing decades of agency guidance, and consistent with the Administrator's own expressed view of the need to "fundamentally transform Medicaid," the letter to State Medicaid Directors announced the agency's intention to, for the first time, approve waiver applications containing work requirements and outlining "guidelines" for states to consider in submitting such applications. On March 5,

2018, citing the Dear State Medicaid Director Letter, the Secretary approved the Arkansas Works Amendment, and Arkansas began implementing the Amendment on June 1, 2018.

8.      The Secretary's issuance of the letter to State Medicaid Directors and approval of Arkansas' request sharply deviate from the congressionally established requirements of the Medicaid program and vastly exceed any lawful exercise of the Secretary's limited waiver authority. This Amendment will harm Arkansans across the state who need a range of health services, including check-ups, diabetes treatment, mental health services, non-emergency medical transportation, and vision and dental care. The letter and approval of Arkansas' application are unauthorized attempts to re-write the Medicaid Act, and the use of the Social Security Act's waiver authority to "transform" Medicaid is an abuse of that authority. The Defendants' actions here thus violate both the Administrative Procedure Act and the Constitution, and they cannot survive.

## JURISDICTION AND VENUE

9.      This is an action for declaratory and injunctive relief for violations of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

10.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

11.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

12.     Plaintiff Charles Gresham is a 37-year-old man who lives in Harrison, Boone County, Arkansas with his fiancé. Mr. Gresham is enrolled in the Arkansas Medicaid program.

13.     Plaintiff Cesar Ardon is a 40-year-old man who lives in Siloam Springs, Benton County, Arkansas and is enrolled in the Arkansas Medicaid program.

14.     Plaintiff Marisol Ardon is a 44-year-old woman who lives is Siloam Springs, Benton County, Arkansas with her adult daughter. Ms. Ardon is enrolled in the Arkansas Medicaid program.

15.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. Defendant Azar ("the Secretary") has overall responsibility for implementation of the Medicaid program, including responsibility for federal review and approval of state requests for waivers pursuant to Section 1115 of the Social Security Act.

16.     Defendant Seema Verma is Administrator of the Centers for Medicare and Medicaid Services ("CMS") and is sued in her official capacity. Defendant Verma is responsible for implementing the Medicaid program in the manner required by federal law, including as amended by the ACA.

17.     Defendant HHS is a federal agency with responsibility for, among other things, overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

18.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A.     The Medicaid Program

19.     Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical

services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

20.     The statute defines "medical assistance" to be a range of health care services that participating states must cover or are permitted to cover at state option. *Id.* § 1396d(a).

21.     Although states do not have to participate in Medicaid, all have chosen to do so.

22.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id*. § 1396a.

23.     The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its associated regulations.

24.     State and federal governments share responsibility for funding Medicaid. Section 1396b of the Medicaid Act requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's relative per capita income.

**B.     Medicaid Eligibility and Coverage Requirements**

25.     Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage. *Id*. §§ 1396a(a)(10)(A), (C). The Act identifies required coverage groups as well as options for states to extend Medicaid to additional population groups. *Id.*

26.     States participating in Medicaid must provide medical assistance to individuals who meet the eligibility standards applicable to required coverage groups (so-called "mandatory populations"). *Id.* § 1396a(a)(10)(A)(i.

27.     To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id.* §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

28.     The mandatory Medicaid population groups include children; parents and certain other caretaker relatives; pregnant women; and the elderly, blind, or disabled. 42 U.S.C. § 1396a(a)(10)(A)(i).

29.     In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act ("ACA"). Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

30.     As part of the effort to ensure comprehensive health insurance coverage, Congress amended the Medicaid Act to add an additional mandatory population group. Effective January 1, 2014, the Medicaid Act requires participating states to cover adults who are under age 65, not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household income below 133% of the federal poverty level ("FPL"). 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14). This group is often called the "expansion population" or the "Section VIII population," and it includes adults in a variety of family circumstances: parents living with children (whose incomes exceed the state-established limit for the mandatory parents/caretaker relatives population group); parents of older children who have left the home; and adults without children.

31.     States receive enhanced federal reimbursement rates for medical assistance provided to the Medicaid expansion population: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. *Id.* § 1396d(y).

32.     The Supreme Court's decision in *National Federation of Independent Business v. Sebelius* barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population. 567 U.S. 519 (2012).

33.     States that cover the expansion population submit state plan amendments electing to provide this coverage. To date, 34 states, including Arkansas, and the District of Columbia have approved state plans covering the expansion population.

34.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).

35.     As noted above, the Medicaid Act also allows states to extend Medicaid eligibility to certain optional population groups, including children and pregnant women with incomes between 133% and 185% of FPL, *see id.* § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income, *id.* § 1396a(a)(10)(C).

36.     The Medicaid Act requires a participating state to cover *all* members of a covered population group. In other words, the state may not cover subsets of a population group described in the Medicaid Act. *Id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups: if a state elects to cover an optional group, it must cover all eligible individuals within that group. *Id.*

37.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act. *See id.* § 1396(a)(10)(A).

38.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act delineates how states must make and implement eligibility determinations to ensure that all eligible people who apply are served and get coverage.

39.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility . . . and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

40.     The ACA requires states to use a streamlined Medicaid eligibility process so that individuals "may apply for enrollment in, receive a determination of eligibility for participation in, and continue participation in, [Medicaid]." 42 U.S.C. § 18083(a). Individuals must be able to file streamlined eligibility forms online, in person, by mail, or by telephone. *Id.* § 18083(b)(1)(A); *see also* 42 U.S.C. § 1396w-3 (requiring participating states to streamline and simplify process for persons to remain enrolled in Medicaid); 42 C.F.R. §§ 435.907(a) (requiring states to accept applications and any documentation required to establish eligibility by internet, telephone, mail, and in person); 435.908(a) (requiring states to provide assistance with applications and renewals in person, over the telephone, and online).

41.     Since its enactment, the Medicaid Act has required states to determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." Social Security Amendments of 1965, Pub. L. No. 89-97, § 1902(a)(8), 79 Stat. 286, 344 (codified at 42 U.S.C. § 1396a(a)(8)); 42 C.F.R. §§ 435.906 (requiring states to allow individuals to apply without delay); 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability and 45 days for all other individuals).

42.     Through so-called "presumptive" eligibility, the Medicaid Act gives states a mechanism to provide immediate, temporary coverage to individuals who appear to their health care provider to be Medicaid eligible based on preliminary information. 42 U.S.C. § 1396a(a)(47). Under the ACA, states must allow qualified hospitals to provide presumptive eligibility to their patients. *See* Pub. L. 111-148, 124 Stat. 119, 291, § 2202 (codified at 42 U.S.C. § 1396a(a)(47)(B) (eff. Jan. 1, 2014). *See* Ctrs. for Medicare & Medicaid Servs., *Medicaid & CHIP FAQs: Implementing Hospital Presumptive Eligibility Programs* (2014), https://www.medicaid.gov/state-resource-center/faq-medicaid-and-chip-affordable-care-act-implementation/downloads/faqs-by-topic-hospital-pe-01-23-14.pdf (noting that hospital presumptive eligibility assures that individuals have timely access to care and promotes "ongoing Medicaid coverage by offering additional channels through which individuals can apply").

43.     The Medicaid Act has always required states to provide retroactive coverage to certain individuals to ensure that they can obtain timely care and avoid incurring medical debts. Social Security Amendments of 1965, Pub. L. No. 89-97, § 1905(a), 79 Stat. 286, 351 (codified at 42 U.S.C. §§ 1396a(a)(34), 1396d(a)); *see also* S. Report No. 92-1230, 92nd Congress, 2nd Session, pg. 209 (1972) (noting the purpose of retroactive coverage is to protect individuals "who are eligible for [M]edicaid but do not apply for assistance until after they have received care, either because they did not know about the [M]edicaid eligibility requirements or because the sudden nature of their illness prevented their applying"). Specifically, states must provide medical assistance for care provided in or after the third month before the month of application, as long as the enrollee would have been eligible for Medicaid at the time the services were received. 42 U.S.C. §§ 1396a(a)(34), 1396d(a).

### C.       The Secretary's Section 1115 Waiver Authority

44.       Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315, grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions.

45.       The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id*. § 1315(a).

46.       The Secretary may only waive requirements of Section 1396a for Section 1115 projects relating to Medicaid. *Id*. § 1315(a)(1).

47.       The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

48.       The Secretary may grant a Section 1115 waiver only to the extent and for the period necessary to enable the state to carry out the experimental, pilot, or demonstration project. *Id*.

49.       The costs of such a project, upon approval, are included as expenditures under the State Medicaid plan. 42 U.S.C. § 1315(a)(2).

50.       The Secretary must follow certain procedural requirements before he may approve a Section 1115 project. *Id*. § 1315(d); 42 C.F.R. §§ 431.400 to 431.416. In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period. 42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

51.       The Secretary does not have the authority under Section 1115 to waive compliance with other federal laws, such as the United States Constitution, the Americans with Disabilities Act, or other federal statutes.

52.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked. *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2 (1997), http://nclej.org/wp-content/uploads/2015/11/ LaborProtectionsAndWelfareReform.pdf. Notably, the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and further describe how the benefits interact with the FLSA minimum wage protections. *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607 (TANF). There is no such reference or description in the Medicaid Act. According to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage. *See How Workplace Laws Apply to Welfare Recipients* at 4.

**D.     Medicaid in Arkansas**

53.     Arkansas, like all other states, has elected to participate in Medicaid. *See* Ark. Code Ann. §§ 20-77-101 to 20-77-2811, 23-61-1004 to 23-61-1009. The Department of Human Services ("DHS") administers the program at the state level.

54.     HHS typically reimburses Arkansas for over 70% of the cost of providing medical assistance through its Medicaid program. *See* 81 Fed. Reg. 80078-79 (Nov. 15, 2016) (70.87%, in fiscal year 2017); 82 Fed. Reg. 55383-85 (Nov. 21, 2017) (70.51% in fiscal year 2018).

55.     Effective January 1, 2014, Arkansas expanded its Medicaid program to include the Medicaid expansion population – *i.e.*, adults who are under age 65; do not fit into another Medicaid (or Medicare) eligibility category; and have household income below 133% of FPL. As noted above, the State receives enhanced federal reimbursement for medical assistance provided to this

group: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. 42 U.S.C. § 1396d(y).

56.     Arkansas implemented the Medicaid expansion through a Section 1115 project called the "Arkansas Health Care Independence Program" ("HCIP"). *See* Letter from Marilyn Tavenner, Admin., Ctrs. for Medicare & Medicaid Servs., to Andy Allison, Dir., Arkansas Dep't of Human Servs. (Sept. 27, 2013) (approving HCIP through December 31, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-private-option-app-ltr-09272013.pdf (last visited Aug. 8, 2018).

57.     HCIP allowed the State to cover most of the expansion population through a "private option." Under the private option, individuals receive health coverage, *i.e.*, medical assistance, through a private health plan, and the Medicaid program covers the enrollees' portion of the premiums and cost sharing. *Id*. Because the private plans do not cover all of the services that the Medicaid Act requires Arkansas to provide to the expansion population, enrollees continue to receive some services through the State on a fee-for-services basis. *See id.* at Special Terms and Conditions ¶ 36-37.

58.     In 2014 and 2015, more than 225,000 individuals received coverage through HCIP. Arkansas Ctr. for Health Improvement, *Arkansas Health Care Independence Program ("Private Option") Section 1115 Demonstration Waiver Interim Report* 16, 21 (2016), http://www.achi.net/Content/Documents/ResourceRenderer.ashx?ID=347. During that same time period, Arkansas saw "a reduction in the uninsured rate for adults from 22.5 percent to 9.6 percent, the largest reduction observed nationwide." *Id*. at 20.

59.     Medicaid expansion in Arkansas has been associated with a variety of positive health outcomes, including increased utilization of preventive services, out-patient office visits, and chronic disease care; decreased reliance on emergency rooms; fewer skipped medications due to cost; better quality care; and improved self-reported health. Benjamin D. Sommers et al., *Changes in Utilization and Health Among Low-Income Adults After Medicaid Expansion or Expanded Private Insurance*, 176 JAMA Internal Medicine 1501, 1505-06 (2016).

60.     In mid-2016, Arkansas requested permission from HHS to extend and amend HCIP, renaming the project "Arkansas Works." Letter from Asa Hutchinson, Governor of Arkansas to Sylvia Mathews Burwell, Sec'y, U.S. Dep't Health & Human Servs. (June 28, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-works-application-07072016.pdf.

61.     The Secretary extended the Section 1115 project through the end of 2021. Letter from Andrew M. Slavitt, Acting Admin., Ctrs. for Medicare & Medicaid Servs., to Cindy Gillespie, Dir., Arkansas Dep't of Human Servs. (Dec. 8, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-works-amndmnt-appvl-12292017.pdf.

62.     The Secretary also approved several changes to the project. Most notably, the Secretary granted Arkansas a conditional waiver of retroactive eligibility. Before implementing this waiver, the State needed to demonstrate: (1) compliance with the requirement to provide Medicaid coverage during a reasonable opportunity period to individuals who are otherwise eligible for Medicaid and attest to eligible immigration status, consistent with 42 U.S.C. § 1320b-7(d); (2) completion of the Arkansas MAGI Backlog Mitigation Plan and written assurance that "eligibility

determinations and redeterminations are completed on a timely basis;" and (3) implementation of the requirement to allow hospitals to make presumptive eligibility determinations. *Id.* at Waiver List ¶ 7).

63.     Arkansas DHS has not implemented hospital presumptive eligibility.

**E.     The Arkansas Works Amendment**

64.     On or about June 30, 2017, Governor Hutchinson submitted to the Secretary a request to amend Arkansas Works. Letter from Asa Hutchinson, Governor of Arkansas, to Thomas E. Hargan, Sec., U.S. Dep't of Health & Human Servs. (June 30, 2017) ("Arkansas Works Amendment") (attached as Exhibit 1, hereto).

65.     Arkansas requested permission to implement a work and community engagement requirement and to eliminate three-month retroactive coverage. Arkansas also sought permission to phase out Medicaid coverage of individuals with household income above 100% of the FPL. *Id.*

66.     Governor Hutchinson described the proposed Amendment as designed to "promot[e] personal responsibility and work, encourage[e] movement up the economic ladder, and facilitate[e] transitions from Arkansas Works" to private coverage. *Id.* The State commented that the changes would better position Arkansas Works to focus on "the most vulnerable enrollees." *Id.* at App. C, p. 2.

67.     The State's request did not provide an estimate of the number of individuals who would lose coverage as a result of the work requirement. Likewise, Arkansas did not indicate the number of individuals who would incur medical costs due to the elimination of retroactive coverage or the amount of those costs.

68.     CMS held a public comment period on the proposed Amendment from July 11, 2017 to August 10, 2017. Medicaid.gov, Arkansas Works Amendment, https://public.medicaid.gov/connect.ti/public.comments/view?objectID=1891331.

69.     On March 5, 2018, the Secretary issued his approval letter for the Arkansas Works Amendment, pursuant to Section 1115 and effective through the end of 2021. *See* Letter from Seema Verma, Admin., Ctrs. for Medicare & Medicaid Servs. to Cindy Gillespie, Dir. Ark. Dep't of Human Servs. (March 5, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/ar-works-ca.pdf (hereinafter "Amendment Approval") (attached as Exhibit 2, hereto).

70.     The Amendment Approval granted Arkansas permission to implement the work requirement, on or after June 1, 2018.

71.     The Amendment Approval also waived the retroactive coverage requirement for Arkansas, reducing the retroactive coverage period from three months to one month. Neither the State's Amendment application nor the CMS approval explained how the State had met the three pre-conditions CMS set forth in 2016 for a waiver of the retroactive coverage requirement—that Arkansas comply with the reasonable opportunity period requirements, successfully complete the Arkansas MAGI Backlog Mitigation Plan, and implement hospital presumptive eligibility. *See* Amendment Approval at Ex. 2 at 4, 7, 21; Arkansas Works Amendment.

72.     Arkansas' request to reduce income eligibility for Arkansas Works to 100% of FPL was not approved. *See* Amendment Approval at Ex. 2 at 2.

73.     In approving Arkansas' request, HHS did not provide an estimate of the number of individuals who would lose coverage as a result of the Arkansas Work Amendment.

<u>Work and Community Engagement Requirements</u>

74.     As noted above, the Medicaid Act requires a participating state to furnish Medicaid to *all* members of covered population groups. The state may not cover only subsets of a population group described in the Medicaid Act. *See* 42 U.S.C. §§ 1396a(a)(10)(A)-(B).

75.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act.

76.     The Arkansas Works Amendment added a new condition of eligibility that is not permitted under the Medicaid Act: Arkansas Works enrollees ages 19 to 49 must engage in 80 hours of specified employment or community engagement activities every month. Amendment Approval at Ex.2 at 28.

77.     The work requirement does not apply to pregnant women or medically frail individuals. Amendment Approval at Ex. 2 at 28. In addition, enrollees who meet certain other criteria are exempt from the requirement. *Id.*

78.     If enrollees subject to the work requirement do not meet the requirement for any three months of the year, the State will terminate their coverage unless they demonstrate that one of the narrow "good cause" exceptions applies. *Id*. at 29-31.

79.     Under the Medicaid Act, an individual may apply for and enroll in Medicaid at any time.

80.     Under the Arkansas Works Amendment, the State will prohibit an individual who has been terminated from Medicaid for failure to meet the work requirements from re-enrolling in Arkansas Works for the remainder of the calendar year. *Id*. at 30. Only once the year begins again will a terminated enrollee be allowed to submit a new application to re-enroll. However, enrollees may end the lockout period early by showing that one of the "good cause" exceptions would have

applied at the time of termination and their inability to fulfill the requirement "was the result of a catastrophic event or circumstances beyond [their] control." *Id.*

81.    According to the State, the purpose of the work requirement is to "incentivize enrollees to work and encourage personal responsibility" and "encourage individuals to climb the economic ladder." Arkansas Works Amendment at p. 55. The State also described the goal of the work requirement as "promot[ing] independence through employment." *Id*. at 15.

82.    The State began implementing the requirement for individuals ages 30 to 49 on June 1, 2018. Arkansas is fully rolling out the requirement, to include individuals ages 19 to 29, during the first four months of 2019. *Eligibility and Enrollment Monitoring Plan, Arkansas Works: Work and Community Engagement Amendment* 8 (2018) (hereinafter "Implementation Plan") (attached as Exhibit 3, hereto).

83.    As a condition of eligibility, enrollees must report their participation activities each month, which they can only do by using an online portal. Enrollees may not report participation in-person or by telephone. *Id.*

84.    DHS Director Cindy Gillespie stated in March 2018 that the online-only reporting requirement was more convenient for DHS, and "If you implement it in the old-fashioned way of 'Come into our county office,' we would have to hire so many people – and that just doesn't make sense." Benjamin Hardy, *Medicaid Advocate Criticizes Arkansas Works' Email-only Reporting for Work Requirements*, Ark. Times, Apr. 28, 2018, https://www.arktimes.com/ArkansasBlog/archives/2018/04/28/medicaid-advocate-criticizes-arkansas-works-email-only-reporting-for-work-requirements (last visited Aug. 3, 2018).

85.    To use the online portal, enrollees need an email address, a log-in and password unique to the portal, and a reference number provided in a multi-page letter sent by DHS. Enrollees

use the reference number to link their insurance account to the reporting portal. Once the link is established, individuals must click through multiple different screens to report their work activities each month. The portal is only accessible to beneficiaries between the hours of 7 a.m. and 9 p.m. Sometimes, DHS schedules online maintenance of the portal during these operating hours. Enrollees must report work activities for a given month by the 5th of the following month, or the activities will not be counted for purposes of determining compliance. *See generally* Arkansas Works Information, https://ardhs.sharepointsite.net/ARWorks/default.aspx.

86.     To claim an exemption, Arkansas Works beneficiaries use the online portal to make an attestation based on their understanding of the exemption. The State plans to review exemption attestations as part of a quality review process, which may result in retroactive removal of months of exemption or compliance. If the retroactive removal leaves an enrollee with three months of non-compliance in a calendar year, the individual's Arkansas Works case will be closed and referred for investigation as potential fraud and overpayment. Implementation Plan at 13.

87.     After the March 5, 2018 approval, the Arkansas Medicaid agency publicly estimated that "approximately 69,000 out of 278,734 individuals currently enrolled in Arkansas Works will be expected to participate in monthly approved work activities" once the requirement is fully implemented. This estimate did not include an estimate of Arkansans who would not be able to meet the requirement and would thus lose Medicaid coverage for the year. Implementation Plan at 1, 6.

88.     The State estimates there are 125,242 Arkansas Works beneficiaries in the 30 to 49 age group. *Id.* at 6. The State began rolling out the work requirement to this group in June 2018, announcing that 25,815 of these enrollees needed to meet the work and community engagement

requirement in June 2018. Almost one-third of the individuals who needed to meet the work re-quirements – 7,464 people – did not do so for the month. Of those who met the requirement, 15,511 were deemed to meet it through state data sources, 2,395 reported an exemption, and only 445 reported they met the 80 hours of work-related activity. *See* Arkansas Dep't of Human Servs., *Arkansas Works Program June 2018 Report*, at 1 (attached as Exhibit 4, hereto).

89.     The State estimates that 38,321 of the 125,242 Arkansas Works beneficiaries ages 30 to 49 will need to report how they met the work requirement or an exemption when the require-ment is fully implemented for this age group by October 2018. Once fully implemented, the State estimates that about 69,000 of the 171,999 Arkansas Works beneficiaries in the 19 to 49 age group will need to report how they meet the work requirement or an exemption. Implementation Plan at 1, 6.

Retroactive Eligibility

90.     As noted above, the Medicaid Act requires that medical assistance be provided to enrollees retroactively. States must provide that

> in the case of any individual who has been determined to be eligible for medical assistance . . . such assistance will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application . . . for such assistance if such individual was . . . eligible for such assistance at the time such care and services were furnished.

42 U.S.C. § 1396a(a)(34).

91.     Separately, Section 1396d(a) defines "medical assistance" to include coverage for services received by eligible individuals during the three-month period prior to the month of application. *Id.* § 1396d(a).

92.     There is no authority for the Secretary to grant a waiver of Section 1396d(a).

93.     Under the approved Arkansas Works Amendment, retroactive eligibility coverage as required by the statute is terminated. Instead, the State will only pay for services received during the 30 days before an individual submits an application. Amendment Approval at Ex. 2 at 11, 21.

**F.      Action Taken by the Defendants to Allow Work Requirements and Approve the Arkansas Works Amendment**

94.     Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017). The "general criteria" for CMS to use when assessing waiver applications included whether the demonstration would:

1.   increase and strengthen overall coverage of low-income individuals in the state;

2.   increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

3.   improve health outcomes for Medicaid and other low-income populations in the state; or

4.   increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.*

95.     Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care." Letter from Andrew M. Slavitt, Acting Administrator, Ctrs. For Medicare & Medicaid Servs., HHS to Thomas Betlach, Dir. Az. Health Care Cost Containment System (Sept. 30, 2016); *see* Sec'y of Health & Human

Services Sylvia Burwell, *Hearing on The President's Fiscal Year 2017 Budget*, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee at 35 (Feb. 24, 2016), http://docs.house.gov/meetings/IF/IF14/20160224/104521/ HHRG-114-IF14-Wstate-BurwellS-20160224-SD002.pdf.

96.    In 2016, CMS denied Arkansas' request to institute a work requirement in Medicaid, stating in part: "[C]onsistent with the purposes of the Medicaid program, we cannot approve a work requirement." Letter from Sylvia Burwell, Sec'y of Health & Human Services, to Asa Hutchinson, Governor of Arkansas (Apr. 5, 2016) (attached as Exhibit 5, hereto).

97.    The current HHS abruptly reversed course to revise its use of the Section 1115 waiver authority and to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. *See* Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017, https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html.

98.    When he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "[t]o the maximum extent permitted by law." Executive Order 13765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal,* 82 Fed. Reg. 8351 (Jan. 20, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-01-24/pdf/2017-01799.pdf.

99.    On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator of CMS. Defendant Verma and former Secretary Price immediately issued a letter to state Governors announcing CMS's disagreement with the purpose and objectives of the Medicaid Act,

stating that "[t]he expansion of Medicaid through the Affordable Care Act ('ACA') to non-disabled, working-age adults without dependent children was a clear departure from the core, historical mission of the program." *See* Sec'y of Health and Human Servs., Dear Governor Letter, at 1, https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

100.    Since then, Defendant Verma has made repeated public statements criticizing the expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in Medicaid, and outlining plans to "reform" Medicaid through agency action. *See* Casey Ross, *Trump health official Seema Verma has a plan to Slash Medicaid rolls. Here's how*, Stat News, Oct. 26, 2017, https://www.statnews.com/2017/10/26/seema-verma-medicaid-plan/.

101.    For instance, on June 27, 2017, Defendant Verma wrote an Opinion piece in the Washington Post observing that "U.S. policymakers have a rare opportunity, through a combination of congressional and administrative actions, to fundamentally transform Medicaid." Seema Verma, *Lawmakers have a rare chance to transform Medicaid. They should take it*, Wash. Post, June 27, 2017, https://www.washingtonpost.com/opinions/lawmakers-have-a-rare-chance-to-transform-medicaid-they-should-take-it/2017/06/27/f8e5408a-5b49-11e7-9b7d-14576dc0f39d_story.html?utm_term=.11a4dfe727df.

102.    On November 7, 2017, at a speech before the National Association of Medicaid Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-age, non-disabled adults into" Medicaid "does not make sense," and announced that CMS would resist that change by approving state waivers that contain work requirements. Speech: Remarks by Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017 Fall Conference, CMS.Gov (Nov. 7, 2017), https://www.cms.gov/newsroom/fact-sheets/speech-remarks-administrator-seema-verma-national-association-medicaid-directors-namd-2017-fall.

103.    On November 10, 2017, Defendant Verma gave an interview in which she declared that one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied adults," declaring that Medicaid was "not designed for an able bodied person," and announcing that CMS is "trying" to "restructure the Medicaid program." Wall Street Journal, *The Future of: Health Care* (Nov. 10, 2017), http://www.wsj.com/video/the-future-of-health-care/D5B767E4-B2F2-4394-90BB-37935CCD410C.html.

104.    In or around early November 2017, CMS revised its website to invite states to submit Section 1115 waivers that would:

1.  Improve access to high-quality, person-centered services that produce positive health outcomes for individuals;

2.  Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the long term;

3.  Support coordinated strategies to address certain health determinants that promote upward mobility, greater independence, and improved quality of life among individuals;

4.  Strengthen beneficiary engagement in their personal healthcare plan, including incentive structures that promote responsible decision-making;

5.  Enhance alignment between Medicaid policies and commercial health insurance products to facilitate smoother beneficiary transition; and

6.  Advance innovative delivery system and payment models to strengthen provider network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html.

105.    On January 11, 2018, well after the federal comment period for the Arkansas Works Amendment had closed, Defendant CMS issued a letter to State Medicaid Directors ("Dear State Medicaid Director Letter"), attached as Exhibit 6, herteo, titled "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries."

106.   The nine-page document "announc[es] a new policy" that allows states to apply "work and community engagement" requirements to certain Medicaid recipients—specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability." Dear State Medicaid Director Letter at 1, https://www.medicaid.gov/federal-policy-guidance/downloads/smd18002.pdf.

107.   The Dear State Medicaid Director Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy." *Id.* at 3.

108.   The Dear State Medicaid Director Letter  outlines the "guidelines" for states to consider in submitting applications containing work requirements.

109.   The Dear State Medicaid Director Letter was not submitted for notice and public comment and was not published in the Federal Register.

110.   The same day CMS issued the Dear State Medicaid Director Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit organizations. The National Health Law Program ("NHeLP") noted that by announcing the policy change after the Arkansas Works comment period had closed, CMS had not given the public the ability to comment meaningfully on the pending Arkansas Amendment. NHeLP further noted that the Dear State Medicaid Director Letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments." Letter from Jane Perkins, Legal Director, Nat'l Health Law Program, to Brian Neale, Dir., Ctrs. For Medicare & Medicaid Servs. (Jan. 11, 2018),                    http://www.healthlaw.org/component/jsfsubmit/showAttachment ?tmpl=raw&id=00P0W00000ozROSUA2.

111.    NHeLP requested that CMS re-open public comment on the Arkansas Works project to allow the public a meaningful opportunity to comment. Defendants ignored this request.

112.    On or about January 18, 2018, CMS further emphasized that it disagrees with the legislative expansion of Medicaid under the ACA and that it had announced the "new policy guidance" to support state implementation of work requirements intended to target that expansion population. CMS, Community Engagement Initiative Frequently Asked Questions, https://www.medicaid.gov/medicaid/section-1115-demo/community-engagement/index.html (last visited August 13, 2018).

113.    When Defendant Verma announced approval of the Arkansas Works Amendment on March 5, 2018, she tied it to the Dear State Medicaid Director Letter, tweeting, "#ArkansasWorks is the 3rd community engagement demonstration we've approved since releasing guidance in January. @CMSgov has 9 pending applications with similar demonstration applications and several states have expressed interest in exploring these reforms. #TransformingMedicaid." Seema Verma, Administrator, Ctrs. for Medicare & Medicaid Servs. (@SeemaCMS),        Twitter        (Mar.        5,        2018,        9:45        AM), https://twitter.com/SeemaCMS/status/970716905379123205.

114.    In approving the Arkansas work and community engagement requirement, CMS cited the Dear State Medicaid Director Letter and imposed a number of terms and conditions on the State. Amendment Approval at Ex. 2 at 3-4. Several of those terms and conditions require that Arkansas follow requirements set out in the Dear State Medicaid Director Letter. *See*, *e.g.*, *id.* at 27 (exempting from work requirement enrollees with an acute medical condition that would prevent compliance); *id.* (exempting enrollees participating in substance use disorder treatment); id (exempting enrollees who are exempt from SNAP/TANF work requirements); *id.* at 20-21

(requiring reasonable modifications for enrollees with ADA-protected disabilities, including exemption from participation); *id.* at 32 (promising that Arkansas will assess areas with limited economies and/or educational activities or higher barriers to participation to determine whether further exemptions or modifications are needed to the work requirement).

115.    Each waiver approval including work requirements that has come after the Dear State Medicaid Director Letter—Kentucky, Arkanasas, Indiana, and New Hampshire—invokes the Dear State Medicaid Director Letter and reflects its requirements.

116.    In July 2018, Defendant Azar stated: "We are undeterred. We are proceeding forward… We're fully committed to work requirements and community participation in the Medicaid program… we will continue to litigate, we will continue to approve plans, we will continue to work with states. We are moving forward." Colby Itkowitz, *The Health 202: Trump administration 'undeterred' by court ruling against Medicaid work requirements,* Wash. Post, July 25, 2018, https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2018/07/27/the-health-202-trump-administration-undeterred-by-court-ruling-against-medicaid-work-requirements/5b5a10bb1b326b1e64695577/?utm_term=.7ba76e8a0719.

### G.    The Constitution's Take Care Clause

117.    The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id.* §§ 1, 8.

118.    After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3.

119.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

120.    The Take Care Clause limits the President's power and ensures that he will faithfully execute the laws that Congress has passed.

121.    Under the Constitution, the President lacks the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

122.    The Administrator of CMS has expressed the need to "fundamentally transform Medicaid."

123.    The power to "transform" a congressional program is a legislative power vested in Congress. An effort to "transform" a statute outside that legislative process is at odds with the President's constitutional duty to take care that the laws be faithfully executed.

124.    The Medicaid population targeted by the Arkansas Works Amendment is the so-called "expansion population," which Congress added to Medicaid in the Affordable Care Act. The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation. An effort to undermine the Affordable Care Act by undoing the extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

**H.      Effects of the Arkansas Works Amendment on the Plaintiffs**

125.    By approving the Arkansas Works Amendment, the Secretary has enabled the State to impose requirements and procedures that punish Plaintiffs by prohibiting them from obtaining and retaining Medicaid coverage.

126.    By approving the Arkansas Works Amendment, the Secretary has allowed the State to ignore ACA requirements to streamline Medicaid enrollment and continued program participation. Plaintiffs should be able to submit information to Arkansas online, in-person, by mail, or by telephone. However, under the Secretary's approval of the Arkansas Works Amendment, they are restricted to only online submission of work requirement and exemption documentation—a difficult, if not impossible task for Plaintiffs on a regular basis due to lack of internet access, trouble using computers, and problems working with the online portal. Instead of simplifying the Medicaid system for individuals, the Secretary's approval to disregard these ACA requirements for the primary purpose of making things simpler and cheaper for Arkansas, results in harm to those who rely on Arkansas Works for health coverage.

127.    By approving the Arkansas Works Amendment, the Secretary has permitted Arkansas to eliminate the three months of retroactive coverage required under the Medicaid Act and instead provide only one month of coverage prior to the month of application. If a Plaintiff loses coverage and then reapplies, the Plaintiff will not have retroactive coverage for health services received during the gap in coverage. Plaintiffs who lose coverage after three months of non-compliance with the work requirement and then re-enroll the following year will lose two months of retroactive coverage they would have otherwise had during the gap in coverage.

128.    Continuous and adequate health insurance coverage is fundamental for each Plaintiff's ability to stay as healthy as possible and to work.

129.    The Secretary's action approving the Arkansas Works Amendment will cause harm to Plaintiffs. Specifically:

130.    Plaintiff Charles Gresham is a 37-year-old man who lives with his fiancé in Harrison, Arkansas. Mr. Gresham's fiancé works at a fast food restaurant earning about $9 an hour with a gross income of about $1100 per month. She currently supports Mr. Gresham financially and is his source of transportation.

131.    Mr. Gresham has his GED and has largely worked in the food service industry. In 2015, he went to work as a labor hand with a local construction company but was let go after about a year because he began having seizures on the job. Mr. Gresham went back to the food service industry and other service jobs, but has lost those jobs due to issues related to his seizures, including missing work.

132.    Although Mr. Gresham would like to work, he is not working at this time because he has had trouble finding and keeping a job. Despite his health conditions, he can do some types of work but needs a flexible schedule because he may not be able to work all day and he needs times for doctors' appointments.

133.    Mr. Gresham has medical conditions that need to be monitored and treated. He has a seizure disorder, extreme social anxiety, and asthma. With Medicaid coverage through Arkansas Works, he has been able to the get the treatment and services he needs, including doctors and therapists.

134.    Mr. Gresham has been covered by Medicaid through Arkansas Works since 2015. When he has questions or needs help in renewing his coverage, Mr. Gresham has gone to the local Arkansas Department of Human Services office in Boone County. He is not comfortable with computers and generally requires help from other people when going online, especially to fill

something out or send in information. Mr. Gresham recently tried to navigate the Access Arkansas website and could not report his work activities online without assistance from his fiancé and Legal Aid of Arkansas. Up until recently, Medicaid coverage has been mostly easy for him to obtain, but the Arkansas Works notices and materials he has received in the past few months have been confusing and difficult to understand.

135.    In May 2018, Mr. Gresham received a notice that he would be subject to the work requirement for Arkansas Works. He was unable to meet the work requirement in June and July 2018 because he has been unable to find and maintain a job. He cannot meet the requirement through volunteering or searching for jobs consistently because he does not have his own transportation, is not comfortable with computers, and may not be able to do an activity as scheduled.

136.    Mr. Gresham received a letter from DHS stating he was exempt from the work requirements due to receiving unemployment benefits. He is no longer receiving unemployment benefits and has notified DHS that his situation has changed. Mr. Gresham does not currently have an exemption to the work requirement and does not expect his situation to change in the coming months such that he will be able to meet the requirements.

137.    Mr. Gresham has previously had gaps in health care coverage that caused him to go without the care he needed. In April 2018, he had a month-long gap that caused him to miss a therapist visit and three doctors' appointments. Although during that gap he had enough medications to get him through, if he were immediately cut off from his medications, his seizure disorder would be much worse and potentially harmful to him.

138.     The threat of losing his health coverage has increased Mr. Gresham's anxiety as he worries that without medical coverage his conditions will get worse and that he may suffer irreversible harm or die before he has an opportunity to figure out what is causing his seizures.

139.     Plaintiff Cesar Ardon is a 40-year-old man who lives in Siloam Springs, Arkansas.

140.     Mr. Ardon worked as a welder for fifteen years until he had a tumor surgery in May 2017. Currently, Mr. Ardon works in construction as a self-employed handyman doing mostly outdoor work. His income and hours fluctuate greatly from month to month.  He earned about $1,200 in July 2018 but typically earns less during other times of year.

141.     As a self-employed handyman, Mr. Ardon's work hours change from week to week based on the type of work he gets. Sometimes he is able to work 20 hours a week; other times, especially in the fall and winter when work is slower, he works less.

142.     Prior to receiving Medicaid in 2017, Mr. Ardon often did not get the medical care that he needed. For example, he did not get treatment for carpal tunnel, arthritis, and vision issues because he could not afford it.

143.     In 2017, Mr. Ardon had major surgery to remove a baseball-sized tumor on his side. He also currently has medical conditions that require monitoring, such as high cholesterol. With Medicaid, he is able to get the treatment and services he needs, as well as annual check-ups.

144.     In May 2018, Mr. Ardon received a notice stating he would have to work at least 80 hours a month to keep his Medicaid coverage. Mr. Ardon did not have enough hours to meet the work requirement in June 2018 and received a notice from DHS in July 2018 that he failed to comply with the work requirements for June.

145.     In July 2018, Mr. Ardon was able to work enough hours to meet the work requirement. Although he met the hours requirement, Mr. Ardon had trouble accessing the online

portal to report his hours. He has not received confirmation that his online report for July 2018's work activities was accepted.

146.    Mr. Ardon does not expect to always be able to get 80 hours of month of work, such that he will be able to meet the requirements. Mr. Ardon is concerned that he will lose his Medicaid coverage because he will not be able to meet the work requirements or because of problems reporting on the online portal. Mr. Ardon worries about getting sick, being unable to work, and losing access to health care if he loses his Medicaid coverage.

147.    Mr. Ardon fears what will happen because he cannot predict his future or health. He depends on Medicaid to help him get through the ups and downs of life, especially if he has trouble finding work.

148.    Plaintiff Marisol Ardon is a 44-year-old woman who lives in Siloam Springs, Arkansas with her adult daughter. She is separated from her husband, Mr. Ardon, but he rents a room with a separate entrance to her home.

149.    Ms. Ardon previously worked answering phones and connecting people to social service agencies and other community resources. In 2013, her job changed slightly and for the next four years she continued to do the same type of work but she did not have the same health care coverage. Ms. Ardon had a gap in health care coverage from about 2013 until 2015 when she started receiving health care coverage from Arkansas Works. During that gap, she paid for basic health care out of her pocket, such as when she had the flu, but she did not go to the doctor for an annual physical, get any blood work, or receive other services.

150.    Ms. Ardon has several medical conditions that need to be treated and monitored. She has a hernia in her stomach, thyroid problems, asthma, anxiety attacks, and chronic back pain.

Her back pain is associated with a 25-pound non-cancerous tumor in her midsection that she had removed in July 2017.

151.    Ms. Ardon uses her Medicaid coverage to get her four daily medications, regular doctor visits with her primary care doctor and specialists, and to get annual checkups.

152.    Ms. Ardon has not worked since about March 2017 because of her health issues at the time. She does not currently have income from work and relies on her adult daughter to pay rent and other household expenses.

153.    Ms. Ardon confirmed with DHS that she needs to meet the work requirement and is not exempt. She has not met the requirements in June and July of 2018, and she does not expect to meet the requirement in August.

154.    Ms. Ardon tried to create her account on the online portal, but had difficulty with the website. The portal rejected her attempts to create an account several times.  Ms. Ardon found the long letters from DHS confusing and does not fully understand the requirements and exemptions. She telephoned DHS for assistance and submitted a paper about not working because of her back, but she has not heard back from DHS.

155.    Ms. Ardon does not expect her situation to change and is worried about meeting the requirements either through work or an exemption. She needs her health care coverage to address her health issues. The uncertainty around her Medicaid coverage and the work requirements has increased her anxiety, including having more panic attacks per day because of her concerns about her health care coverage.

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (DEAR STATE MEDICAID DIRECTOR LETTER)

156.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D)

158. The approval of the Arkansas Works Amendment was explicitly based in substantial part on the policy announced in the Dear State Medicaid Director Letter. Amendment Approval at Ex. 2 at 2.

159. The Dear State Medicaid Director Letter was required to be, but was not, issued through notice and comment rulemaking. *See* 5 U.S.C. § 553.

160. In issuing the Dear State Medicaid Director Letter, the Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

161. Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

162. In the Dear State Medicaid Director Letter, the Defendants relied on factors that Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

163. The Defendants' issuance of the Dear State Medicaid Director Letter exceeded the Secretary's Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (ARKANSAS WORKS AMENDMENT APPROVAL)

164. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

165.   The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

166.   The Secretary's decision to approve the Arkansas Works Amendment as described herein exceeded his authority under 42 U.S.C. § 1315, otherwise violated the Medicaid Act, was arbitrary and capricious and an abuse of discretion, and ran counter to the evidence in the record.

167.   Plaintiffs will suffer irreparable injury if the Secretary's actions approving the Arkansas Works Amendment are not declared unlawful because those actions have harmed and will continue to harm Plaintiffs.

168.   Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## COUNT THREE: VIOLATION OF THE TAKE CARE CLAUSE,<br>ARTICLE II, SECTION 3, CLAUSE 5

169.   Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.   Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

171.   The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id.* §§ 1, 8.

172.     The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

173.     Accordingly, the Defendants' actions are in violation of the Take Care Clause and are ultra vires.

174.     Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Orders are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

175.     Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.     Declare that Defendants' issuance of the Dear State Medicaid Director Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

2.     Declare that Defendants' approval of the Arkansas Works Amendment violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.     Preliminarily and permanently enjoin Defendants from implementing the practices purportedly authorized by the January 11, 2018 Dear State Medicaid Director Letter and the Arkansas Works Amendment.

4.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

5.     Grant such other and further relief as may be just and proper.

August 14, 2018

Respectfully submitted,

By: /s/ Jane Perkins
Jane Perkins
Elizabeth Edwards
Catherine McKee
National Health Law Program
200 N. Greensboro Street, Suite D-13
Carrboro, NC 27510
Phone: 919-968-6308 (x101)
perkins@healthlaw.org
mckee@healhtlaw.org
edwards@healthlaw.org

/s/ Kevin De Liban
Kevin De Liban
Trevor Hawkins
Legal Aid of Arkansas
310 Mid-Continent Plaza, Suite 420
West Memphis, AR 72301
Phone: 870-732-6370 (x2206)
kdeliban@arlegalaid.org
thawkins@arlegalaid.org

/s/ Samuel Brooke
Samuel Brooke
Neil K. Sawhney
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Phone: 334-956-8200
samuel.brooke@splcenter.org
neil.sawhney@splcenter.org

*Counsel for Plaintiffs*