

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

MAR - 5 2018                    *Administrator*
Washington, DC 20201

Cindy Gillespie
Director
Arkansas Department of Human Services
700 Main Street
Little Rock, Arkansas 72201

Dear Ms. Gillespie:

The Centers for Medicare & Medicaid Services (CMS) is approving Arkansas's request for an amendment to its section 1115 demonstration project, entitled "Arkansas Works" (Project Number 11-W-00287/6) in accordance with section 1115(a) of the Social Security Act (the Act).

This approval is effective March 5, 2018, through December 31, 2021, upon which date, unless extended or otherwise amended, all authorities granted to operate this demonstration will expire. CMS's approval is subject to the limitations specified in the attached expenditure authorities, waivers, and special terms and conditions (STCs). The state will begin implementation of the community engagement requirement no sooner than June 1, 2018. The state may deviate from Medicaid state plan requirements only to the extent those requirements have been listed as waived or as not applicable to expenditures.

**Extent and Scope of Demonstration**

The current Arkansas Works section 1115 demonstration project was implemented by the State of Arkansas ("state") in December 2016. The Arkansas Works program provides certain adult Medicaid beneficiaries with premium assistance to purchase qualified health plan (QHP) coverage through the Health Insurance Marketplace. As originally approved, Arkansas Works was designed to leverage the efficiencies and experience of the commercial market to test whether this premium assistance mode improves continuity, access, and quality for Arkansas Works beneficiaries and results in lowering the growth rate of premiums across population groups. The demonstration project also attempts to facilitate transitions between and among Arkansas Works, ESI, and the Marketplace for Arkansas Works enrollees. Approval of this demonstration amendment allows Arkansas, no sooner than June 1, 2018, to require all Arkansas Works beneficiaries ages 19 through 49, with certain exceptions, to participate in and timely document and report 80 hours per month of community engagement activities, such as employment, education, job skills training, or community service, as a condition of continued Medicaid eligibility. Community engagement requirements will not apply to Arkansas Works beneficiaries ages 50 and older so as to ensure alignment and consistency with the state's Supplemental Nutrition Assistance Program (SNAP) requirements. The alignment is appropriate and consistent with the ultimate objective of improving health and well-being for Medicaid beneficiaries.

Page 2 – Ms. Cindy Gillespie

CMS also is authorizing authorities for additional features, including:

- Removing the requirement to have an approved-hospital presumptive-eligibility state plan amendment (SPA) as a condition of enacting the state's waiver of retroactive eligibility;
- Clarifying the waiver of the requirement to provide new adult group beneficiaries[1] with retroactive eligibility to reflect the state's intent to not provide retroactive eligibility but for the 30 days prior to the date of application coverage; and
- Removing the waiver and expenditure authorities related to the state's mandatory employer-sponsored insurance (ESI) premium assistance program, as the state no longer intends to continue this program.

Under the new community engagement program, the state will test whether coupling the requirement for certain beneficiaries to engage in and report work or other community engagement activities with meaningful incentives to encourage compliance will lead to improved health outcomes and greater independence. CMS is approving the community engagement program based on our determination that it is likely to assist in promoting the objectives of the Medicaid program. The terms and conditions of Arkansas's community engagement requirement that accompany this approval are consistent with the guidance provided to states through State Medicaid Director's Letter (SMD 18-0002), Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries, issued on January 11, 2018. CMS is not at this time approving Arkansas's request to reduce income eligibility for Arkansas Works beneficiaries to 100 percent of the federal poverty level (FPL).

## Determination that the demonstration project is likely to assist in promoting Medicaid's Objectives

Demonstration projects under section 1115 of the Act offer a way to give states more freedom to test and evaluate innovative solutions to improve quality, accessibility and health outcomes in a budget-neutral manner, provided that, in the judgment of the Secretary, the demonstrations are likely to assist in promoting the objectives of Medicaid.

While CMS believes that states are in the best position to design solutions that address the unique needs of their Medicaid-eligible populations, the agency has an obligation to ensure that proposed demonstration programs are likely to better enable states to serve their low-income populations, through measures designed to improve health and wellness, including measures to help individuals and families attain or retain capability for independence or self-care. Medicaid programs are complex and shaped by a diverse set of interconnected policies and components, including eligibility standards, benefit designs, reimbursement and payment policies, information technology (IT) systems, and more. Therefore, in making this determination, CMS considers the proposed demonstration as a whole.

---

[1] This group includes adults up to and including 133 percent of the FPL who meet the other criteria specified in Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act.

Page 3 – Ms. Cindy Gillespie

In its consideration of the proposed changes to Arkansas Works, CMS examined whether the demonstration as amended was likely to assist in improving health outcomes; whether it would address behavioral and social factors that influence health outcomes; and whether it would incentivize beneficiaries to engage in their own health care and achieve better health outcomes. CMS has determined that the Arkansas Works demonstration as amended is likely to promote Medicaid objectives, and that the waivers sought are necessary and appropriate to carry out the demonstration.

1. **The demonstration is likely to assist in improving health outcomes through strategies that promote community engagement and address certain health determinants.**

Arkansas Works supports coordinated strategies to address certain health determinants, as well as promote health and wellness through increased upward mobility, greater independence, and improved quality of life. Specifically, Arkansas Works' community engagement requirement is designed to encourage beneficiaries to obtain and maintain employment or undertake other community engagement activities that research has shown to be correlated with improved health and wellness.[2,3]  As noted in CMS' SMDL: 18-0002, these activities have been positively correlated with improvements in individuals' health.  CMS has long supported policies that recognize meaningful work as essential to the economic self-sufficiency, self-esteem, well-being, and improved health of people with disabilities.

Given the potential benefits of work and community engagement, we believe that state Medicaid programs should be able to design and test incentives for beneficiary compliance. Under Arkansas's demonstration, the state will encourage compliance by making it a condition of continued coverage. Beneficiaries that successfully report compliance on a monthly basis will have no disruption in coverage.  It is only when a beneficiary fails to report compliance for 3 months that the state will dis-enroll the beneficiary for the remainder of the calendar year. Beneficiaries that are disenrolled from their plan will be able to re-enroll through Arkansas Works upon the earlier of turning age 50, qualifying for another category of Medicaid eligibility, or the beginning of a new calendar year.

Arkansas' approach is informed by the state's experience with the voluntary work-referral program in its current demonstration, which the state has not found to be an effective incentive. Since January 2017, certain individuals enrolled in Arkansas Medicaid have been referred to the Arkansas Department of Workforce Services (DWS), which provides a variety of services to assist individuals in gaining employment. Through October 2017, only 4.7 percent of beneficiaries followed through with the referral and accessed DWS services. Of those who accessed DWS services, 23 percent have become employed.  This result suggests that referrals alone, without any further incentive, may not be be sufficient to encourage the Arkansas Works

---

[2] Waddell, G. and Burton, AK. Is Work Good For Your Health And Well-Being? (2006) EurErg Centre for Health and Social Care Research, University of Huddersfield, UK

[3] Van der Noordt, M, Jzelenberg, H, Droomers, M, and Proper,K. Health effects of employment: a systemic review of prospective studies. BMJournals. Occupational and Environmental Medicine. 2014: 71 (10).

Page 4 – Ms. Cindy Gillespie

population to participate in community engagement activities. CMS will therefore allow Arkansas to test whether the stronger incentive model is more effective in encouraging participation.

Arkansas has tailored the incentive structure to include beneficiary protections, such as an opportunity to maintain coverage for beneficiaries who report that they failed to meet the community engagement hours due to circumstances that give rise to a good cause exemption, as well as the opportunity to apply and reenroll in Arkansas Works in the beginning of the next plan year. Additionally, if Arkansas determines that a beneficiary's failure to comply or report compliance was the result of a catastrophic event or circumstances beyond the beneficiary's control, the beneficiary will receive retroactive coverage to the date coverage ended without need for a new application. The impact of this incentive, as well as other aspects of the demonstration, will be assessed through an evaluation designed to measure how the demonstration affects eligibility, and health outcomes over time for persons subject to the demonstration's policies.

## 2. The demonstration is expected to strengthen beneficiary engagement in their personal health care.

CMS believes that it is important for beneficiaries to engage in their personal health care, particularly while they are healthy to prevent illness. Accordingly, CMS supports state testing of policies designed to incentivize beneficiaries to obtain and maintain health coverage before they become sick so they can take an active role in engaging in their personal health care while healthy. Consistent with CMS's commitment to support states in their efforts to align Medicaid and private insurance policies for non-disabled adults to help them prepare for private coverage (stated in the letter to governors on March 14, 2017), this amendment removes the requirement that Arkansas provide hospitals with an opportunity to conduct presumptive eligibility (consistent with Section 1902(a)(47)(B)) as a condition of its waiver of retroactive eligibility. It further clarifies the waiver of the requirement to provide new adult group beneficiaries with retroactive eligibility but for the 30 days prior to the date of application coverage. With respect to the waiver of retroactive eligibility, through this approval, we are testing whether eliminating 2 of the 3 months of retroactive coverage will encourage beneficiaries to obtain and maintain health coverage, even when they are healthy. This feature of the amendment is intended to increase continuity of care by reducing gaps in coverage when beneficiaries churn on and off of Medicaid or sign up for Medicaid only when sick with the ultimate objective of improving beneficiary health.

## Consideration of Public Comments

Both Arkansas and CMS received comments during the state and federal public comment periods. Consistent with federal transparency requirements, CMS reviewed all of the materials submitted by the state, as well as all the public comments it received, when evaluating whether the demonstration project as a whole was likely to assist in promoting the objectives of the Medicaid program, and whether the waiver authorities sought were necessary and appropriate to implement the demonstration. In addition, CMS took public comments submitted during the federal comment period into account as it worked with Arkansas to develop the STCs that

Page 5 – Ms. Cindy Gillespie

accompany this approval that will bolster beneficiary protections, including specific state assurances around these protections to further support beneficiaries.

Opposing commenters expressed general disagreement with efforts to modify Arkansas Works. Some offered more specific feedback regarding individual elements of the demonstration or the impact of certain provisions on distinct populations. Some commenters expressed the desire to see greater detail regarding how the program would be operationalized, particularly with respect to provisions like the community engagement requirements. Other comments expressed concerns that these requirements would be burdensome on families or create barriers to coverage. The state has pledged to do beneficiary outreach and education on how to comply with the new community engagement requirements, and intends to use an online reporting system to make reporting easy for enrollees. Further, CMS intends to monitor state-reported data on how the new requirements are impacting enrollment.

Many commenters indicated that many beneficiaries not qualifying for Medicaid on the basis of disability may still have issues gaining and maintaining employment due to their medical or behavioral health conditions. To mitigate these concerns, Arkansas assures that it will provide these beneficiaries reasonable modifications, which could include the reduction of or exemption from community engagement hours. This is a condition of approval, as provided in the STCs.

Some commenters expressed concern that Arkansas's proposal "lacked sufficient detail to permit informed public comments." To ensure meaningful public input at the Federal level, and to facilitate the demonstration application process for States, CMS utilizes standardized demonstration application requirements so that the public, including those with disabilities, and CMS can meaningfully assess states' applications. Upon receipt of Arkansas' proposal, CMS followed its standard protocols for evaluating the completeness of the application and determined that Arkansas application was complete. We continue to believe that Arkansas submitted sufficient detail to permit meaningful public input.

Many commenters who opposed the community engagement requirement emphasized that the community engagement requirements would be burdensome for individuals and families or create barriers to coverage for non-exempt people who might have trouble accessing care. We believe that the community engagement requirements create appropriate incentives for beneficiaries to gain employment. Given that employment is positively correlated with health outcomes, it furthers the purposes of the Medicaid statute to test and evaluate these requirements as a means to improve beneficiaries' health and to promote beneficiary independence. However, CMS has included provisions in these STCs to ensure that CMS may withdraw waivers or expenditure authorities at any time if federal monitoring of data indicates that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of Title XIX and Title XXI, including if data indicates that the community engagement features of this demonstration may not adequately incentivize beneficiary participation or are unlikely to result in improved health outcomes, or that other demonstration features are not operating as intended. In efforts to support beneficiaries, CMS will require Arkansas to provide written notices to beneficiaries that include information such as how to ensure that they are in compliance with the community engagement requirements, how to appeal an eligibility denial, and how to access primary and preventive care during the non-eligibility

Page 6 – Ms. Cindy Gillespie

period.  The state will also implement an outreach strategy to inform beneficiaries how to report compliance with the community engagement requirements.

Additional comments characterized the provisions to terminate coverage for failure to participate in the community engagement process as "causing disruptions in care."  CMS and Arkansas acknowledged these concerns and Arkansas will be exempting from the requirement those individuals who are medically frail, as well as those whom a medical professional has determined are unable to work due to illness or injury.  The state will implement an outreach strategy to inform beneficiaries about how to report compliance with the community engagement requirements.  In addition, monthly notices will provide information on resources available to beneficiaries who may require assistance reporting community engagement activities.

Several commenters expressed concern about the potential 9-month length of the non-eligibility period.  This would only occur where (i) an individual fails to fulfill his or her community engagement obligations in the first month of a calendar year and then after receiving a notice from the State in the second month, fails to respond to that notice by rectifying the situation or seeking an exemption,  (ii)  the same individual fails to  fulfill his or her community engagement obligations in the second month of a calendar year and then after receiving a notice from the State in the third month, fails to respond to that notice by rectifying the situation or seeking an exemption, and (iii)  the same individual fails to  fulfill his or her community engagement obligations in the third month of a calendar year and then after receiving a notice from the State in the fourth month, fails to respond to that notice by rectifying the situation or seeking an exemption.  The program provides the individual with three opportunities to rectify the situation or seek an exemption.  Any system that requires individuals to fulfill certain requirements as a condition of receiving benefits necessarily places some degree of responsibility on these individuals.   We believe that the overall health benefits to the effected population through community engagement outweigh the health-risks with respect to those who  fail to respond and who fail to seek exemption from the programs limited requirements.

Some comments pointed out that the maximum non-eligibility period is longer than what has been proposed in other state demonstration applications, and does not offer any way to regain eligibility during the non-eligibility period.  CMS acknowledges this and Arkansas will be required to monitor and report to CMS certain metrics on compliance rates and health outcomes.  CMS will closely monitor this data, and retains the right to suspend, amend or terminate the demonstration if the agency determines that it is not meeting its stated objectives.

Other commenters expressed concern about Arkansas' current eligibility and application operations and their impact on beneficiaries who may reapply for eligibility after serving their disenrollment period for non-compliance with community engagement. To help mitigate these concerns, CMS has added additional assurances to the STCs and Arkansas will submit for CMS approval an eligibility and enrollment monitoring plan within 90 calendar days after approval of the community engagement amendment of this demonstration which will allow CMS to track Arkansas' compliance with the assurances described in the STCs, including several related to eligibility and application processing systems.  The state may not take adverse action on a beneficiary for failing to complete community engagement requirements until CMS has reviewed the application processing monitoring plan for completeness and determined that the

Page 7 – Ms. Cindy Gillespie

state has addressed all of the required elements in a reasonable manner.  As part of this requirement, CMS will require that Arkansas provide status updates on the implementation of the eligibility and enrollment monitoring plan in the state's quarterly reports.

Finally, many comments expressed concern over the waiver of retroactive eligibility, citing disruptions in care for beneficiaries and potential financial burdens for both providers and beneficiaries.  Arkansas had previously received approval for a conditional waiver of retroactive coverage conditioned upon the state coming into compliance with statutory and regulatory requirements related to eligibility determinations.  CMS has determined the state has met these requirements.  CMS believes that a more limited period of retroactive eligibility will encourage beneficiaries to obtain and maintain health coverage, even when they are healthy.  As such, with this amendment we are testing whether this limited retroactive eligibility period supports increased continuity of care by reducing gaps in coverage when beneficiaries churn on and off Medicaid or sign up for Medicaid only when sick and whether this feature will improve health outcomes.

**Other Information**

CMS's approval of this demonstration is conditioned upon compliance with the enclosed list of waiver and expenditure authorities and the STCs defining the nature, character and extent of anticipated federal involvement in the project.  The award is subject to our receiving your written acknowledgement of the award and acceptance of these STCs within 30 days of the date of this letter.

Your project officer for this demonstration is Ms. Tia Witherspoon.  She is available to answer any questions concerning your section 1115 demonstration.  Ms. Witherspoon's contact information is as follows:

> Centers for Medicare & Medicaid Services
> Center for Medicaid and CHIP Services
> Mail Stop: S2-03-17
> 7500 Security Boulevard
> Baltimore, MD 21244-1850
> Email: Tia. Witherspoon@cms.hhs.gov

Official communications regarding program matters should be sent simultaneously to Ms. Witherspoon and Mr. Bill Brooks, Associate Regional Administrator, in our Dallas Regional Office.  Mr. Brooks' contact information is as follows:

> Mr. Bill Brooks
> Associate Regional Administrator
> Centers for Medicare & Medicaid Services
> Division of Medicaid and Children's Health Operations
> 1301 Young Street, Suite 833
> Dallas, TX 75202

Page 8 – Ms. Cindy Gillespie

If you have questions regarding this approval, please contact Ms. Judith Cash, Acting Director, State Demonstrations Group, Center for Medicaid and CHIP Services, at (410) 786-9686.

Thank you for all your work with us, as well as stakeholders in Arkansas, over the past months to reach approval.

Sincerely,



Seema Verma

Enclosures

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**
**EXPENDITURE AUTHORITY**

**NUMBER:**           **11-W-00287/6**

**TITLE:**              **Arkansas Works Section 1115 Demonstration**

**AWARDEE:**         **Arkansas Department of Human Services**

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made by the state for the items identified below, which are not otherwise included as expenditure under section 1903 shall, for the period of this demonstration be regarded as expenditures under the state's Title XIX plan but are further limited by the special terms and conditions (STCs) for the Arkansas Works Section 1115 demonstration.

As discussed in the Centers for Medicare & Medicaid Services' (CMS) approval letter, the Secretary of Health and Human Services has determined that the Arkansas Works section 1115 demonstration, including the granting of the waiver and expenditure authorities described below, is likely to assist in promoting the objectives of title XIX of the Social Security Act.
The following expenditure authorities shall enable Arkansas to implement the Arkansas Works section 1115 demonstration:

1. **Premium Assistance and Cost Sharing Reduction Payments.** Expenditures for part or all of the cost of private insurance premiums in the individual market, and for payments to reduce cost sharing under such coverage for certain beneficiaries as described in these STCs.

2. **Community Engagement Reporting.**  Expenditures to the extent necessary to enable Arkansas to allow a beneficiary to report monthly their community engagement qualifying activities or exemptions using only an online portal as described in these STCs, in a manner inconsistent with requirements under section 1943 of the Act as implemented in 42 CFR 435.907(a).

**Requirements Not Applicable to the Expenditure Authority:**

1.   **Cost Effectiveness**                                              **Section 1902(a)(4) and**
                                                                          **42 CFR 435.1015(a)(4)**

   To the extent necessary to permit the state to offer, with respect to beneficiaries  through qualified health plans, premium assistance and cost sharing reduction payments that are determined to be cost effective using state developed tests of cost effectiveness that differ from otherwise permissible tests for cost effectiveness as described in these STCs.

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**WAIVER LIST**

**NUMBER:**          **11-W-00287/6**

**TITLE:**          **Arkansas Works Section 1115 Demonstration**

**AWARDEE:**          **Arkansas Department of Human Services**

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in accompanying expenditure authorities, shall apply to the demonstration project effective March 5, 2018 through December 31, 2021. In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of state plan requirements contained in section 1902 of the Act are granted for the Arkansas Works Section 1115 demonstration, subject to the STCs.

**1.     Freedom of Choice**                                    **Section 1902(a)(23)(A)**

To the extent necessary to enable Arkansas to limit beneficiaries' freedom of choice among providers to the providers participating in the network of the beneficiary's Qualified Health Plan. No waiver of freedom of choice is authorized for family planning providers.

**2.     Payment to Providers**                      **Section 1902(a)(13) and Section 1902(a)(30)**

To the extent necessary to permit Arkansas to provide for payment to providers equal to the market-based rates determined by the Qualified Health Plan.

**3.     Prior Authorization**                           **Section 1902(a)(54) insofar as it incorporates Section 1927(d)(5)**

To permit Arkansas to require that requests for prior authorization for drugs be addressed within 72 hours, and for expedited review in exigent circumstances within 24 hours, rather than 24 hours for all circumstances as is currently required in their state policy. A 72- hour supply of the requested medication will be provided in the event of an emergency.

**4.     Premiums**                                    **Section 1902(a)(14) insofar as it incorporates Sections 1916 and 1916A**

To the extent necessary to enable Arkansas to collect monthly premium payments, for beneficiaries with incomes above 100 up to and including 133 percent of the federal poverty level (FPL) as described in these STCs.

                                                        **Page 2 of 48**

**5.  Comparability**                                            **Section 1902(a)(10)(B)**

To the extent necessary to enable the state to impose targeted cost sharing on beneficiaries as described in these STCs.

**6.  Retroactive Eligibility**                                 **Section 1902(a)(34)**

To enable the state to not provide beneficiaries in table 1 retroactive eligibility but for 30 days prior to the date of the application for coverage under the demonstration.

**7.  Provision of Medical Assistance**             **Section 1902(a)(8) and Sections 1902(a)(10)**

To the extent necessary to enable Arkansas to terminate eligibility for, and not make medical assistance available to, Arkansas Works beneficiaries who fail to comply with community engagement requirements, as described in these STCs, unless the beneficiary is exempted as described in these STCs.

**8.  Eligibility**                                             **Section 1902(a)(10)**

To the extent necessary to enable Arkansas to require community engagement as a condition of eligibility as described in these STCs.

To the extent necessary to enable Arkansas to prohibit re-enrollment and deny eligibility, for up to nine months for Arkansas Works program beneficiaries who are disenrolled for failure to timely report community engagement qualifying activities and exemptions for three months, subject to qualifying catastrophic events described in these STCs.

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**
**SPECIAL TERMS AND CONDITIONS**

**NUMBER:**         **11-W-00287/6**

**TITLE:**            **Arkansas Works**

**AWARDEE:**      **Arkansas Department of Human Services**

## I.      PREFACE

The following are the amended Special Terms and Conditions (STCs) for the Arkansas Works section 1115(a) Medicaid demonstration (hereinafter demonstration) to enable the Arkansas Department of Human Services (state) to operate this demonstration. The Centers for Medicare & Medicaid Services (CMS) has granted waivers of requirements under section 1902(a) of the Social Security Act (Act), and expenditure authorities authorizing federal matching of demonstration costs that are not otherwise matchable, and which are separately enumerated. These STCs set forth in detail the nature, character, and extent of federal involvement in the demonstration and the state's obligations to CMS during the life of the demonstration. Enrollment into the demonstration is statewide and is approved through December 31, 2021. The STCs have been arranged into the following subject areas:

I.      Preface
II.     Program Description and Objectives
III.    General Program Requirements
IV.     Populations Affected
V.      Arkansas Works Program Population Affected
VI.     Premium Assistance Delivery System
VII.    Benefits
VIII.   Premiums & Cost Sharing
IX.     Appeals
X.      Community Engagement Requirements
XI.     General Reporting Requirements
XII.    General Financial Requirements
XIII.   Monitoring Budget Neutrality
XIV.    Evaluation
XV.     Monitoring
Attachments

## II.      PROGRAM DESCRIPTION AND OBJECTIVES

Under the Arkansas Works demonstration, the state has been providing premium assistance to support the purchase by beneficiaries eligible under the new adult group under the state plan of coverage from qualified health plans (QHPs) offered in the individual market through the Marketplace. Enrollment activities for the new adult population began on October 1, 2013 for QHPs with eligibility effective January 1, 2014. Beginning in 2014, individuals eligible for

coverage under the new adult group are described at Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act and are further specified in the state plan (collectively Arkansas Works beneficiaries). Arkansas Works beneficiaries receive a state plan Alternative Benefit Plan ("ABP").

Effective January 1, 2017, Arkansas Works beneficiaries with incomes above 100 percent of the FPL are charged monthly premium payments.  The state will test innovative approaches to promoting community engagement and work, encouraging movement up the economic ladder, and facilitating transitions between and among Arkansas Works, employer sponsored insurance (ESI), and the Marketplace for Arkansas Works beneficiaries. The state will institute community engagement requirements as a condition of Arkansas Works eligibility. Once community engagement requirements are fully implemented, including that beneficiaries have been adequately notified of the requirements, the state will implement an outreach strategy to inform beneficiaries about how to report compliance with the community engagement requirements.  In addition, monthly notices will provide information on resources available to beneficiaries who may require assistance reporting community engagement activities. Arkansas will also provide reasonable accommodations for beneficiaries who request assistance due to barriers to accessing the online portal for reporting.  Arkansas Works beneficiaries who are ages 19-49 must work or engage in specified educational, job training, or job search activities for at least 80 hours per month to remain covered through Arkansas Works, unless they meet exemption criteria established by the state. Arkansas Works beneficiaries who fail to meet the community engagement requirements or reporting requirements for any three months during a plan year will be disenrolled from Arkansas Works and will not be permitted to re-enroll until the following plan year. After the beneficiary receives notification of disenrollment for either noncompliance with community engagement requirements or for failure to report, eligible beneficiaries may request a good cause exemption as described in these STCs. If Arkansas determines the beneficiary's failure to comply or report compliance was the result of a catastrophic event or circumstances beyond the beneficiary's control, the beneficiary will receive retroactive coverage to the date coverage ended without need for a new application. Arkansas will act on the request for good cause exemption and, if approved, restore the beneficiary's coverage within 5 business days of receiving the request.

Finally, the state will eliminate its ESI premium assistance program under the demonstration. All Arkansas Works beneficiaries who were enrolled in ESI premium assistance and who remain eligible for Arkansas Works will transition to QHP coverage.

Over the demonstration period, the state seeks to demonstrate several demonstration goals. The state's goals will inform the state's evaluation design hypotheses, subject to CMS approval, as described in these STCs. The state's goals include, and are not limited to the following:

- Providing continuity of coverage for individuals,
- Improving access to providers,
- Improving continuity of care across the continuum of coverage,
- Requiring beneficiaries to pay a monthly premium to promote more efficient use of health care services,

- Improving health outcomes and promoting independence through employment and community engagement, and
- Furthering quality improvement and delivery system reform initiatives that are successful across population groups.

Arkansas proposes that the demonstration will provide integrated coverage for low-income Arkansans, leveraging the efficiencies and experience of the private market to improve continuity, access, and quality for Arkansas Works beneficiaries that should ultimately result in lowering the rate of growth in premiums across population groups. The state proposes that the demonstration will also drive structural health care system reform and more competitive premium pricing for all individuals purchasing coverage through the Marketplace by at least doubling the size of the population enrolling in QHPs offered through the Marketplace. The state proposes to demonstrate the following key features:

***Continuity of coverage and care -*** The demonstration will allow qualifying households to stay enrolled in the same plan regardless of whether their coverage is subsidized through Medicaid, or Advanced Premium Tax Credits/Cost Sharing Reductions (APTC/CSRs).

***Support equalization of provider reimbursement and improve provider access -*** The demonstration will support equalization of provider reimbursement across payers, toward the end of expanding provider access and eliminating the need for providers to cross-subsidize. Arkansas Medicaid provides rates of reimbursement lower than Medicare or commercial payers, causing some providers to forego participation in the program and others to "cross subsidize" their Medicaid patients by charging more to private insurers.

***Integration, efficiency, quality improvement and delivery system reform -*** Arkansas is proposing taking an integrated and market-based approach to covering uninsured Arkansans. It is anticipated that QHPs will bring the experience of successful private sector models that can improve access to high quality services and lead delivery system reform. One of the benefits of this demonstration should be to gain a better understanding of how the private sector uses incentives to engage individuals in healthy behaviors.

***Promoting community engagement and personal responsibility-*** By testing innovative approaches to promoting community engagement as a condition of eligibility, the demonstration aims to incentivize employment.

## III.    GENERAL PROGRAM REQUIREMENTS

1.    **Compliance with Federal Non-Discrimination Statutes.** The state must comply with all applicable federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2.    **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP, expressed

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), apply to the demonstration.

3.    **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The state must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in federal law, regulation, or policy affecting the Medicaid or CHIP program that occur during this demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable. In addition, CMS reserves the right to amend the STCs to reflect such changes and/or changes without requiring the state to submit an amendment to the demonstration under STC 7. CMS will notify the state 30 days in advance of the expected approval date of the amended STCs to provide the state with additional notice of the changes.

4.    **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy.**

   a.    To the extent that a change in federal law, regulation, or policy requires either a reduction or an increase in federal financial participation (FFP) for expenditures made under this demonstration, the state must adopt, subject to CMS approval, a modified budget neutrality agreement as well as a modified allotment neutrality worksheet for the demonstration as necessary to comply with such change. The modified budget neutrality agreement will be effective upon the implementation of the change.

   b.    If mandated changes in the federal law require state legislation, the changes must take effect on the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5.    **State Plan Amendments.** If the eligibility of a population eligible through the Medicaid or CHIP state plan is affected by a change to the demonstration, a conforming amendment to the appropriate state plan may be required, except as otherwise noted in these STCs. In all such instances the Medicaid state plan governs.

   Should the state amend the state plan to make any changes to eligibility for this population, upon submission of the state plan amendment, the state must notify CMS demonstration staff in writing of the pending state plan amendment, and request a corresponding technical correction to the demonstration.

6.    **Changes Subject to the Amendment Process.** If not otherwise specified in these STCs, changes related to demonstration features including eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary in accordance with section 1115 of the Act. The state must not implement changes to these elements without prior approval by CMS either through an approved amendment to the Medicaid state plan and/or amendment to

the demonstration. Amendments to the demonstration are not retroactive and FFP will not be available for changes to the demonstration that have not been approved through the amendment process set forth in STC 7 below.

7.  **Amendment Process.** Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change and may not be implemented until approved. CMS reserves the right to deny or delay approval of a demonstration amendment based on non-compliance with these STCs, including but not limited to failure by the state to submit required reports and other deliverables in a timely fashion according to the deadlines specified herein. Amendment requests must include, but are not limited to, the following:

   a.  An explanation of the public process used by the state, consistent with the requirements of STC 15, prior to submission of the requested amendment;

   b.  A data analysis worksheet which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality agreement. Such analysis shall include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment, which isolates (by Eligibility Group) the impact of the amendment;

   c.  An up-to-date CHIP allotment neutrality worksheet, if necessary;

   d.  A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation; and

   e.  A description of how the evaluation design will be modified to incorporate the amendment provisions.

8.  **Extension of the Demonstration.** States that intend to request demonstration extensions under sections 1115(e) or 1115(f) are advised to observe the timelines contained in those statutes. Otherwise, no later than 12 months prior to the expiration date of the demonstration, the governor or chief executive officer of the state must submit to CMS either a demonstration extension request that meets federal requirements at 42 CFR 431.412(c)   or a transition and phase-out plan consistent with the requirements of STC 9.

   a.  Compliance with Transparency Requirements at 42 CFR Section 431.412.

   b.  As part of the demonstration extension requests the state must provide documentation of compliance with the transparency requirements 42 CFR Section 431.412 and the public notice and tribal consultation requirements outlined in STC 15.

9.    **Demonstration Phase Out.** The state may only suspend or terminate this demonstration in whole, or in part, consistent with the following requirements.

a.    **Notification of Suspension or Termination.** The state must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a transition and phase-out plan. The state must submit its notification letter and a draft plan to CMS no less than six (6) months before the effective date of the demonstration's suspension or termination. Prior to submitting the draft plan to CMS, the state must publish on its website the draft transition and phase-out plan for a 30-day public comment period. In addition, the state must conduct tribal consultation in accordance with its approved tribal consultation state plan Amendment, if applicable. Once the 30-day public comment period has ended, the state must provide a summary of each public comment received, the state's response to the comment and how the state incorporated the received comment into the revised plan.

b.    **Prior CMS Approval**. The state must obtain CMS approval of the transition and phase-out plan prior to the implementation of the phase-out activities. Implementation of activities must be no sooner than 14 calendar days after CMS approval of the plan.

c.    **Transition and Phase-out Plan Requirements**. The state must include, at a minimum, in its plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the state will conduct administrative reviews of Medicaid eligibility prior to the termination of the program for the affected beneficiaries, and ensure ongoing coverage for those beneficiaries determined eligible, as well as any community outreach activities including community resources that are available.

d.    **Phase-out Procedures.** The state must comply with all notice requirements found in 42 CFR Sections 431.206, 431.210, and 431.213. In addition, the state must assure all appeal and hearing rights afforded to demonstration participants as outlined in 42 CFR Sections 431.220 and 431.221. If a demonstration participant is entitled to requests a hearing before the date of action, the state must maintain benefits as required in 42 CFR Section 431.230. In addition, the state must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category. 42 CFR Section 435.916.

e.    **Exemption from Public Notice Procedures 42 CFR Section 431.416(g).** CMS may expedite the federal and state public notice requirements in the event it determines that the objectives of title XIX and XXI would be served or under circumstances described in 42 CFR Section 431.416(g).

     f.     **Federal Financial Participation (FFP).** If the demonstration is terminated or any relevant waivers suspended by the state, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services, continued benefits as a result of participant's appeals and administrative costs of disenrolling participants.

10.     **Pre-Approved Transition and Phase Out Plan.** The state may elect to submit a draft transition and phase-out plan for review and approval at any time, including prior to when a date of termination has been identified. Once the transition and phase-out plan has been approved, implementation of the plan may be delayed indefinitely at the option of the state.

11.     **Federal Financial Participation (FFP).** If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services and administrative costs of disenrolling beneficiaries.

12.     **Expiring Demonstration Authority.** For demonstration authority that expires prior to the demonstration's expiration date, the State must submit a transition plan to CMS no later than six months prior to the applicable demonstration authority's expiration date, consistent with the following requirements:

     a.     **Expiration Requirements.** The State must include, at a minimum, in its demonstration expiration plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the State will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for eligible individuals, as well as any community outreach activities.

     b.     **Expiration Procedures**. The State must comply with all notice requirements found in 42 CFR Sections 431.206, 431.210 and 431.213. In addition, the State must assure all appeal and hearing rights afforded to demonstration beneficiaries as outlined in 42 CFR Sections 431.220 and 431.221. If a demonstration beneficiary requests a hearing before the date of action, the State must maintain benefits as required in 42 CFR Section 431.230. In addition, the State must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category as discussed in October 1, 2010, State Health Official Letter #10-008.

     c.     **Federal Public Notice.** CMS will conduct a 30-day federal public comment period consistent with the process outlined in 42 CFR Section 431.416 in order to solicit public input on the State's demonstration expiration plan. CMS will consider comments received during the 30-day period during its review and approval of the State's demonstration expiration plan. The State must obtain CMS approval of the demonstration expiration plan prior to the implementation of the

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

expiration activities. Implementation of expiration activities must be no sooner than 14 days after CMS approval of the plan. d. Federal Financial Participation (FFP): FFP shall be limited to normal closeout costs associated with the expiration of the demonstration including services and administrative costs of disenrolling beneficiaries.

13.   **Withdrawal of Demonstration Authority.** CMS reserves the right to amend and withdraw waivers or expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of Title XIX, including if federal monitoring of data indicates that the community engagement features of this demonstration may not adequately incentivize beneficiary participation or are unlikely to result in improved health outcomes, or that other demonstration features are not operating as intended.  CMS will promptly notify the State in writing of the determination and the reasons for the amendment and withdrawal, together with the effective date, and afford the State an opportunity to request a hearing to challenge CMS' determination prior to the effective date. If a waiver or expenditure authority is withdrawn or amended, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services and administrative costs of disenrolling beneficiaries.

14.   **Adequacy of Infrastructure.** The State must ensure the availability of adequate resources for implementation and monitoring of the demonstration, including education, outreach, and enrollment; maintaining eligibility systems; compliance with cost sharing requirements; and reporting on financial and other demonstration components.

15.   **Public Notice, Tribal Consultation, and Consultation with Interested Parties.** The State must comply with the State Notice Procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994). The State must also comply with the tribal consultation requirements in section 1902(a)(73) of the Act as amended by section 5006(e) of the American Recovery and Reinvestment Act (ARRA) of 2009, the implementing regulations for the Review and Approval Process for Section 1115 demonstrations at 42 CFR Section 431.408, and the tribal consultation requirements contained in the State's approved state plan, when any program changes to the demonstration are proposed by the State.

   a.   In States with federally recognized Indian tribes consultation must be conducted in accordance with the consultation process outlined in the July 17, 2001 letter or the consultation process in the State's approved Medicaid state plan if that process is specifically applicable to consulting with tribal governments on waivers (42 CFR Section 431.408(b)(2)).

   b.   In States with federally recognized Indian tribes, Indian health programs, and/or Urban Indian organizations, the State is required to submit evidence to CMS regarding the solicitation of advice from these entities prior to submission of any demonstration proposal, amendment and/or renewal of this demonstration (42 CFR Section 431.408(b)(3)).

**Page 11 of 48**

    c.    The State must also comply with the Public Notice Procedures set forth in 42 CFR Section 447.205 for changes in statewide methods and standards for setting payment rates.

16.    **Federal Financial Participation (FFP).** No federal matching for administrative or service expenditures for this demonstration will take effect until the effective date identified in the demonstration approval letter.

17.    **Common Rule Exemption.** The state shall ensure that the only involvement of human subjects in research activities that may be authorized and/or required by this demonstration is for projects which are conducted by or subject to the approval of CMS, and that are designed to study, evaluate, or otherwise examine the Medicaid or CHIP program – including procedures for obtaining Medicaid or CHIP benefits or services, possible changes in or alternatives to Medicaid or CHIP programs and procedures, or possible changes in methods or levels of payment for Medicaid benefits or services. The Secretary has determined that this demonstration as represented in these approved STCs meets the requirements for exemption from the human subject research provisions of the Common Rule set forth in 45 CFR 46.101(b)(5).

## IV.   ARKANSAS WORKS PROGRAM POPULATIONS AFFECTED

The State will use this demonstration to ensure coverage for Arkansas Works eligible beneficiaries provided primarily through QHPs offered in the individual market instead of the fee-for-service delivery system that serves the traditional Medicaid population. The State will provide premium assistance to aid Arkansas Works beneficiaries in enrolling in coverage through QHPs in the Marketplace.

18.    **Populations Affected by the Arkansas Works Demonstration.** Except as described in STCs 19 and 20, the Arkansas Works demonstration affects adults aged 19 through 64 eligible under the state plan under 1902(a)(10)(A)(i)(VIII) of the Act, 42 CFR Section 435.119. Eligibility and coverage for Arkansas Works beneficiaries is subject to all applicable Medicaid laws and regulations in accordance with the Medicaid state plan, except as expressly waived in this demonstration and as described in these STCs. Any Medicaid state plan amendments to this eligibility group, including the conversion to a modified adjusted gross income (MAGI) standard on January 1, 2014, will apply to this demonstration.

**Table 1. Eligibility Groups**

| Medicaid State Plan Mandatory Groups | Federal Poverty Level | Funding Stream | Expenditure and Eligibility Group Reporting |
|---|---|---|---|
| New Adult Group | This group includes adults up to and including 133 percent of the FPL who meet the other criteria specified in Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act | Title XIX | MEG - 1 |

19.   **Medically Frail Individuals.** Arkansas has instituted a process to determine whether a beneficiary is medically frail. The process is described in the Alternative Benefit state plan. Beneficiaries excluded from enrolling in QHPs through the Arkansas Works as a result of a determination of medical frailty as that term is defined above will have the option of receiving direct coverage through the state of either the same ABP offered to the beneficiaries or an ABP that includes all benefits otherwise available under the approved Medicaid state plan (the standard Medicaid benefit package). Direct coverage will be provided through a fee- for- service (FFS) system.

20.   **American Indian/Alaska Native Individuals.** Beneficiaries identified as American Indian or Alaskan Native (AI/AN) will not be required to enroll in QHPs in this demonstration, but can choose to opt into a QHP.  New applicants will be subject to provisions of STC 21 and coverage will begin 30 days prior to the date an application is submitted for coverage.  Beneficiaries who are AI/AN and who have not opted into a QHP will receive the ABP through a fee for service (FFS) system. An AI/AN beneficiary will be able to access covered benefits through Indian Health Service (IHS), Tribal or Urban Indian Organization (collectively, I/T/U) facilities funded through the IHS. Under the Indian Health Care Improvement Act (IHCIA), I/T/U facilities are entitled to payment notwithstanding network restrictions.

21.   **Retroactive Eligibility.** The state will provide coverage effective 30 days prior to the date of submitting an application for coverage for beneficiaries in table 1.

V.   **ARKANSAS WORKS PREMIUM ASSISTANCE ENROLLMENT**

22.   **Arkansas Works.** For Arkansas Works beneficiaries, except as noted in STCs 19 and 20, enrollment in a QHP is a condition of receiving benefits.

23.   **Notices.** Arkansas Works beneficiaries will receive a notice or notices from Arkansas Medicaid or its designee advising them of the following:

    a.    QHP Plan Selection. The notice will include information regarding how Arkansas Works beneficiaries can select a QHP and information on the State's auto-assignment process in the event that the beneficiary does not select a plan.

    b.    State Premiums and Cost-Sharing. The notice will include information about the beneficiary's premium and cost-sharing obligations, if any, as well as the quarterly cap on premiums and cost-sharing.

    c.    Access to Services until QHP Enrollment is Effective. The notice will include the Medicaid client identification number (CIN) and information on how beneficiaries can use the CIN number to access services until their QHP enrollment is effective.

    d.    Wrapped Benefits. The notice will also include information on how beneficiaries can access wrapped benefits. The notice will include specific information regarding services that are covered directly through fee-for-service Medicaid and what phone numbers to call or websites to visit to access wrapped services.

    e.    Appeals. The notice will also include information regarding the grievance and appeals process.

    f.    Identification of Medically Frail. The notice will include information describing how Arkansas Works beneficiaries who believe they are medically frail can request a determination of whether they are exempt from the ABP. The notice will also include alternative benefit plan options.

    g.    Timely and adequate notice concerning adverse actions. The notice must give beneficiaries timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility or to reduce or discontinue services they may receive under Medicaid in accordance with 42 CFR 435.919.

24.   **QHP Selection.** The QHPs in which Arkansas Works beneficiaries enroll are certified through the Arkansas Insurance Department's QHP certification process. The QHPs available for selection by the beneficiary are determined by the Medicaid agency.

25.   **Auto-assignment.** In the event that an beneficiary is determined eligible for coverage through the Arkansas Works QHP premium assistance program, but does not select a plan, the State will auto-assign the beneficiary to one of the available QHPs in the beneficiary's rating area. Beneficiaries who are auto-assigned will be notified of their assignment, and the effective date of QHP enrollment, and will be given a thirty-day period from the date of enrollment to request enrollment in another plan.

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

26. **Distribution of Members Auto-assigned.** Arkansas Works QHP auto-assignments will be distributed among QHP issuers in good standing with the Arkansas Insurance Department offering certified silver-level QHPs certified by the Arkansas Insurance Department.

27. **Changes to Auto-assignment Methodology.** The state will advise CMS prior to implementing a change to the auto-assignment methodology.

28. **Disenrollment.** Beneficiaries may be disenrolled from the demonstration if they are determined to be medically frail after they were previously determined eligible.

## VI.   PREMIUM ASSISTANCE DELIVERY SYSTEM

29. **Memorandum of Understanding for QHP Premium Assistance.** The Arkansas Department of Human Services and the Arkansas Insurance Department have entered into a memorandum of understanding (MOU) with each QHP that enrolls beneficiaries. Areas to be addressed in the MOU include, but are not limited to:

   a.   Enrollment of beneficiaries in populations covered by the demonstration;

   b.   Payment of premiums and cost-sharing reductions, including the process for collecting and tracking beneficiary premiums;

   c.   Reporting and data requirements necessary to monitor and evaluate the Arkansas Works including those referenced in STC 79, ensuring beneficiary access to EPSDT and other covered benefits through the QHP;

   d.   Requirement for QHPs to provide, consistent with federal and state laws, claims and other data as requested to support state and federal evaluations, including any corresponding state arrangements needed to disclose and share data, as required by 42 CFR 431.420(f)(2), to CMS or CMS' evaluation contractors.

   e.   Noticing requirements; and

   f.   Audit rights.

30. **Qualified Health Plans.** The State will use premium assistance to support the purchase of coverage for Arkansas Works beneficiaries through Marketplace QHPs.

31. **Choice of QHPs.** Each Arkansas Works beneficiary required to enroll in a QHP will have the option to choose between at least two silver plans covering only Essential Health Benefits that are offered in the individual market through the Marketplace. The State will pay the full cost of QHP premiums.

   a.   Arkansas Works beneficiaries will be able to choose from at least two silver plans covering only Essential Health Benefits that are in each rating area of the State.

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

b.     Arkansas Works beneficiaries will be permitted to choose among all silver plans covering only Essential Health Benefits that are offered in their geographic area and that meet the purchasing guidelines established by the State in that year, and thus all Arkansas Works beneficiaries will have a choice of at least two QHPs.

c.     The State will comply with Essential Community Provider network requirements, as part of the QHP certification process.

d.     Arkansas Works beneficiaries will have access to the same networks as other beneficiaries enrolling in QHPs through the individual Marketplace.

32.    **Coverage Prior to Enrollment in a QHP.** The State will provide coverage through fee-for-service Medicaid from the date a beneficiary is determined eligible until the beneficiary's enrollment in the QHP becomes effective.

a.     For beneficiaries who enroll in a QHP (whether by selecting the QHP or through auto-assignment) between the first and fifteenth day of a month, QHP coverage will become effective as of the first day of the month following QHP enrollment.

b.     For beneficiaries who enroll in a QHP (whether by selecting the QHP or through auto-assignment) between the sixteenth and last day of a month, QHP coverage will become effective as of the first day of the second month following QHP selection (or auto-assignment).

33.    **Family Planning.** If family planning services are accessed at a facility that the QHP considers to be an out-of-network provider, the State's fee-for-service Medicaid program will cover those services.

34.    **NEMT.** Non-emergency medical transport services will be provided through the State's fee-for-service Medicaid program. See STC 41 for further discussion of non-emergency medical transport services.

## VII.   BENEFITS

35.    **Arkansas Works Benefits.** Beneficiaries affected by this demonstration will receive benefits as set forth in section 1905(y)(2)(B) of the Act and codified at 42 CFR Section 433.204(a)(2). These benefits are described in the Medicaid state plan.

36.    **Alternative Benefit Plan.** The benefits provided under an alternative benefit plan for the new adult group are reflected in the State ABP state plan.

37.    **Medicaid Wrap Benefits.** The State will provide through its fee-for-service system wrap-around benefits that are required for the ABP but not covered by QHPs. These benefits include non-emergency transportation and Early Periodic Screening Diagnosis

and Treatment (EPSDT) services for beneficiaries participating in the demonstration who are under age 21.

38.     **Access to Wrap Around Benefits.** In addition to receiving an insurance card from the applicable QHP issuer, Arkansas Works beneficiaries will have a Medicaid CIN through which providers may bill Medicaid for wrap-around benefits. The notice containing the CIN will include information about which services Arkansas Works beneficiaries may receive through fee-for-service Medicaid and how to access those services. This information is also posted on Arkansas Department of Human Service's Medicaid website and will be provided through information at the Department of Human Service's call centers and through QHP issuers.

39.     **Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).** The State must fulfill its responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

40.     **Access to Federally Qualified Health Centers and Rural Health Centers.** Arkansas Works beneficiaries will have access to at least one QHP in each service area that contracts with at least one FQHC and RHC.

41.     **Access to Non-Emergency Medical Transportation.** The state will establish prior authorization for NEMT in the ABP. Beneficiaries served by IHS or Tribal facilities and medically frail beneficiaries will be exempt from such requirements.

42.     **Incentive Benefits.** To the extent an amendment is approved by CMS, Arkansas will offer an additional benefit not otherwise provided under the Alternative Benefit Plan for Arkansas Works beneficiaries who make timely premium payments (if above 100 percent FPL) and engage with a primary care provider (PCP). Arkansas Works beneficiaries with incomes at or below 100 percent FPL and others who are exempt from premiums will be eligible for an incentive benefit at the time the amendment is approved.

## VIII.   PREMIUMS & COST SHARING

43.     **Premiums & Cost Sharing.** Cost sharing for Arkansas Works beneficiaries must be in compliance with federal requirements that are set forth in statute, regulation and policies, including exemptions from cost-sharing set forth in 42 CFR Section 447.56(a).

44.     **Premiums & Cost Sharing Parameters for the Arkansas Works Program.** With the approval of this demonstration:

    a.      Beneficiaries up to and including 100 percent of the FPL will have no cost sharing.

    b.      Beneficiaries above 100 percent of the FPL will have cost sharing consistent with Medicaid requirements.

**Page 17 of 48**

    c.       Beneficiaries above 100 percent of the FPL will be required to pay monthly premiums of up to 2 percent of household income.

    d.       Premiums and cost-sharing will be subject to an aggregate cap of no more than 5 percent of family monthly or quarterly income.

    e.       Cost sharing limitations described in 42 CFR 447.56(a) will be applied to all program beneficiaries.

    f.       Copayment and coinsurance amounts will be consistent with federal requirements regarding Medicaid cost sharing and with the state's approved state plan; premium, copayment, and coinsurance amounts are listed in Attachment B.

**45.** **Payment Process for Payment of Cost Sharing Reduction to QHPs.** Agreements with QHP issuers may provide for advance monthly cost-sharing reduction (CSR) payments to cover the costs associated with the reduced cost sharing for Arkansas Works beneficiaries. Such payments will be subject to reconciliation at the conclusion of the benefit year based on actual expenditures by the QHP for cost sharing reduction. If a QHP issuer's actuary determines during the benefit year that the estimated advance CSR payments are significantly different than the CSR payments the QHP issuer will be entitled to during reconciliation, the QHP issuer may ask Arkansas' Department of Human Services to adjust the advance payments. Arkansas' reconciliation process will follow 45 CFR Section 156.430 to the extent applicable.

**46.** **Grace Period/Debt Collection.** Arkansas Works beneficiaries will have two months from the date of the payment invoice to make the required monthly premium contribution. Arkansas and/or its vendor may attempt to collect unpaid premiums and the related debt from beneficiaries, but may not report the debt to credit reporting agencies, place a lien on an individual's home, refer the case to debt collectors, file a lawsuit, or seek a court order to seize a portion of the individual's earnings for beneficiaries at any income level. The state and/or its vendor may not "sell" the debt for collection by a third party.

## IX.    APPEALS

**47.** Beneficiary safeguards of appeal rights will be provided by the State, including fair hearing rights. No waiver will be granted related to appeals. The State must ensure compliance with all federal and State requirements related to beneficiary appeal rights. Pursuant to the Intergovernmental Cooperation Act of 1968, the State has submitted a state plan amendment delegating certain responsibilities to the Arkansas Insurance Department.

## X.    COMMUNITY ENGAGEMENT REQUIREMENTS

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

48. **Overview**. Subject to these STCs, the state will implement a community engagement requirement as a condition of continued eligibility for Arkansas Works members below the age of 50 who are not otherwise subject to an exemption described in STC 49 or 53(a). To maintain Medicaid eligibility, non-exempt members will be required to participate in specified activities that may include employment, education or community services, as specified in these STCs. The work requirements will be implemented no sooner than June 1, 2018, and the state will provide CMS with notice 30 days prior to its implementation.

49. **Exempt Populations**. The Arkansas Works beneficiaries below are exempt from the community engagement requirements. Beneficiaries who report, in accordance with 42 CFR 435.945(a) that they meet one or more of the following exemptions will not be required to complete community engagement related activities to maintain eligibility:

- Beneficiaries identified as medically frail (under 42 CFR 440.315(f) and as defined in the alternative benefit plan in the state plan)
- Beneficiaries who are pregnant or 60 days post-partum
- Full time students
- Beneficiary is exempt from Supplemental Nutrition Assistance Program (SNAP) community engagement requirements
- Beneficiary is exempt from Transitional Employment Assistance (TEA)[1] Cash Assistance community engagement requirements
- Beneficiary receives TEA Cash Assistance
- Beneficiary is incapacitated in the short-term, is medically certified as physically or mentally unfit for employment, or has an acute medical condition validated by a medical professional that would prevent him or her from complying with the requirements
- Beneficiary is caring for an incapacitated person
- Beneficiary lives in a home with his or her minor dependent child age 17 or younger
- Beneficiary is receiving unemployment benefits
- Beneficiary is currently participating in a treatment program for alcoholism or drug addiction

Beneficiaries who report that they meet one or more of the above listed exemptions will not be required to complete community engagement related qualifying activities to maintain eligibility. Upon initial notice that a beneficiary must commence community engagement activities, the beneficiary may report an exemption at any time, via electronic submission. Consistent with STC 52, Arkansas will also provide web sites that comply with federal disability rights laws and reasonable accommodations for beneficiaries who are unable to report, or have difficulty reporting, work activities to ensure that they have an equal opportunity to report their participation

---

[1] Arkansas' Temporary Assistance for Needy Families (TANF) program.

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

50.     **Qualifying Activities**.  Arkansas Works beneficiaries who are not exempt under STC 49 may satisfy their community engagement requirements through a variety of activities, including but not limited to:

- Employment or self-employment, or having an income that is consistent with being employed or self-employed at least 80 hours per month[2]
- Enrollment in an educational program, including high school, higher education, or GED classes
- Participation in on-the-job training
- Participation in vocational training
- Community Service
- Participation in independent job search (up to 40 hours per month)
- Participation in job search training (up to 40 hours per month)
- Participation in a class on health insurance, using the health system, or healthy living (up to 20 hours per year)
- Participation in activities or programs available through the Arkansas Department of Workforce Services
- Participation in and compliance with SNAP/Transitional Employment Assistance (TEA) employment initiative programs.

51.     **Hour Requirements.**  Arkansas Works beneficiaries must complete at least 80 hours per calendar month of one, or any combination, of the qualifying activities listed in STC 50. Beneficiaries will be required to electronically report into the online portal by the 5th of each month for the previous month's qualifying activities. Arkansas will also provide reasonable accommodations to ensure that beneficiaries with disabilities protected by the ADA, Section 504 of the Rehabilitation Act and Section 1557 of the Patient Protection and Affordable Care Act, who are unable to report, or have difficulty reporting, work activities to ensure that they have an equal opportunity to report their participation and therefore to  have an equal opportunity to participate in, and benefit from, the program. If the state is unable to provide such a modification to the reporting requirements as required by federal law, then the state must follow the requirements of STC 52, which would require that the state provide a modification in the form of an exemption from participation.

52.     **Reasonable Modifications.**  Arkansas must provide reasonable accommodations related to meeting the community engagement requirements for beneficiaries with disabilities protected by the ADA, Section 504 of the Rehabilitation Act and Section 1557 of the Patient Protection and Affordable Care Act, when necessary, to enable them to have an equal opportunity to participate in, and benefit from, the program.  The state must also provide reasonable modifications for program protections and procedures, including but not limited to, assistance with demonstrating eligibility for good cause exemptions;

---

[2] Arkansas minimum wage is used as a proxy amount to determine this income standard.  As of 2017, minimum wage is $8.50 per hour.  Multiplied by 80 hours per month, an individual is considered to be in compliance with the community engagement requirements if they have income or earnings of at least $736 per month.

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

appealing disenrollments; documenting community engagement activities and other documentation requirements; understanding notices and program rules related to community engagement requirements; navigating ADA compliant web sites as required by 42 CFR 435.1200(f); and other types of reasonable modifications.  The reasonable modifications must include exemptions from participation where an individual is unable to participate or report for disability-related reasons, modification in the number of hours of participation required where an individual is unable to participate for the otherwise-required number of hours, and provision of support services necessary to participate, where participation is possible with supports.  In addition, the state should evaluate individuals' ability to participate and the types of reasonable modifications and supports needed.

53.   **Non-Compliance.**  Beneficiaries who are subject to community engagement and reporting requirements and do not comply with the requirements will lose eligibility for Arkansas Works consistent with the terms of these STCs. Beneficiaries who submit an appeal request or report a good cause exemption prior to disenrollment will maintain services as provided under 42 CFR 431.230.

Beneficiaries who fail to meet the required community engagement hours or fail to report for any month within a coverage year before they are disenrolled for non-compliance will receive timely and adequate monthly notices in writing to inform them of non-compliance and how to come into compliance.

   a.   **Good Cause Exemption.**  The state will not count any month of non-compliance with the community engagement requirement or reporting requirements toward the three months under this STC for beneficiaries who demonstrate good cause for failing to meet the community engagement hours otherwise required for that month.  The circumstances constituting good cause must have occurred during the month for which the beneficiary is seeking a good cause exemption.  . The recognized good cause exemptions include, but are not limited to, at a minimum, the following verified circumstances:

      i.   The beneficiary has a disability as defined by the ADA, section 504 of the Rehabilitation Act, or section 1557 of the Patient Protection and Affordable Care Act and was unable to meet the requirement for reasons related to that disability; or has an immediate family member in the home with a disability under federal disability rights laws and was unable to meet the requirement for reasons related to the disability of that family member; or the beneficiary or an immediate family member who was living in the home with the beneficiary experiences a hospitalization or serious illness;

      ii.   The beneficiary experiences the birth, or death, of a family member living with the beneficiary;

**Page 21 of 48**

iii.    The beneficiary experiences severe inclement weather (including a natural disaster) that renders him or her unable to meet the requirement; or

iv.    The beneficiary has a family emergency or other life-changing event (e.g., divorce or domestic violence).

b.    **Disenrollment Effective Date.**  Disenrollment for non-compliance with the community engagement requirements is effective the first day of the month after proper notice is provided during the third month of non-compliance, unless an appeal is timely filed as specified in STC 54(i) or a good cause exemption is requested as specified in STC 53(a).

c.    **Re-enrollment Following Non-Compliance.**   If the beneficiaries are non-compliant with the community engagement requirements or reporting requirements for any three months, eligibility will be terminated until the next plan year, when they must file a new application to receive an eligibility determination. At this time, their previous noncompliance with the community engagement requirement will not be factored into the state's determination of their eligibility. A beneficiary who is disenrolled pursuant to this STC can reapply at any time for coverage and will be eligible to enroll with an effective date consistent with the regulations at 42 CFR. 435.915, (1) if she or he is determined eligible for another eligibility group, or (2) the beneficiary would have qualified for a good cause exemption at the time of disenrollment and Arkansas determines the beneficiary's failure to comply or report compliance was the result of a catastrophic event or circumstances beyond the beneficiary's control,  Such beneficiaries who experienced catastrophic events or circumstances beyond their control will receive retroactive coverage to the date coverage ended without need for a new application. Arkansas will act on the request for good cause exemption and, if approved, restore the beneficiary's coverage within 5 business days of receiving the request.

54.    **Community engagement requirements:  State Assurances**.  Prior to implementation of community engagement requirements as a condition of eligibility, the state will:

a.    Maintain mechanisms to stop payments to a QHP when a beneficiary is terminated for failure to comply with program requirements.

b.    Ensure that there are processes and procedures in place to seek data from other sources including SNAP and Temporary Assistance for Needy Families (TANF), and that the state uses available systems and data sources to  verify that beneficiaries are meeting community engagement requirements.

c.    To the extent that it is required by SNAP, beneficiaries who participate in both SNAP and Arkansas Works will have the option of reporting community engagement activities through either program. If a beneficiary reports activities through SNAP, Arkansas will transfer the individual's file to Arkansas Works to

satisfy reporting for both programs. In accordance with all applicable federal and state reporting requirements, beneficiaries enrolled in and compliant with a SNAP work requirement, as well as individuals exempt from a SNAP work requirement, will be considered to be complying with the Arkansas Works community engagement requirements without further need to report.

d.   Ensure that there are timely and adequate beneficiary notices provided in writing, including but not limited to:

i.    When community engagement requirements will commence for that specific beneficiary;

ii.   Whether a beneficiary is exempt, how the beneficiary must apply for and document that she or he meets the requirements for an exemption, and under what conditions the exemption would end;

iii.  Information about resources that help connect beneficiaries to opportunities for activities that would meet the community engagement requirement, and information about the community supports that are available to assist beneficiaries in meeting community engagement requirements;

iv.   Information about how community engagement hours will be counted and documented;

v.    What gives rise to disenrollment, what disenrollment would mean for the beneficiary, including how it could affect redetermination, and how to avoid disenrollment, including how to apply for a good cause exemption and what kinds of circumstances might give rise to good cause;

vi.   If a beneficiary is not in compliance for a particular month, that the beneficiary is out of compliance, and, if applicable, how the beneficiary can be in compliance in the month immediately following;

vii.  If a beneficiary has eligibility denied, how to appeal, and how to access primary and preventive care during the non-eligibility period.

viii. If a beneficiary has requested a good cause exemption, that the good cause exemption has been approved or denied, with an explanation of the basis for the decision and how to appeal a denial.

e.   Conduct active outreach and education beyond standard noticing for Arkansas Works beneficiaries for successful compliance with community engagement requirements as clients move toward self-sufficiency and economic security.

**Page 23 of 48**

f.   Ensure the state will assess areas within the state that experience high rates of unemployment, areas with limited economies and/or educational opportunities, and areas with lack of public transportation to determine whether there should be further exemptions or alternative compliance standards from the community engagement requirements and/or additional mitigation strategies, so that the community engagement requirements will not be impossible or unreasonably burdensome for beneficiaries to meet in impacted areas.

g.   Develop and maintain an ongoing partnership with the Arkansas Department of Workforce Services to assist Arkansas Works recipients with complying with community engagement requirements and moving toward self-sufficiency.

h.   Leverage the ongoing partnership with QHPs participating in the Arkansas Works premium assistance model for continued outreach, education and encouragement to comply with community engagement requirements.

i.   Provide full appeal rights, consistent with all federal statute and regulation, prior to disenrollment and observe all requirements for due process for beneficiaries who will be disenrolled for failing to comply with the applicable community engagement requirements, including allowing beneficiaries the opportunity to raise additional issues in a hearing (in addition to whether the beneficiary should be subject to termination) or provide additional documentation through the appeals process.

j.   Maintain timely processing of applications to avoid further delays in accessing benefits once the disenrollment period is over.

k.   If a beneficiary has requested a good cause exemption, the state must provide timely notice that the good cause exemption has been approved or denied, with an explanation of the basis for the decision and how to appeal a denial.

l.   Comply with the screening and eligibility determination requirements in 42 CFR 435.916(f).

m.   Establish beneficiary protections, including assuring that Arkansas Works beneficiaries do not have to duplicate requirements to maintain access to all public assistance programs that require community engagement and employment.

n.   With the assistance of other state agencies including the Arkansas Department of Workforce Services and other public and private partners, DHS will make good faith efforts to screen, identify, and connect Arkansas Works beneficiaries to existing community supports that are available to assist beneficiaries in meeting community engagement requirements, including available non-Medicaid assistance with transportation, child care, language access services and other supports; and connect beneficiaries with disabilities as defined in the ADA, section 504 of the Rehabilitation Act, or section 1557 of the Patient Protection

and Affordable Care Act with services and supports necessary to enable them to meet and report compliance with community engagement requirements.

o.  The State makes the general assurance that it is in compliance with protections for beneficiaries with disabilities under ADA, section 504 of the Rehabilitation Act, or section 1557 of the Patient Protection and Affordable Care Act.

p.  Consider the impact of any reporting obligations on persons without access to the Internet.  To the extent practicable, the State shall ensure that the availability of Medicaid services will not been diminished under this demonstration for individuals who lack access to the Internet.

q.  The state will provide each beneficiary who has been disenrolled from Arkansas Works with information on how to access primary care and preventative care services at low or no cost to the individual.  This material will include information about free health clinics and community health centers including clinics that provide behavioral health and substance use disorder services.  Arkansas shall also maintain such information on its public-facing website and employ other broad outreach activities that are specifically targeted to beneficiaries who have lost coverage.

r.  The state must submit an eligibility and enrollment monitoring plan within 90 calendar days after approval of the community engagement amendment of this demonstration.   CMS will work with the state if we determine changes are necessary to the state's submission, or if issues are identified as part of the review.  Once approved, the eligibility and enrollment monitoring plan will be incorporated into the STCs as Attachment A. The state will provide status updates on the implementation of the eligibility and enrollment monitoring plan in the quarterly reports.  Should the state wish to make additional changes to the eligibility and enrollment monitoring plan, the state should submit a revised plan to CMS for review and approval. The state may not take adverse action on a beneficiary for failing to complete community engagement requirements until CMS has reviewed and approved the revised eligibility and enrollment monitoring plan for completeness and determined that the state has addressed all of the required elements in a reasonable manner.

**Plan Requirements.**  At a minimum, the eligibility and enrollment monitoring plan will describe the strategic approach and detailed project implementation plan, including metrics, timetables and programmatic content where applicable, for defining and addressing how the state will comply with the assurances described in these STCs, as well as the assurances listed within this STC. Where possible, metrics baselines will be informed by state data, and targets will be benchmarked against performance in best practice settings.

i.  Send timely and accurate notices to beneficiaries, including sufficient ability for beneficiaries to respond to notices.

**Page 25 of 48**

ii.   Assure application assistance is available to beneficiaries (in person and by phone).

iii.   Assure processes are in place to accurately identify including but not limited to the following data points :

    a.   Number and percentage of individuals required to report each month

    b.   Number and percentage of beneficiaries who are exempt from the community engagement requirement.

    c.   Number and percentage of beneficiaries requesting good cause exemptions from reporting requirements

    d.   Number and percentage of beneficiaries granted good cause exemption from reporting requirements

    e.   Number and percentage of beneficiaries who requested reasonable accommodations

    f.   Number and percentage and type of reasonable accommodations provided to beneficiaries

    g.   Number and percentage of beneficiaries disenrolled for failing to comply with community engagement requirements

    h.   Number and percentage of beneficiaries disenrolled for failing to report

    i.   Number and percentage of beneficiaries disenrolled for not meeting community engagement and reporting requirements

    j.   Number and percentage of community engagement appeal requests from beneficiaries

    k.   Number, percentage and type of community engagement good cause exemptions requested

    l.   Number, percentage and type of community engagement good cause exemptions granted

    m.   Number, percentage and type of reporting good cause exemptions requested

**Page 26 of 48**

       n.      Number, percentage and type of reporting good cause exemptions granted

       o.      Number and percentage of applications made in-person, via phone, via mail and electronically.

iv.    Maintain an annual renewal process, including systems to complete ex parte renewals and use of notices that contain prepopulated information known to the state, consistent with all applicable Medicaid requirements.

v.    Maintain ability to report on and process applications in-person, via phone, via mail and electronically.

vi.    Maintain compliance with coordinated agency responsibilities under 42 CFR 435.120, including the community engagement online portal under 42 CFR 435.1200(f)(2).

vii.    Assure timeliness of transfers between Medicaid and other insurance programs at any determination, including application, renewal, or non-eligibility period.

viii.    The state's plan to implement an outreach strategy to inform beneficiaries how to report compliance with the community engagement requirements including how monthly notices will provide information on resources available to beneficiaries who may require assistance reporting community engagement activities.

## XI. GENERAL REPORTING REQUIREMENTS

**55. Deferral for Failure to Submit Timely Demonstration Deliverables.** The state agrees that CMS may issue deferrals in the amount of $5,000,000 (federal share) per deliverable when items required by these STCs (e.g., required data elements, analyses, reports, design documents, presentations, and other items specified in these STCs (hereafter singly or collectively referred to as "deliverable(s)") are not submitted timely to CMS or are found to not be consistent with the requirements approved by CMS.

a.    Thirty (30) days after the deliverable was due, CMS will issue a written notification to the state providing advance notification of a pending deferral for late or non-compliant submissions of required deliverables.

b.    For each deliverable, the state may submit a written request for an extension in which to submit the required deliverable. Extension requests that extend beyond the fiscal quarter in which the deliverable was due must include a Corrective Action Plan (CAP).

i.    CMS may decline the extension request.

**Page 27 of 48**

       ii.     Should CMS agree in writing to the state's request, a corresponding extension of the deferral process described below can be provided.

       iii.    If the state's request for an extension includes a CAP, CMS may agree to or further negotiate the CAP as an interim step before applying the deferral.

c.     The deferral would be issued against the next quarterly expenditure report following the written deferral notification.

d.     When the state submits the overdue deliverable(s) that are accepted by CMS, the deferral(s) will be released.

e.     As the purpose of a section 1115 demonstration is to test new methods of operation or service delivery, a state's failure to submit all required reports, evaluations and other deliverables may preclude a state from renewing a demonstration or obtaining a new demonstration.

f.     CMS will consider with the state an alternative set of operational steps for implementing the intended deferral to align the process with the state's existing deferral process, for example the structure of the state request for an extension, what quarter the deferral applies to, and how the deferral is released.

56.    **Post Award Forum.** Pursuant to 42 CFR 431.420(c), within six months of the demonstration's implementation, and annually thereafter, the state shall afford the public with an opportunity to provide meaningful comment on the progress of the demonstration. At least 30 days prior to the date of the planned public forum, the state must publish the date, time and location of the forum in a prominent location on its website. Pursuant to 42 CFR 431.420(c),the state must include a summary of the comments in the Quarterly Report associated with the quarter in which the forum was held, as well as in its compiled Annual Report.

57.    **Electronic Submission of Reports.** The state shall submit all required plans and reports using the process stipulated by CMS, if applicable.

58.    **Compliance with Federal Systems Innovation.** As federal systems continue to evolve and incorporate 1115 demonstration reporting and analytics, the state will work with CMS to:

a.     Revise the reporting templates and submission processes to accommodate timely compliance with the requirements of the new systems;

b.     Ensure all 1115, T-MSIS, and other data elements that have been agreed to are provided; and

**Page 28 of 48**

c.      Submit the monitoring reports and evaluation reports to the appropriate system as directed by CMS.

## XII.   GENERAL FINANCIAL REQUIREMENTS

This project is approved for Title XIX expenditures applicable to services rendered during the demonstration period. This section describes the general financial requirements for these expenditures.

59.     **Quarterly Expenditure Reports.** The State must provide quarterly Title XIX expenditure reports using Form CMS-64, to separately report total Title XIX expenditures for services provided through this demonstration under section 1115 authority. CMS shall provide Title XIX FFP for allowable demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in section XIII of the STCs.

60.     **Reporting Expenditures under the Demonstration.** The following describes the reporting of expenditures subject to the budget neutrality agreement:

a.      **Tracking Expenditures.** In order to track expenditures under this demonstration, the State will report demonstration expenditures through the Medicaid and State Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in section 2500 and Section 2115 of the SMM. All demonstration expenditures subject to the budget neutrality limit must be reported each quarter on separate forms CMS-64.9 Waiver and/or 64.9P Waiver, identified by the demonstration project number assigned by CMS (including the project number extension, which indicates the DY in which services were rendered or for which capitation payments were made). For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements must be recorded on the appropriate prior period adjustment schedules (forms CMS-64.9 Waiver) for the summary line 10B, in lieu of lines 9 or l0C. For any other cost settlements (i.e., those not attributable to this demonstration), the adjustments should be reported on lines 9 or 10C, as instructed in the SMM. The term, "expenditures subject to the budget neutrality limit," is defined below in STC 67.

b.      **Cost Settlements.** For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements attributable to the demonstration must be recorded on the appropriate prior period adjustment schedules (forms CMS-64.9P Waiver) for the summary sheet sine 10B, in lieu of lines 9 or 10C. For any cost settlement not attributable to this demonstration, the adjustments should be reported as otherwise instructed in the SMM.

c.      **Premium and Cost Sharing Contributions.** Premiums and other applicable cost sharing contributions from beneficiaries that are collected by the state from beneficiaries under the demonstration must be reported to CMS each quarter on

Form CMS-64 summary sheet line 9.D, columns A and B. In order to assure that these collections are properly credited to the demonstration, premium and cost-sharing collections (both total computable and federal share) should also be reported separately by DY on the form CMS-64 narrative. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to demonstration populations will be offset against expenditures. These section 1115 premium collections will be included as a manual adjustment (decrease) to the demonstration's actual expenditures on a quarterly basis.

d. **Pharmacy Rebates.** Pharmacy rebates are not considered here as this program is not eligible.

e. **Use of Waiver Forms for Medicaid.** For each DY, separate Forms CMS-64.9 Waiver and/or 64.9P Waiver shall be submitted reporting expenditures for individuals enrolled in the demonstration, subject to the budget neutrality limit (Section XII of these STCs). The State must complete separate waiver forms for the following eligibility groups/waiver names:

    i.    MEG 1 - "New Adult Group"

f. The first Demonstration Year (DY1) will begin on January 1, 2014. Subsequent DYs will be defined as follows:

**Table 2Demonstration Populations**

| Demonstration Year 1 (DY1) | January 1, 2014 | 12 months |
|---|---|---|
| Demonstration Year 2 (DY2) | January 1, 2015 | 12 months |
| Demonstration Year 3 (DY3) | January 1, 2016 | 12 months |
| Demonstration Year 4 (DY4) | January 1, 2017 | 12 months |
| Demonstration Year 5 (DY5) | January 1, 2018 | 12 months |
| Demonstration Year 6 (DY6) | January 1, 2019 | 12 months |
| Demonstration Year 7 (DY7) | January 1, 2020 | 12 months |
| Demonstration Year 8 (DY8) | January 1, 2021 | 12 months |

**61.** **Administrative Costs.** Administrative costs will not be included in the budget neutrality limit, but the State must separately track and report additional administrative costs that

are directly attributable to the demonstration, using Forms CMS-64.10 Waiver and/or 64.10P Waiver, with waiver name Local Administration Costs ("ADM").

62. **Claiming Period.** All claims for expenditures subject to the budget neutrality limit (including any cost settlements resulting from annual reconciliation) must be made within 2 years after the calendar quarter in which the State made the expenditures. Furthermore, all claims for services during the demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the demonstration. During the latter 2-year period, the State must continue to identify separately net expenditures related to dates of service during the operation of the section 1115 demonstration on the Form CMS-64 and Form CMS-21 in order to properly account for these expenditures in determining budget neutrality.

63. **Reporting Member Months.** The following describes the reporting of member months for demonstration populations:

    a.    For the purpose of calculating the budget neutrality expenditure cap and for other purposes, the State must provide to CMS, as part of the quarterly report required under STC 86, the actual number of eligible member months for the demonstration populations defined in STC 17. The State must submit a statement accompanying the quarterly report, which certifies the accuracy of this information. To permit full recognition of "in-process" eligibility, reported counts of member months may be subject to revisions after the end of each quarter. Member month counts may be revised retrospectively as needed.

    b.    The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for three months contributes three eligible member months to the total. Two individuals who are eligible for two months each contribute two eligible member months to the total, for a total of four eligible member months.

64. **Standard Medicaid Funding Process.** The standard Medicaid funding process must be used during the demonstration. The State must estimate matchable demonstration expenditures (total computable and federal share) subject to the budget neutrality expenditure cap and separately report these expenditures by quarter for each federal fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and State and Local Administration Costs (ADM). CMS will make federal funds available based upon the State's estimate, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure report, showing Medicaid expenditures made in the quarter just ended. The CMS will reconcile expenditures reported on the Form CMS-64 quarterly with federal funding previously made available to the State, and include the reconciling adjustment in the finalization of the grant award to the State.

65. **Extent of FFP for the Demonstration.** Subject to CMS approval of the source(s) of the non-federal share of funding, CMS will provide FFP at the applicable federal matching

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

rate for the demonstration as a whole as outlined below, subject to the limits described in STC 66:

a.   Administrative costs, including those associated with the administration of the demonstration.

b.   Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved State plan.

c.   Medical Assistance expenditures made under section 1115 demonstration authority, including those made in conjunction with the demonstration, net of enrollment fees, cost sharing, pharmacy rebates, and all other types of third party liability or CMS payment adjustments.

66.   **Sources of Non-Federal Share.** The State must certify that the matching non-federal share of funds for the demonstration is state/local monies. The State further certifies that such funds shall not be used as the match for any other federal grant or contract, except as permitted by law. All sources of non-federal funding must be compliant with section 1903(w) of the Act and applicable regulations. In addition, all sources of the non-federal share of funding are subject to CMS approval.

a.   CMS may review the sources of the non-federal share of funding for the demonstration at any time. The State agrees that all funding sources deemed unacceptable by CMS shall be addressed within the time frames set by CMS.

b.   Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-federal share of funding.

c.   The State assures that all health care-related taxes comport with section 1903(w) of the Act and all other applicable federal statutory and regulatory provisions, as well as the approved Medicaid State plan.

67.   **State Certification of Funding Conditions.** The State must certify that the following conditions for non-federal share of demonstration expenditures are met:

a.   Units of government, including governmentally operated health care providers, may certify that State or local tax dollars have been expended as the non-federal share of funds under the demonstration.

b.   To the extent the State utilizes certified public expenditures (CPEs) as the funding mechanism for Title XIX (or under section 1115 authority) payments, CMS must approve a cost reimbursement methodology. This methodology must include a detailed explanation of the process by which the State would identify those costs eligible under Title XIX (or under section 1115 authority) for purposes of certifying public expenditures.

**Page 32 of 48**

c.     To the extent the State utilizes CPEs as the funding mechanism to claim federal match for payments under the demonstration, governmental entities to which general revenue funds are appropriated must certify to the State the amount of such tax revenue (State or local) used to satisfy demonstration expenditures. The entities that incurred the cost must also provide cost documentation to support the State's claim for federal match.

d.     The State may use intergovernmental transfers to the extent that such funds are derived from State or local tax revenues and are transferred by units of government within the State. Any transfers from governmentally operated health care providers must be made in an amount not to exceed the non-federal share of Title XIX payments.

e.     Under all circumstances, health care providers must retain 100 percent of the reimbursement amounts claimed by the State as demonstration expenditures. Moreover, no pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (such as payments related to taxes - including health care provider-related taxes - fees, and business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments) are not considered returning and/or redirecting a Medicaid payment.

## XIII.   MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

68.    **Limit on Title XIX Funding.** The State shall be subject to a limit on the amount of federal Title XIX funding that the State may receive on selected Medicaid expenditures during the period of approval of the demonstration. The limit is determined by using the per capita cost method described in STC 69, and budget neutrality expenditure limits are set on a yearly basis with a cumulative budget neutrality expenditure limit for the length of the entire demonstration. The data supplied by the State to CMS to set the annual caps is subject to review and audit, and if found to be inaccurate, will result in a modified budget neutrality expenditure limit. CMS' assessment of the State's compliance with these annual limits will be done using the Schedule C report from the CMS-64.

69.    **Risk.** The State will be at risk for the per capita cost (as determined by the method described below) for demonstration populations as defined in STC 70, but not at risk for the number of beneficiaries in the demonstration population. By providing FFP without regard to enrollment in the demonstration populations, CMS will not place the State at risk for changing economic conditions that impact enrollment levels. However, by placing the State at risk for the per capita costs of current eligibles, CMS assures that the demonstration expenditures do not exceed the levels that would have been realized had there been no demonstration.

                                                                      **Page 33 of 48**

70. **Calculation of the Budget Neutrality Limit.** For the purpose of calculating the overall budget neutrality limit for the demonstration, separate annual budget limits will be calculated for each DY on a total computable basis, as described in STC 70 below. The annual limits will then be added together to obtain a budget neutrality limit for the entire demonstration period. The federal share of this limit will represent the maximum amount of FFP that the State may receive during the demonstration period for the types of demonstration expenditures described below. The federal share will be calculated by multiplying the total computable budget neutrality limit by the Composite Federal Share, which is defined in STC 71 below.

71. **Demonstration Populations Used to Calculate the Budget Neutrality Limit.** For each DY, separate annual budget limits of demonstration service expenditures will be calculated as the product of the trended monthly per person cost times the actual number of eligible/member months as reported to CMS by the State under the guidelines set forth in STC 73. The trend rates and per capita cost estimates for each Mandatory Enrollment Group (MEG) for each year of the demonstration are listed in the table below.

**Table 3 Per Capita Cost Estimate**

| MEG | TREND | DY 4 - PMPM | DY 5 - PMPM | DY 6 - PMPM | DY 7 - PMPM | DY 8 - PMPM |
|---|---|---|---|---|---|---|
| New Adult Group | 4.7% | $570.50 | $597.32 | $625.39 | $654.79 | $685.56 |

    a.    If the State's experience of the take up rate for the new adult group and other factors that affect the costs of this population indicates that the PMPM limit described above in paragraph (a) may underestimate the actual costs of medical assistance for the new adult group, the State may submit an adjustment to paragraph (a), along with detailed expenditure data to justify this, for CMS review without submitting an amendment pursuant to STC 7. Adjustments to the PMPM limit for a demonstration year must be submitted to CMS by no later than October 1 of the demonstration year for which the adjustment would take effect.

    b.    The budget neutrality cap is calculated by taking the PMPM cost projection for the above group in each DY, times the number of eligible member months for that group and DY, and adding the products together across DYs. The federal share of the budget neutrality cap is obtained by multiplying total computable budget neutrality cap by the federal share.

    c.    The State will not be allowed to obtain budget neutrality "savings" from this population.

72. **Composite Federal Share Ratio.** The Composite Federal Share is the ratio calculated by dividing the sum total of federal financial participation (FFP) received by the State on actual demonstration expenditures during the approval period, as reported through the MBES/CBES and summarized on Schedule C (with consideration of additional allowable

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

demonstration offsets such as, but not limited to, premium collections) by total computable demonstration expenditures for the same period as reported on the same forms. Should the demonstration be terminated prior to the end of the extension approval period (see STC 9), the Composite Federal Share will be determined based on actual expenditures for the period in which the demonstration was active. For the purpose of interim monitoring of budget neutrality, a reasonable estimate of Composite Federal Share may be developed and used through the same process or through an alternative mutually agreed upon method.

73. **Future Adjustments to the Budget Neutrality Expenditure Limit.** CMS reserves the right to adjust the budget neutrality expenditure limit to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or policy interpretations implemented through letters, memoranda, or regulations with respect to the provision of services covered under the demonstration.

74. **Enforcement of Budget Neutrality.** CMS shall enforce budget neutrality over the life of the demonstration rather than on an annual basis. However, if the State's expenditures exceed the calculated cumulative budget neutrality expenditure cap by the percentage identified below for any of the demonstration years, the State must submit a corrective action plan to CMS for approval. The State will subsequently implement the approved corrective action plan.

**Table 4 Cap Thresholds**

| Year | Cumulative target definition | Percentage |
|------|------------------------------|------------|
| DY 4 | Cumulative budget neutrality limit plus: | 0% |
| DY 5 | Cumulative budget neutrality limit plus: | 0% |
| DY 6 | Cumulative budget neutrality limit plus: | 0% |
| DY 7 | Cumulative budget neutrality limit plus: | 0% |
| DY 8 | Cumulative budget neutrality limit plus: | 0% |

75. **Exceeding Budget Neutrality.** If at the end of the demonstration period the cumulative budget neutrality limit has been exceeded, the excess federal funds will be returned to CMS. If the demonstration is terminated prior to the end of the budget neutrality agreement, an evaluation of this provision will be based on the time elapsed through the termination date.

76. **Impermissible DSH, Taxes or Donations.** The CMS reserves the right to adjust the budget neutrality expenditure limit in order to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or with policy interpretations implemented through letters, memoranda, or regulations. CMS reserves

**Page 35 of 48**

the right to make adjustments to the budget neutrality expenditure limit if CMS determines that any health care-related tax that was in effect during the base year, or provider-related donation that occurred during the base year, is in violation of the provider donation and health care related tax provisions of Section 1903(w) of the Act. Adjustments to the budget neutrality agreement will reflect the phase-out of impermissible provider payments by law or regulation, where applicable.

## XIV.  EVALUATION

77.  **Evaluation Design and Implementation.** The State shall submit a draft evaluation design for Arkansas Works to CMS no later than 120 days after the award of the demonstration amendment. Such revisions to the evaluation design and the STCs shall not affect previously established timelines for report submission for the Health Care Independence Program. The state must submit a final evaluation design within 60 days after receipt of CMS' comments. Upon CMS approval of the evaluation design, the state must implement the evaluation design and submit their evaluation implementation progress in each of the quarterly and annual progress reports, including the rapid cycle assessments as outlined in the Monitoring Section of these STCs. The final evaluation design will be included as an attachment to the STCs. Per 42 CFR 431.424(c), the state will publish the approved evaluation design within 30 days of CMS approval.

78.  **Evaluation Budget.** A budget for the evaluation shall be provided with the evaluation design. It will include the total estimated cost, as well as a breakdown of estimated staff, administrative and other costs for all aspects of the evaluation such as any survey and measurement development, quantitative and qualitative data collection and cleaning, analyses, and reports generation. A justification of the costs may be required by CMS if the estimates provided do not appear to sufficiently cover the costs of the design or if CMS finds that the design is not sufficiently developed.

79.  **Cost-effectiveness.** While not the only purpose of the evaluation, the core purpose of the evaluation is to support a determination as to whether the preponderance of the evidence about the costs and effectiveness of the Arkansas Works Demonstration using premium assistance when considered in its totality demonstrates cost effectiveness taking into account both initial and longer term costs and other impacts such as improvements in service delivery and health outcomes.

   a.  The evaluation will explore and explain through developed evidence the effectiveness of the demonstration for each hypothesis, including total costs in accordance with the evaluation design as approved by CMS.

   b.  Included in the evaluation will be examinations using a robust set of measures of provider access and clinical quality measures under the Arkansas Works demonstration compared to what would have happened for a comparable population in Medicaid fee-for-service.

c.    The State will compare total costs under the Arkansas Works demonstration to costs of what would have happened under a traditional Medicaid expansion. This will include an evaluation of provider rates, healthcare utilization and associated costs, and administrative expenses over time.

d.    The State will compare changes in access and quality to associated changes in costs within the Arkansas Works. To the extent possible, component contributions to changes in access and quality and their associated levels of investment in Arkansas will be determined and compared to improvement efforts undertaken in other delivery systems.

80.    **Evaluation Requirements.** The demonstration evaluation will meet the prevailing standards of scientific and academic rigor, as appropriate and feasible for each aspect of the evaluation, including standards for the evaluation design, conduct, and interpretation and reporting of findings. The demonstration evaluation will use the best available data; use controls and adjustments for and reporting of the limitations of data and their effects on results; and discuss the generalizability of results.

The State shall acquire an independent entity to conduct the evaluation. The evaluation design shall discuss the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications the entity must possess, how the State will assure no conflict of interest, and a budget for evaluation activities.

81.    **Evaluation Design.** The Evaluation Design shall include the following core components to be approved by CMS:

a.    **Research questions and hypotheses:** This includes a statement of the specific research questions and testable hypotheses that address the goals of the demonstration. At a minimum, the research questions shall address the goals of improving access, reducing churning, improving quality of care thereby leading to enhanced health outcomes, and lowering costs. The research questions will have appropriate comparison groups and may be studied in a time series. The analyses of these research questions will provide the basis for a robust assessment of cost effectiveness.

The following are among the hypotheses to be considered in development of the evaluation design and will be included in the design as appropriate.  Additional hypotheses relative to the new and revised components of the demonstration will also be included in the state's evaluation design.
  i.    Premium Assistance beneficiaries will have equal or better access to care, including primary care and specialty physician networks and services.
  ii.   Premium Assistance beneficiaries will have equal or better access to preventive care services.
  iii.  Premium Assistance beneficiaries will have lower non-emergent use of emergency room services.

**Page 37 of 48**

   iv. Premium Assistance beneficiaries will have fewer gaps in insurance coverage.

   v. Premium Assistance beneficiaries will maintain continuous access to the same health plans, and will maintain continuous access to providers.

   vi. Premium Assistance beneficiaries, including those who become eligible for Exchange Marketplace coverage, will have fewer gaps in plan enrollment, improved continuity of care, and resultant lower administrative costs.

   vii. Premium Assistance beneficiaries will have lower rates of potentially preventable emergency department and hospital admissions.

   viii. Premium assistance beneficiaries will report equal or better satisfaction in the care provided.

   ix. Premium Assistance beneficiaries who are young adults eligible for EPSDT benefits will have at least as satisfactory and appropriate access to these benefits.

   x. Premium Assistance beneficiaries will have appropriate access to non-emergency transportation.

   xi. Premium Assistance will reduce overall premium costs in the Exchange Marketplace and will increase quality of care.

   xii. The cost for covering Premium Assistance beneficiaries will be comparable to what the costs would have been for covering the same expansion group in Arkansas Medicaid fee-for-service in accordance with STC 77 on determining cost effectiveness and other requirements in the evaluation design as approved by CMS.

   xiii. Incentive benefits offered to Arkansas Works beneficiaries will increase primary care utilization.

These hypotheses should be addressed in the demonstration reporting described in STC 86 and 87 with regard to progress towards the expected outcomes.

b. Data: This discussion shall include:

   i. A description of the data, including a definition/description of the sources and the baseline values for metrics/measures;

   ii. Method of data collection;

   iii. Frequency and timing of data collection.

The following shall be considered and included as appropriate:

   i. Medicaid encounters and claims data;

   ii. Enrollment data; and

   iii. Consumer and provider surveys

c.   **Study Design**: The design will include a description of the quantitative and qualitative study design, including a rationale for the methodologies selected. The discussion will include a proposed baseline and approach to comparison; examples to be considered as appropriate include the definition of control and/or comparison groups or within-subjects design, use of propensity score matching and difference in differences design to adjust for differences in comparison populations over time. To the extent possible, the former will address how the effects of the demonstration will be isolated from those other changes occurring in the state at the same time through the use of comparison or control groups to identify the impact of significant aspects of the demonstration. The discussion will include approach to benchmarking, and should consider applicability of national and state standards. The application of sensitivity analyses as appropriate shall be considered

d.   **Study Population**: This includes a clear description of the populations impacted by each hypothesis, as well as the comparison population, if applicable. The discussion may include the sampling methodology for the selected population, as well as support that a statistically reliable sample size is available.

e.   **Access, Service Delivery Improvement, Health Outcome, Satisfaction and Cost Measures**: This includes identification, for each hypothesis, of quantitative and/or qualitative process and/or outcome measures that adequately assess the effectiveness of the demonstration. Nationally recognized measures may be used where appropriate. Measures will be clearly stated and described, with the numerator and dominator clearly defined. To the extent possible, the State may incorporate comparisons to national data and/or measure sets. A broad set of performance metrics may be selected from nationally recognized metrics, for example from sets developed by the Center for Medicare and Medicaid Innovation, for meaningful use under HIT, and from the Medicaid Core Adult sets. Among considerations in selecting the metrics shall be opportunities identified by the State for improving quality of care and health outcomes, and controlling cost of care.

f.   **Assurances Needed to Obtain Data**: The design report will discuss the State's arrangements to assure needed data to support the evaluation design are available.

g.   **Data Analysis**: This includes a detailed discussion of the method of data evaluation, including appropriate statistical methods that will allow for the effects of the demonstration to be isolated from other initiatives occurring in the State. The level of analysis may be at the beneficiary, provider, and program level, as appropriate, and shall include population stratifications, for further depth. Sensitivity analyses may be used when appropriate. Qualitative analysis methods may also be described, if applicable.

h.   **Timeline**: This includes a timeline for evaluation-related milestones, including those related to procurement of an outside contractor, and the deliverables

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

outlined in this section. Pursuant to 42 CFR 431.424(c)(v), this timeline should also include the date by which the final summative evaluation report is due.

i. **Evaluator**: This includes a discussion of the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications that the selected entity must possess; how the state will assure no conflict of interest, and a budget for evaluation activities.

j. **State additions**: The state may provide to CMS any other information pertinent to the state's research on the policy operations of the demonstration operations. The state and CMS may discuss the scope of information necessary to clarify what is pertinent to the state's research.

82. **Interim Evaluation Report.** The state must submit a draft Interim Evaluation Report one year prior to this renewal period ending December 31, 2021. The Interim Evaluation Report shall include the same core components as identified in STC 81 for the Summative Evaluation Report and should be in accordance with the CMS approved evaluation design. The State shall submit the final Interim Evaluation Report within 30 days after receipt of CMS' comments. The state will submit an Interim Evaluation Report for the completed years of the demonstration, and for each subsequent renewal or extension of the demonstration, as outlined in 42 CFR 431.412(c)(2)(vi). When submitting an application for renewal, the Interim Evaluation Report should be posted to the state's website with the application for public comment. Also refer to Attachment C for additional information on the Interim Evaluation Report.

a. The Interim Evaluation Report will discuss evaluation progress and present findings to date as per the approved Evaluation Design.

b. For demonstration authority that expires prior to the overall demonstration's expiration date, the Interim Evaluation Report must include an evaluation of the authority as approved by CMS.

c. If the state is seeking to renew or extend the demonstration, the draft Interim Evaluation Report is due when the application for renewal is submitted.  If the state made changes to the demonstration, the research questions, hypotheses and how the design was adapted should be included. If the state is not requesting a renewal for a demonstration, an Interim Evaluation report is due one (1) year prior to the end of the demonstration. For demonstration phase outs prior to the expiration of the approval period, the draft Interim Evaluation Report is due to CMS on the date that will be specified in the notice of termination or suspension.

d. The state will submit the final Interim Evaluation Report sixty (60) days after receiving CMS comments on the draft Interim Evaluation Report and post the document to the state's website.

e. The Interim Evaluation Report must comply with Attachment B of these STCs.

**Page 40 of 48**

83.     **Summative Evaluation Reports.**

a.      The state shall provide the summative evaluation reports described below to capture the different demonstration periods.

      i.     The state shall provide a Summative Evaluation Report for the Arkansas Private Option demonstration period September 27, 2013 through December 31, 2016. This Summative Evaluation Report is due July 1, 2018, i.e., eighteen months following the date by which the demonstration would have ended except for this extension.

      ii.    The state shall submit a draft summative evaluation report for the Arkansas Works demonstration period starting January 1, 2017 through December 31, 2021.  The draft summative evaluation report must be submitted within 18 months of the end of the approved period (December 31, 2021).  The summative evaluation report must include the information in the approved evaluation design.

           a.     Unless otherwise agreed upon in writing by CMS, the state shall submit the final summative evaluation report within 60 days of receiving comments from CMS on the draft.

           b.     The final summative evaluation report must be posted to the state's Medicaid website within 30 days of approval by CMS.

b.      The Summative Evaluation Report shall include the following core components:

      i.     **Executive Summary**. This includes a concise summary of the goals of the demonstration; the evaluation questions and hypotheses tested; and key findings including whether the evaluators find the demonstration to be budget neutral and cost effective, and policy implications.

      ii.    **Demonstration Description**. This includes a description of the demonstration programmatic goals and strategies, particularly how they relate to budget neutrality and cost effectiveness.

      iii.   **Study Design**. This includes a discussion of the evaluation design employed including research questions and hypotheses; type of study design; impacted populations and stakeholders; data sources; and data collection; analysis techniques, including controls or adjustments for differences in comparison groups, controls for other interventions in the State and any sensitivity analyses, and limitations of the study.

**Page 41 of 48**

      iv.    **Discussion of Findings and Conclusions.** This includes a summary of the key findings and outcomes, particularly a discussion of cost effectiveness, as well as implementation successes, challenges, and lessons learned.

      v.    **Policy Implications**. This includes an interpretation of the conclusions; the impact of the demonstration within the health delivery system in the State; the implications for State and Federal health policy; and the potential for successful demonstration strategies to be replicated in other State Medicaid programs.

      vi.    **Interactions with Other State Initiatives**. This includes a discussion of this demonstration within an overall Medicaid context and long range planning, and includes interrelations of the demonstration with other aspects of the State's Medicaid program, and interactions with other Medicaid waivers, the SIM award and other federal awards affecting service delivery, health outcomes and the cost of care under Medicaid.

84.    **State Presentations for CMS.** The State will present to and participate in a discussion with CMS on the final design plan, post approval, in conjunction with STC 75. The State will present on its interim evaluation in conjunction with STC 79. The State will present on its summative evaluation in conjunction with STC 80.

85.    **Public Access.** The State shall post the final documents (e.g. Quarterly Reports, Annual Reports, Final Report, approved Evaluation Design, Interim Evaluation Report, and Summative Evaluation Report) on the State Medicaid website within 30 days of approval by CMS.

86.    **Additional Publications and Presentations.** For a period of 24 months following CMS approval of the Summative Evaluation Report, CMS will be notified prior to the public release or presentation of these reports and related journal articles, by the State, contractor or any other third party. Prior to release of these reports, articles and other documents, CMS will be provided a copy including press materials. CMS will be given 30 days to review and comment on journal articles before they are released. CMS may choose to decline to comment or review some or all of these notifications and reviews.

87.    **Cooperation with Federal Evaluators.** Should CMS undertake an evaluation of the demonstration or any component of the demonstration, the state shall cooperate timely and fully with CMS and its contractors. This includes, but is not limited to, submitting any required data to CMS or the contractor in a timely manner. Failure to cooperate with federal evaluators in a timely manner, including but not limited to entering into data use agreements covering data that the state is legally permitted to share, providing a technical point of contact, providing data dictionaries and record layouts of any data under control of the state that the state is legally permitted to share, and/or disclosing data may result in

**Page 42 of 48**

CMS requiring the state to cease drawing down federal funds until satisfactory cooperation, until the amount of federal funds not drawn down would exceed $5,000,000.

## XV.   MONITORING

88.   **Monitoring Calls.** CMS will convene periodic conference calls with the state. The purpose of these calls is to discuss any significant actual or anticipated developments affecting the demonstration. CMS will provide updates on any amendments or concept papers under review, as well as federal policies and issues that may affect any aspect of the demonstration. The state and CMS will jointly develop the agenda for the calls. Areas to be addressed include, but are not limited to:

   a.   Transition and implementation activities;
   b.   Stakeholder concerns;
   c.   QHP operations and performance;
   d.   Enrollment;
   e.   Cost sharing;
   f.   Quality of care;
   g.   Beneficiary access,
   h.   Benefit package and wrap around benefits;
   i.   Audits;
   j.   Lawsuits;
   k.   Financial reporting and budget neutrality issues;
   l.   Progress on evaluation activities and contracts;
   m.   Related legislative developments in the state; and
   n.   Any demonstration changes or amendments the state is considering.

89.   **Quarterly Reports.** The state must submit three Quarterly Reports and one compiled Annual Report each DY.

   a.   The state will submit the reports following the format established by CMS. All Quarterly Reports and associated data must be submitted through the designated electronic system(s). The Quarterly Reports are due no later than 60 days following the end of each demonstration quarter, and the compiled Annual Report is due no later than 90 days following the end of the DY.

   b.   The reports shall provide sufficient information for CMS to understand implementation progress of the demonstration, including the reports documenting key operational and other challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed.

   c.   Monitoring and performance metric reporting templates are subject to review and approval by CMS. Where possible, information will be provided in a structured manner that can support federal tracking and analysis.

                                                                    **Page 43 of 48**

d.      The Quarterly Report must include all required elements and should not direct readers to links outside the report, except if listed in a Reference/Bibliography section. The reports shall provide sufficient information for CMS to understand implementation progress and operational issues associated with the demonstration and whether there has been progress toward the goals of the demonstration.

      i.      **Operational Updates** - The reports shall provide sufficient information to document key operational and other challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed. The discussion should also include any lawsuits or legal actions; unusual or unanticipated trends; legislative updates; and descriptions of any public forums held.

      ii.     **Performance Metrics** - Progress on any required monitoring and performance metrics must be included in writing in the Quarterly and Annual Reports. Information in the reports will follow the framework provided by CMS and be provided in a structured manner that supports federal tracking and analysis.

      iii.    **Budget Neutrality and Financial Reporting Requirements** - The state must provide an updated budget neutrality workbook with every Quarterly and Annual Report that meets all the reporting requirements for monitoring budget neutrality set forth in the General Financial Requirements section of these STCs, including the submission of corrected budget neutrality data upon request. In addition, the state must report quarterly expenditures associated with the populations affected by this demonstration on the Form CMS-64.

      iv.     **Evaluation Activities and Interim Findings**. The state shall include a summary of the progress of evaluation activities, including key milestones accomplished, as well as challenges encountered and how they were addressed. The state shall specify for CMS approval a set of performance and outcome metrics and network adequacy, including their specifications, reporting cycles, level of reporting (e.g., the state, health plan and provider level, and segmentation by population) to support rapid cycle assessment in trends for monitoring and evaluation of the demonstration.

e.      The Annual Report must include all items included in the preceding three quarterly reports, which must be summarized to reflect the operation/activities throughout the whole DY. All items included in the quarterly report pursuant to STC 86 must be summarized to reflect the operation/activities throughout the DY. In addition, the annual report must, at should include the requirements outlined below.

**Page 44 of 48**

      i.      Total annual expenditures for the demonstration population for each DY, with administrative costs reported separately;

     ii.      Total contributions, withdrawals, balances, and credits; and,

    iii.      Yearly unduplicated enrollment reports for demonstration beneficiaries for each DY (beneficiaries include all individuals enrolled in the demonstration) that include the member months, as required to evaluate compliance with the budget neutrality agreement.

**90.**    **Final Report.** Within 120 days after the expiration of the demonstration, the state must submit a draft Close Out Report to CMS for comments.

    a.    The draft report must comply with the most current guidance from CMS.

    b.    The state will present to and participate in a discussion with CMS on the Close-Out report.

    c.    The state must take into consideration CMS' comments for incorporation into the final Close Out Report.

    d.    The final Close Out Report is due to CMS no later than thirty (30) days after receipt of CMS' comments.

    e.    A delay in submitting the draft or final version of the Close Out Report may subject the state to penalties described in STC 6.

ATTACHMENT A:
Eligibility and Enrollment Monitoring Report  [To be incorporated after CMS approval.]

ATTACHMENT B
Copayment Amounts[3]

| General Service Description | Cost Sharing for Beneficiaries with Incomes >100% FPL |
|---|---|
| Behavioral Health - Inpatient | $60 |
| Behavioral Health - Outpatient | $4 |
| Behavioral Health - Professional | $4 |
| Durable Medical Equipment | $4 |
| Emergency Room Services | - |
| FQHC | $8 |
| Inpatient | $60 |
| Lab and Radiology | - |
| Skilled Nursing Facility | $20 |
| Other | $4 |
| Other Medical Professionals | $4 |
| Outpatient Facility | - |
| Primary Care Physician | $8 |
| Specialty Physician | $10 |
| Pharmacy - Generics | $4 |
| Pharmacy - Preferred Brand Drugs | $4 |
| Pharmacy - Non-Preferred Brand Drugs, including specialty drugs | $8 |

No copayments for individuals at or below 100% FPL.

---

[3] Beneficiaries with incomes above 100% FPL will also be required to pay monthly premiums of up to 2 percent of household income.

**Page 47 of 48**

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**

ATTACHMENT C
Preparing the Interim and Summative Evaluation Reports

**Arkansas Works**
**Approval Period: March 5, 2018 through December 31, 2021**
**Amended: March 5, 2018**