**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action No. 1:18-cv-01900

| | |
|---|---|
| CHARLES GRESHAM<br>123 W. Ridge Ave., Apt. C, Harrison, AR  72601 | )<br>)<br>) |
| ADRIAN MCGONIGAL<br>7105 Parkview Pl., Bentonville, AR 72717 | )<br>)<br>) |
| CESAR ARDON<br>1613 E. Tahlequah St., Siloam Springs, AR 72761 | )<br>)<br>) |
| MARISOL ARDON<br>1613 E. Tahlequah St., Siloam Springs, AR 72761 | )<br>)<br>) |
| ANNA BOOK<br>1111 W. 7th St., Little Rock, AR 72201 | )<br>)<br>) |
| RUSSELL COOK<br>1111 W. 7th St., Little Rock, AR 72201 | )<br>)<br>) |
| VERONICA WATSON<br>6288 Hwy. 238, Moro, AR 72368 | )<br>)<br>) |
| TREDA ROBINSON<br>2909 E. Moore Ave., Bldg. 10 Apt. 4, Searcy, AR<br>72143 | )<br>)<br>)<br>) |
| JAMIE DEYO<br>21 Windwood Cove Ward, AR 72176 | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)<br>) |
| ALEX M. AZAR II<br>SECRETARY, UNITED STATES DEPART-<br>MENT OF HEALTH AND HUMAN SERVICES<br>in his official capacity<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| SEEMA VERMA<br>ADMINISTRATOR, CENTERS FOR MEDI-<br>CARE AND MEDICAID SERVICES | )<br>)<br>) |

in her official capacity            )
7500 Security Boulevard         )
Baltimore, MD 21244            )
                                    )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES         )
200 Independence Avenue, S.W.    )
Washington, DC 20201          )
                                      )
CENTERS FOR MEDICARE AND MEDICAID )
SERVICES                        )
7500 Security Boulevard         )
Baltimore, MD 21244            )
                                      )
              Defendants, and     )
                                      )
STATE OF ARKANSAS          )
323 Center Street, Ste. 200      )
Little Rock, AR 72201          )
                                      )
            Defendant-Intervenor.    )

---

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF[1]

---

### PRELIMINARY STATEMENT

1.     This case challenges the ongoing efforts of the Executive Branch to bypass the legislative process and act unilaterally to fundamentally transform Medicaid, the cornerstone of the social safety net. Purporting to invoke a narrow statutory waiver authority that allows experimental projects "likely to assist in promoting the objectives" of Medicaid, the Executive Branch has instead effectively rewritten the statute, ignoring congressional restrictions, overturning a half-century of administrative practice, and threatening irreparable harm to the health

---

[1] Plaintiffs submit this first amended complaint pursuant to the minute entry from September 28, 2018 adopting the Joint Proposed Briefing Schedule and ordering the Plaintiffs to file their Motion for Summary Judgment and First Amended Complaint by November 5, 2018.

and welfare of the poorest and most vulnerable in our country. The result has been catastrophic for the people of Arkansas. More than 8,400 individuals, including Plaintiffs Adrian McGonigal and Jamie Deyo, have lost access to vital health care over the span of just two months, and thousands more are at significant risk of losing the same.

2.      The Medicaid program provides health insurance coverage to more than 75 million low-income people in the United States. Medicaid enables states to provide a range of federally specified preventive, acute, and long-term health care services to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." As described in more detail below, the core populations covered by Medicaid include children; pregnant women; the aged, blind, or disabled; and, as added by the Affordable Care Act ("ACA"), adults with household incomes of less than 133% of the federal poverty level ("FPL") (currently $12,140 for an individual; $16,460 for a family of two).

3.      The Medicaid program offers a deal for states. If a state chooses to participate, the federal government will contribute the lion's share of the cost of providing care.  In return, the state agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program.  States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states cannot pick and choose among individuals within a covered population group.

4.      The Social Security Act, of which the Medicaid Act is a part, does permit the Secretary of Health and Human Services ("Secretary" or "HHS") to waive certain federal Medicaid requirements, but only in narrow circumstances — when necessary to allow a state to carry out an experimental or pilot program that is likely to promote the objectives of the Medicaid Act.

5.      In 2014, Arkansas obtained such a waiver to expand its Medicaid program to cover the adults made eligible through the ACA by using private health plans. In 2016, this waiver was renewed and extended through 2021. Consistent with previous agency actions, HHS denied Arkansas' request to impose a work requirement as a condition of eligibility, finding such a requirement was not consistent with the objectives of the Medicaid Act.

6.      Early in 2017, the current HHS abruptly reversed course, signaling to states that it would revise its use of the waiver authority in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. On June 30, 2017, Arkansas Governor Asa Hutchinson submitted the "Arkansas Works Amendment," a request to the Secretary of HHS to implement a work requirement as a condition of Medicaid eligibility in order to "promot[e] personal responsibility and work, encourag[e] movement up the economic ladder, and facilitat[e] transitions from Arkansas Works" to private coverage.

7.      While the Arkansas Works Amendment was pending, HHS announced a new Medicaid waiver policy through a letter to State Medicaid Directors in January 2018. ("State Medicaid Director Letter"). Reversing decades of agency guidance, and consistent with the Administrator's own expressed view of the need to "fundamentally transform Medicaid," the State Medicaid Directors announced the agency's intention to, for the first time, approve waiver applications containing work requirements and outlined "guidelines" for states to consider in submitting such applications. On March 5, 2018, citing the State Medicaid Director Letter, the Secretary approved the Arkansas Works Amendment, and Arkansas began implementing the Amendment on June 1, 2018.

8.      Plaintiffs are among the many people who are affected by the Arkansas Works Amendment. Plaintiffs have worked throughout their lives in a range of jobs, such as janitor, dish

washer, restaurant server, landscaper, factory worker, and handyman. Plaintiffs need health coverage to access treatment for serious medical conditions like chronic obstructive pulmonary disease, iron deficiency anemia, seizures, mental health disorders, rheumatoid arthritis, thyroid disorders, and asthma. Without access to Medicaid coverage, Plaintiffs will be forced to forgo treatment for these conditions, or will incur significant medical debt when their conditions become so severe that they have no choice but to seek treatment in the emergency department.

9.      The State Medicaid Director Letter and subsequent approval of Arkansas' application are unauthorized attempts to re-write the Medicaid Act, and the use of the Social Security Act's waiver authority to "transform" Medicaid is an abuse of that authority. The Defendants' actions here thus violate both the Administrative Procedure Act and the Constitution, and they cannot survive.

## JURISDICTION AND VENUE

10.      This is an action for declaratory and injunctive relief for violations of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

11.      The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

12.      Venue is proper under 28 U.S.C. §§ 1391(b)(2) and (e).

## PARTIES

13.      Plaintiff Charles Gresham is a 37-year-old man who lives in Harrison, Boone County, Arkansas, with his fiancé. Mr. Gresham is enrolled in the Arkansas Medicaid program.

14.     Plaintiff Adrian McGonigal is a 40-year-old man who lives in Pea Ridge, Benton County, Arkansas, with his brother. Mr. McGonigal was recently disenrolled from the Arkansas Medicaid Program for failing to comply with work requirements.

15.     Plaintiff Cesar Ardon is a 40-year-old man who lives in Siloam Springs, Benton County, Arkansas, and is enrolled in the Arkansas Medicaid program.

16.     Plaintiff Marisol Ardon is a 45-year-old woman who lives in Siloam Springs, Benton County, Arkansas, with her adult daughter. Ms. Ardon is enrolled in the Arkansas Medicaid program.

17.     Plaintiff Anna Book is a 38-year-old woman who lives in Little Rock, Pulaski County, Arkansas. Ms. Book is enrolled in the Arkansas Medicaid program.

18.     Plaintiff Russell Cook is a 26-year-old man who lives in Little Rock, Pulaski County, Arkansas. He is currently homeless. Mr. Cook is enrolled in the Arkansas Medicaid Program.

19.     Plaintiff Veronica Watson is a 36-year-old woman who lives in Moro, Lee County, Arkansas. Ms. Watson is enrolled in the Arkansas Medicaid Program.

20.     Plaintiff Treda Robinson is a 42-year-old woman who lives in Searcy, White County, Arkansas. Ms. Robinson is enrolled in the Arkansas Medicaid Program.

21.     Plaintiff Jamie Deyo is a 38-year-old woman who lives in Lonoke, Lonoke County, Arkansas, with her parents. Ms. Deyo is currently enrolled in the Arkansas Medicaid Program.

22.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. Defendant Azar ("the Secretary") has overall responsibility for implementation of the Medicaid program, including

responsibility for federal review and approval of state requests for waivers pursuant to Section 1115 of the Social Security Act.

23.     Defendant Seema Verma is Administrator of the Centers for Medicare and Medicaid Services ("CMS") and is sued in her official capacity. Defendant Verma is responsible for implementing the Medicaid program in the manner required by federal law, including as amended by the ACA.

24.     Defendant HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

25.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act.

26.     Defendant-Intervenor, the State of Arkansas, filed an unopposed motion for intervention, which was granted on September 6, 2018.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A.     The Medicaid Program

27.     Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396-1.

28.     The statute defines "medical assistance" to be a range of health care services that participating states must cover or are permitted to cover. *Id.* § 1396d(a).

29.     Although states do not have to participate in Medicaid, all have chosen to do so.

30.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id*. § 1396a.

31.     The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its associated regulations.

32.     State and federal governments share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's relative per capita income.

**B.      Medicaid Eligibility and Coverage Requirements**

33.     Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage. *Id*. §§ 1396a(a)(10)(A), (C). The Act identifies required coverage groups as well as options for states to extend Medicaid to additional population groups. *Id.*

34.     To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id.* §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

35.     The mandatory Medicaid population groups include children; parents and certain other caretaker relatives; pregnant women; and the elderly, blind, or disabled. 42 U.S.C. § 1396a(a)(10)(A)(i).

36.     In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act ("ACA"). Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

37.     As part of the effort to ensure comprehensive health insurance coverage, Congress amended the Medicaid Act to add an additional mandatory population group. Effective January 1, 2014, the Medicaid Act requires participating states to cover adults who are under age 65, not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household income below 133% FPL. 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14). This group is often called the "expansion population" or the "Section VIII population," and it includes adults in a variety of family circumstances: parents living with children (whose incomes exceed the state-established limit for the mandatory parents/caretaker relatives population group); parents of older children who have left the home; and adults without children.

38.     States receive enhanced federal reimbursement rates for medical assistance provided to the Medicaid expansion population: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. *Id.* § 1396d(y).

39.     The Supreme Court's decision in *National Federation of Independent Business v. Sebelius* barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population. 567 U.S. 519 (2012).

40.     States that cover the expansion population submit state plan amendments electing to provide this coverage. To date, 34 states, including Arkansas, have approved state plans covering the expansion population.

41.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).

42.     As noted above, the Medicaid Act allows states to extend Medicaid eligibility to certain optional population groups, including children and pregnant women with incomes between 133% and 185% of FPL, *see id.* § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income, *id.* § 1396a(a)(10)(C).

43.     The Medicaid Act requires a participating state to cover *all* members of a covered population group. In other words, the state may not cover subsets of a population group described in the Medicaid Act. *Id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups: if a state elects to cover an optional group, it must cover all eligible individuals within that group. *Id.*

44.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act. *See id.* § 1396(a)(10)(A).

45.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act delineates *how* states must make and implement eligibility determinations to ensure that all eligible people who apply are served and get coverage.

46.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility . . . and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

47.     The ACA requires states to use a streamlined Medicaid eligibility process so that individuals "may apply for enrollment in, receive a determination of eligibility for participation in, and continue participation in, [Medicaid]." *Id.* § 18083(a). Individuals must be able to file streamlined eligibility forms online, in person, by mail, or by telephone. *Id.* § 18083(b)(1)(A); *see also* 42 U.S.C. § 1396w-3 (requiring states to streamline and simplify process for persons to remain enrolled in Medicaid); 42 C.F.R. §§ 435.907(a) (requiring states to accept applications and any documentation required to establish eligibility by internet, telephone, mail, and in person); 435.908(a) (requiring states to provide assistance with applications and renewals in person, over the telephone, and online).

48.     Since its enactment, the Medicaid Act has required states to determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." Social Security Amendments of 1965, Pub. L. No. 89-97, § 1902(a)(8), 79 Stat. 286, 344 (codified at 42 U.S.C. § 1396a(a)(8)); 42 C.F.R. §§ 435.906 (requiring states to allow individuals to apply without delay); 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability and 45 days for all other individuals).

49.     Through so-called "presumptive" eligibility, the Medicaid Act gives states a mechanism to provide immediate, temporary coverage to individuals who appear to their health care provider to be Medicaid eligible based on preliminary information. 42 U.S.C. § 1396a(a)(47). Under the ACA, states must allow qualified hospitals to provide presumptive eligibility to their patients. *See* Pub. L. 111-148, § 2202, 124 Stat. 119, 291 (codified at 42 U.S.C. § 1396a(a)(47)(B)

(eff. Jan. 1, 2014). *See* Ctrs. for Medicare & Medicaid Servs., *Medicaid & CHIP FAQs: Implementing Hospital Presumptive Eligibility Programs* (2014), http://bit.ly/2OwBCn6 (noting that hospital presumptive eligibility assures that individuals have timely access to care and promotes "ongoing Medicaid coverage by offering additional channels through which individuals can apply.").

50.     The Medicaid Act has always required states to provide retroactive coverage to certain individuals to ensure that they can obtain timely care and avoid incurring medical debts. Social Security Amendments of 1965, Pub. L. No. 89-97, § 1905(a), 79 Stat. 286, 351 (codified at 42 U.S.C. §§ 1396a(a)(34), 1396d(a)); *see also* S. Report No. 92-1230, 92nd Congress, 2nd Session, pg. 209 (1972) (noting the purpose of retroactive coverage is to protect individuals "who are eligible for [M]edicaid but do not apply for assistance until after they have received care, either because they did not know about the [M]edicaid eligibility requirements or because the sudden nature of their illness prevented their applying."). Specifically, states must provide medical assistance for care provided in or after the third month before the month of application, as long as the enrollee would have been eligible for Medicaid at the time the services were received. 42 U.S.C. §§ 1396a(a)(34), 1396d(a).

### C.     The Secretary's Section 1115 Waiver Authority

51.     Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315, grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions.

52.     The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id*. § 1315(a).

53.     The Secretary may only waive requirements of Section 1396a for Section 1115 projects relating to Medicaid. *Id.* § 1315(a)(1).

54.     The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

55.     The Secretary may grant a Section 1115 waiver only to the extent and for the period necessary to enable the state to carry out the experimental, pilot, or demonstration project. *Id.*

56.     The costs of such a project, upon approval, are included as expenditures under the State Medicaid plan. *Id.* § 1315(a)(2).

57.     The Secretary must follow certain procedural requirements before he may approve a Section 1115 project. *Id.* § 1315(d); 42 C.F.R. §§ 431.400 to 431.416. In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period. 42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

58.     The Secretary does not have the authority under Section 1115 to waive compliance with other federal laws, such as the United States Constitution, the Americans with Disabilities Act, or other federal statutes.

59.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked. *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2 (1997), http://bit.ly/2QlKnC7. Notably, the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and further describe how the benefits interact with the FLSA minimum wage protections. *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607

(TANF). There are no such references or descriptions in the Medicaid Act. According to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage. *See How Workplace Laws Apply to Welfare Recipients* at 4.

### D. Medicaid in Arkansas

60.     Arkansas, like all other states, has elected to participate in Medicaid. *See* Ark. Code Ann. §§ 20-77-101 to 20-77-2811, 23-61-1004 to 23-61-1009. The Department of Human Services ("DHS") administers the program at the state level.

61.     HHS typically reimburses Arkansas for over 70% of the cost of providing medical assistance through its Medicaid program. *See* 81 Fed. Reg. 80078-79 (Nov. 15, 2016) (70.87%, in fiscal year 2017); 82 Fed. Reg. 55383-85 (Nov. 21, 2017) (70.51% in fiscal year 2018).

62.     Effective January 1, 2014, Arkansas expanded its Medicaid program to include the Medicaid expansion population, *i.e.*, adults who are under age 65; do not fit into another Medicaid (or Medicare) eligibility category; and have household income below 133% of FPL. As noted above, Arkansas receives enhanced federal reimbursement for medical assistance provided to this group: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. 42 U.S.C. § 1396d(y).

63.     Arkansas implemented the Medicaid expansion through a Section 1115 project called the "Arkansas Health Care Independence Program" ("HCIP"). *See* Letter from Marilyn Tavenner, Admin., Ctrs. for Medicare & Medicaid Servs., to Andy Allison, Dir., Arkansas Dep't of Human Servs. (Sept. 27, 2013) (approving HCIP through December 31, 2016), http://bit.ly/2SLRJQV (last visited Aug. 8, 2018).

64.     HCIP allowed the State to cover most of the expansion population through a "private option." Under the private option, individuals receive medical assistance through a private

health plan, and the Medicaid program covers the enrollees' portion of the premiums and cost sharing. *Id*. Because the private plans do not cover all of the services that the Medicaid Act requires Arkansas to provide, enrollees continue to receive some services directly through DHS on a fee-for-services basis. *See id.* at Special Terms and Conditions ¶ 36-37.

65.     In 2014 and 2015, more than 225,000 individuals received coverage through HCIP. Arkansas Ctr. for Health Improvement, *Arkansas Health Care Independence Program ("Private Option") Section 1115 Demonstration Waiver Interim Report* 16, 21 (2016), http://bit.ly/2qpPNjU. During that time, Arkansas saw "a reduction in the uninsured rate for adults from 22.5 percent to 9.6 percent, the largest reduction observed nationwide." *Id*. at 20.

66.     Medicaid expansion in Arkansas has been associated with a variety of positive health outcomes, including increased useof preventive services, outpatient office visits, and chronic disease care; decreased reliance on emergency rooms; fewer skipped medications due to cost; better quality care; and improved self-reported health. Benjamin D. Sommers et al., *Changes in Utilization and Health Among Low-Income Adults After Medicaid Expansion or Expanded Private Insurance*, 176 JAMA Internal Medicine 1501, 1505-06 (2016).

67.     In mid-2016, Arkansas requested permission from HHS to extend and amend HCIP, renaming the project "Arkansas Works." Letter from Asa Hutchinson, Governor of Arkansas, to Sylvia Mathews Burwell, Sec'y, U.S. Dep't Health & Human Servs. (June 28, 2016), http://bit.ly/2JGWwij.

68.     The Secretary extended the Section 1115 project through the end of 2021. Letter from Andrew M. Slavitt, Acting Admin., Ctrs. for Medicare & Medicaid Servs., to Cindy Gillespie, Dir., Arkansas Dep't of Human Servs. (Dec. 8, 2016), http://bit.ly/2OpcDSs.

69.     The Secretary also approved several changes to the project. Most notably, the Secretary granted Arkansas a conditional waiver of retroactive eligibility, which permitted the State to implement the waiver if it demonstrated compliance with the following three conditions: (1) provide Medicaid coverage during a reasonable period to individuals who are otherwise eligible for Medicaid and attest to eligible immigration status, while they verify their immigration status, as required under 42 U.S.C. § 1320b-7(d); (2) complete a Mitigation Plan to address backlogs in processing Medicaid applications and provide written assurance to the Secretary that "eligibility determinations and redeterminations are completed on a timely basis;" and (3) allow qualified hospitals to enroll their patients in Medicaid through presumptive eligibility, as required under 42 U.S.C. § 1396a(a)(47)(B)). *Id.* at Waiver List ¶ 7.

70.     Arkansas DHS did not implement hospital presumptive eligibility.

**E.     The Arkansas Works Amendment**

71.     On or about June 30, 2017, Governor Hutchinson submitted a request to the Secretary to amend Arkansas Works. Letter from Asa Hutchinson, Governor of Arkansas, to Thomas E. Hargan, Sec'y, U.S. Dep't of Health & Human Servs. (June 30, 2017) ("Arkansas Works Amendment") (attached as Exhibit 1, hereto).

72.     Arkansas requested permission to implement a work and community engagement requirement, to limit individuals to online reporting, and to eliminate three-month retroactive coverage. Arkansas also sought permission to phase out Medicaid coverage of individuals with household income above 100% of the FPL. *Id.*

73.     Governor Hutchinson described the proposed Amendment as designed to "promot[e] personal responsibility and work, encourage[e] movement up the economic ladder, and facilitate[e] transitions from Arkansas Works" to private coverage. *Id.* The State commented that

the changes would better position Arkansas Works to focus on "the most vulnerable enrollees."
*Id.* at App. C, p. 2.

74.     The State's request did not provide an estimate of the number of individuals who
would lose coverage as a result of the work requirement. Likewise, Arkansas did not indicate the
number of individuals who would incur medical costs due to the elimination of retroactive cover-
age or the amount of those costs.

75.     CMS held a public comment period on the proposed Amendment from July 11,
2017 to August 10, 2017. Medicaid.gov, Arkansas Works Amendment, http://bit.ly/2Qhq88x.

76.     On March 5, 2018, the Secretary issued his approval letter for the Arkansas Works
Amendment, pursuant to Section 1115 and effective through the end of 2021. *See* Letter from
Seema Verma, Admin., Ctrs. for Medicare & Medicaid Servs. to Cindy Gillespie, Dir. Ark. Dep't
of Human Servs. (March 5, 2018), http://bit.ly/2Oprpsn (hereinafter "Amendment Approval") (at-
tached as Exhibit 2, hereto).

77.     The Amendment Approval granted Arkansas permission to implement the work
requirement, on or after June 1, 2018.

78.     The Amendment Approval also permitted Arkansas to require individuals to elec-
tronically report their qualifying activities or exemption only through an online portal. *See* Ex. 2,
Amendment Approval, at 1, 20. The approval specifically stated that Arkansas was approved to
require this online only reporting "in a manner inconsistent with" the ACA's requirements that
individuals be allowed to submit information via the internet, telephone, or in-person. *Id.* at 1
(citing the ACA § 1943 and 42 C.F.R. § 435.907(a)).

79.     The Amendment Approval also waived the retroactive coverage requirement for
Arkansas, reducing the coverage period from three months to one month. Neither the State's

Amendment application nor the CMS approval explained how the State had met the three pre-conditions CMS set forth in 2016 for a waiver of the retroactive coverage requirement—that Arkansas comply with the reasonable opportunity period requirements, successfully complete the Backlog Mitigation Plan, and implement hospital presumptive eligibility. *See* Ex. 2, Amendment Approval, at 4, 7, 21; Ex. 1, Arkansas Works Amendment.

80.     Arkansas' request to reduce income eligibility for Arkansas Works to 100% of FPL was not approved. *See* Ex. 2, Amendment Approval, at 2.

81.     In approving Arkansas' request, HHS did not provide an estimate of the number of individuals who would lose coverage as a result of the Arkansas Work Amendment.

<u>Work and Community Engagement Requirements</u>

82.     As noted above, the Medicaid Act requires a participating state to furnish Medicaid to *all* members of covered population groups. The state may not cover only subsets of a population group described in the Medicaid Act. *See* 42 U.S.C. §§ 1396a(a)(10)(A)-(B).

83.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act.

84.     The Arkansas Works Amendment added a new condition of eligibility that is not permitted under the Medicaid Act: Arkansas Works enrollees ages 19 to 49 must engage in 80 hours of specified employment or community engagement activities every month. Ex. 2, Amendment Approval, at 28.

85.     The work requirement does not apply to pregnant women or medically frail individuals. *Id.* In addition, enrollees who meet certain other criteria are exempt from the requirement. *Id.*

86.     If enrollees subject to the work requirement do not meet the requirement for any three months of the year, the State will terminate their coverage unless they demonstrate that one of the narrow "good cause" exceptions applies. *Id*. at 29-31.

87.     Under the Medicaid Act, an individual may apply for and enroll in Medicaid at any time.

88.     Under the Arkansas Works Amendment, the State will prohibit an individual who has been terminated from Medicaid for failure to meet the work requirements from re-enrolling in Arkansas Works for the remainder of the calendar year. *Id*. at 30. Only once a new calendar year begins will a terminated enrollee be allowed to submit a new application to re-enroll. However, enrollees may end this lockout period early by showing that one of the narrow "good cause" exceptions would have applied at the time of termination and that their inability to meet the work requirement "was the result of a catastrophic event or circumstances beyond [their] control." *Id*.

89.     According to the State, the purpose of the work requirement is to "incentivize enrollees to work and encourage personal responsibility" and "encourage individuals to climb the economic ladder." Ex. 1, Arkansas Works Amendment, at 55. The State also described the goal of the work requirement as "promot[ing] independence through employment." *Id*. at 15.

90.     The State began implementing the requirement for individuals ages 30 to 49 on June 1, 2018. Arkansas is scheduled to phase in individuals ages 19 to 29 during the first four months of 2019. *Eligibility and Enrollment Monitoring Plan, Arkansas Works: Work and Community Engagement Amendment* 8 (2018) (hereinafter "Implementation Plan") (attached as Exhibit 3, hereto).

91.     As a condition of eligibility, enrollees must report their participation activities each month. They can only report using an online portal. Enrollees may not report participation by mail, in-person, or by telephone to DHS. *Id*.

92.     DHS Director Cindy Gillespie stated in March 2018 that the online-only reporting requirement was more convenient for DHS, and "[i]f you implement it in the old-fashioned way of 'Come into our county office,' we would have to hire so many people – and that just doesn't make sense." Benjamin Hardy, *Medicaid Advocate Criticizes Arkansas Works' Email-only Reporting for Work Requirements*, Ark. Times, Apr. 28, 2018, http://bit.ly/2PHKU40 (last visited Nov. 5, 2018).

93.     To use the online portal, enrollees need an email address, a log-in and password unique to the portal, and a reference number provided in a multi-page letter sent by DHS. Enrollees use the reference number to link their insurance account to the reporting portal. Once the link is established, individuals must click through multiple different screens to report their work activities each month. The portal is only accessible to beneficiaries between the hours of 7 a.m. and 9 p.m. Sometimes, DHS schedules online maintenance of the portal during these operating hours. Enrollees must report work activities for a given month by the fifth of the following month, or the activities will not be counted for purposes of determining compliance. *See generally* Arkansas Works Information, https://ardhs.sharepointsite.net/ARWorks/default.aspx.

94.     To claim a good cause exemption, Arkansas Works beneficiaries use the online portal to make an attestation based on their understanding of the exemption. The State plans to review exemption attestations as part of a quality review process, which may result in retroactive removal of months of exemption or compliance. If the retroactive removal leaves an enrollee with three months of non-compliance in a calendar year, the individual's Arkansas Works case will be

closed and referred for investigation as potential fraud and overpayment. Implementation Plan at 13.

95.     After the March 5, 2018 approval, the Arkansas Medicaid agency publicly esti-mated that approximately 69,000 out of 278,734 individuals currently enrolled in Arkansas Works will have to take some action — report work activity or request an exemption — to comply with the requirement once it is fully implemented. The State did not estimate the number of Arkansans who would not be able to meet the requirement and would thus lose Medicaid coverage for the year. Ex. 3, Implementation Plan, at 1, 6.

96.     Arkansas began rolling out the work requirement to individuals between the ages of 30 and 49 in June 2018, phasing in individuals in four separate cohorts based on the month of their next Medicaid eligibility renewal. The State used its own data sources to identify individuals whose income indicates they are working at least 80 hours per month or that they are exempt. These individuals do not have to report or take other action to meet the work requirement unless their circumstances change. *Id.* at 6. From June to September 2018, the number of beneficiaries subject to the work requirement rose from 25,815 to 73,266. In each of these months, between 20 and 30 percent of those subject to the work requirement did not meet the work requirement. *See* Arkansas Dep't of Human Servs., *Arkansas Works Program June-September 2018 Reports* (at-tached as Exhibit 4, hereto).

97.     For example, in September, the most recent month for which the State has provided data, approximately 23 percent of beneficiaries subject to the work requirements—16,757 peo-ple—did not comply.  Approximately three percent (2,263 people) self-reported an exemption. Only approximately two percent (1,532 people) reported completing 80 hours of work or work-related activities. *Id*. Approximately 72 percent (52,714) did not have to report because the State

deemed them to have an exemption or to have satisfied the work requirement on the basis of State data sources. This data shows that 82 percent of individuals who were required to report their hours or seek an exemption in September did not do so.

98.    In total, 8,462 people — 4,353 in August and 4,109 in September — have already lost Medicaid coverage for failure to comply with the work requirements for three months. Another 4,841 people are on the brink of losing insurance in the October reporting period because they have accumulated two months of non-compliance. *Id.*

Retroactive Eligibility

99.    As noted above, the Medicaid Act requires that medical assistance be provided to enrollees retroactively. States must provide that

> in the case of any individual who has been determined to be eligible for medical assistance . . . such assistance will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application . . . for such assistance if such individual was . . . eligible for such assistance at the time such care and services were furnished.

42 U.S.C. § 1396a(a)(34).

100.    Separately, Section 1396d(a) defines "medical assistance" to include coverage for services received by eligible individuals during the three-month period prior to the month of application. *Id.* § 1396d(a).

101.    There is no authority for the Secretary to grant a waiver of Section 1396d(a).

102.    Under the approved Arkansas Works Amendment, retroactive eligibility coverage as required by the statute is terminated. Instead, the State will only pay for services received during the 30 days before an individual submits an application. Ex. 2, Amendment Approval, at 11, 21.

F.   **Action Taken by the Defendants to Allow Work Requirements and Approve the Arkansas Works Amendment**

103.   Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017). The "general criteria" CMS used when assessing waiver applications included whether the demonstration would:

1.   increase and strengthen overall coverage of low-income individuals in the state;

2.   increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

3.   improve health outcomes for Medicaid and other low-income populations in the state; or

4.   increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.*

104.   Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care." Letter from Andrew M. Slavitt, Acting Administrator, Ctrs. For Medicare & Medicaid Servs., HHS to Thomas Betlach, Dir. Az. Health Care Cost Containment System (Sept. 30, 2016); *see* Sec'y of Health & Human Services Sylvia Burwell, *Hearing on The President's Fiscal Year 2017 Budget*, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee at 35 (Feb. 24, 2016), http://bit.ly/2QcKnEi.

105.    In 2016, CMS denied Arkansas' request to impose a work requirement in Medicaid, stating in part: "[C]onsistent with the purposes of the Medicaid program, we cannot approve a work requirement." Letter from Sylvia Burwell, Sec'y of Health & Human Services, to Asa Hutchinson, Governor of Arkansas (Apr. 5, 2016) (attached as Exhibit 5, hereto).

106.    The current HHS abruptly reversed course to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. *See* Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017, https://wapo.st/2Do6m8v.

107.    When he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "[t]o the maximum extent permitted by law." Executive Order 13765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal,* 82 Fed. Reg. 8351 (Jan. 20, 2017), http://bit.ly/2qtdVCf.

108.    On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator of CMS. Defendant Verma and former Secretary Price immediately issued a letter to state Governors announcing CMS's disagreement with the purpose and objectives of the Medicaid Act, stating that "[t]he expansion of Medicaid through the Affordable Care Act ('ACA') to non-disabled, working-age adults without dependent children was a clear departure from the core, historical mission of the program." *See* Sec'y of Health and Human Servs., Dear Governor Letter, at 1, http://bit.ly/2zvx2zV.

109.    Since then, Defendant Verma has made repeated public statements criticizing the expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in Medicaid, and outlining plans to "reform" Medicaid through agency action. *See* Casey Ross,

*Trump health official Seema Verma has a plan to Slash Medicaid rolls. Here's how*, Stat News, Oct. 26, 2017, http://bit.ly/2DnaFRy.

110.    For instance, on June 27, 2017, Defendant Verma wrote an Opinion piece in the Washington Post observing that "U.S. policymakers have a rare opportunity, through a combination of congressional and administrative actions, to fundamentally transform Medicaid." Seema Verma, *Lawmakers have a rare chance to transform Medicaid. They should take it*, Wash. Post, June 27, 2017, https://wapo.st/2yQ9XIE.

111.    On November 7, 2017, at a speech before the National Association of Medicaid Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-age, non-disabled adults into" Medicaid "does not make sense," and announced that CMS would resist that change by approving state waivers that contain work requirements. Speech: Remarks by Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017 Fall Conference, CMS.Gov (Nov. 7, 2017), https://go.cms.gov/2PELxLW.

112.    On November 10, 2017, Defendant Verma gave an interview in which she declared that one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied adults," declaring that Medicaid was "not designed for an able bodied person," and announcing that CMS is "trying" to "restructure the Medicaid program." Wall Street Journal, *The Future of: Health Care* (Nov. 10, 2017), https://on.wsj.com/2AMeGMW.

113.    In or around early November 2017, CMS revised its website to invite states to submit Section 1115 waivers that would:

1.  Improve access to high-quality, person-centered services that produce positive health outcomes for individuals;

2.  Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the long term;

3. Support coordinated strategies to address certain health determinants that promote upward mobility, greater independence, and improved quality of life among individuals;

4. Strengthen beneficiary engagement in their personal healthcare plan, including incentive structures that promote responsible decision-making;

5. Enhance alignment between Medicaid policies and commercial health insurance products to facilitate smoother beneficiary transition; and

6. Advance innovative delivery system and payment models to strengthen provider network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, http://bit.ly/2SNWYQ8.

114.    On January 11, 2018, well after the federal comment period for the Arkansas Works Amendment had closed, Defendant CMS issued the State Medicaid Director Letter, attached as Exhibit 6, hereto, titled "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries."

115.    The nine-page document "announc[es] a new policy" that allows states to apply "work and community engagement" requirements to certain Medicaid recipients—specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability." *Id.* at 1.

116.    The State Medicaid Director Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy." *Id.* at 3.

117.    The State Medicaid Director Letter outlines the "guidelines" for states to consider in submitting applications containing work requirements.

118.    The State Medicaid Director Letter was not submitted for notice and public comment and was not published in the Federal Register.

119.    The same day CMS issued the State Medicaid Director Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit

organizations. The National Health Law Program ("NHeLP") noted that, by announcing the policy change after the Arkansas Works comment period had closed, CMS had not given the public the ability to comment meaningfully on the pending Arkansas Amendment. NHeLP further noted that the State Medicaid Director Letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments." Letter from Jane Perkins, Legal Dir., Nat'l Health Law Prog., to Brian Neale, Dir., Ctrs. For Medicare & Medicaid Servs. (Jan. 11, 2018), http://bit.ly/2Par8Pf.

120.    NHeLP requested that CMS re-open public comment on the Arkansas Works project to allow the public a meaningful opportunity to comment. *Id.* Defendants ignored this request.

121.    On or about January 18, 2018, CMS further emphasized that it disagrees with the legislative expansion of Medicaid under the ACA and that it had announced the "new policy guidance" to support state implementation of work requirements intended to target that expansion population. CMS, Community Engagement Initiative Frequently Asked Questions, http://bit.ly/2D03OfX (last visited Nov. 5, 2018).

122.    When Defendant Verma announced approval of the Arkansas Works Amendment on March 5, 2018, she tied it to the State Medicaid Director Letter, tweeting, "#ArkansasWorks is the 3rd community engagement demonstration we've approved since releasing guidance in January. @CMSgov has 9 pending applications with similar demonstration applications and several states have expressed interest in exploring these reforms. #TransformingMedicaid." Seema Verma, Administrator, Ctrs. for Medicare & Medicaid Servs. (@SeemaCMS), Twitter (Mar. 5, 2018, 9:45 AM), https://twitter.com/SeemaCMS/status/970716905379123205.

123.     In approving the Arkansas work and community engagement requirement, CMS cited the State Medicaid Director Letter and imposed a number of terms and conditions on the State. Ex. 2, Amendment Approval, at 3-4. Several of those terms and conditions require that Arkansas follow requirements set out in the State Medicaid Director Letter. *See*, *e.g.*, *id.* at 27 (exempting from work requirement enrollees with an acute medical condition that would prevent compliance); *id.* (exempting enrollees participating in substance use disorder treatment); id (exempting enrollees who are exempt from SNAP/TANF work requirements); *id.* at 20-21 (requiring reasonable modifications for enrollees with ADA-protected disabilities, including exemption from participation); *id.* at 32 (promising that Arkansas will assess areas with limited economies and/or educational activities or higher barriers to participation to determine whether further exemptions or modifications are needed to the work requirement).

124.     Each waiver approval including work requirements that has come after the State Medicaid Director Letter — Kentucky, Arkansas, Indiana, and New Hampshire — invokes the State Medicaid Director Letter and reflects its requirements.

125.     In July 2018, Defendant Azar stated: "We are undeterred. We are proceeding forward. . . . We're fully committed to work requirements and community participation in the Medicaid program. . . . we will continue to litigate, we will continue to approve plans, we will continue to work with states. We are moving forward." Colby Itkowitz, *The Health 202: Trump administration 'undeterred' by court ruling against Medicaid work requirements,* Wash. Post, July 25, 2018, https://wapo.st/2Oqn5Jt.

**G.     The Constitution's Take Care Clause**

126.     The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized

to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id.* §§ 1, 8.

127.    After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3.

128.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

129.    The Take Care Clause limits the President's power and ensures that he will faithfully execute the laws that Congress has passed.

130.    Under the Constitution, the President lacks the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

131.    The Administrator of CMS has expressed the need to "fundamentally transform Medicaid."

132.    The power to "transform" a congressional program is a legislative power vested in Congress. An effort to "transform" a statute outside that legislative process is at odds with the President's constitutional duty to take care that the laws be faithfully executed.

133.    The Medicaid population targeted by the Arkansas Works Amendment is the expansion population, which Congress added to Medicaid in the Affordable Care Act. The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation. An effort to undermine the Affordable Care Act by undoing the

extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

### H.      Effects of the Arkansas Works Amendment on the Plaintiffs

134.     By approving the Arkansas Works Amendment, the Secretary has enabled the State to impose requirements and procedures that punish Plaintiffs by prohibiting them from obtaining and retaining Medicaid coverage.

135.     The approved Arkansas Works Amendment allows the State to ignore ACA requirements for streamlined Medicaid enrollment to ease application and continued program participation. The Secretary's approval of the Arkansas Works Amendment restricts enrollees to only online submission of work requirement and exemption documentation. This task is difficult, and for some impossible, due to lack of internet access, trouble using computers, and problems working with the online portal.

136.     The Secretary's approval of the Arkansas Works Amendment permits Arkansas to eliminate the three months of retroactive coverage required under the Medicaid Act and provide only one month of coverage prior to the month of application. If a Plaintiff loses coverage and then reapplies, the Plaintiff will not have retroactive coverage for health services received during the gap in coverage. Plaintiffs who lose coverage after three months of non-compliance with the work requirement and then re-enroll the following year will lose two months of retroactive coverage they would have otherwise had during the gap in coverage.

137.     Continuous and adequate health insurance coverage is fundamental for each Plaintiff's ability to stay as healthy as possible and to work.

138.     The Secretary's action approving the Arkansas Works Amendment will cause harm to Plaintiffs. Specifically:

139.    Plaintiff **Charles Gresham** is a 37-year-old man who lives with his fiancé in Harrison, Arkansas. Mr. Gresham's fiancé works at a fast food restaurant earning about $9 an hour with a gross income of about $1100 per month. She currently supports Mr. Gresham financially and is his source of transportation.

140.    Mr. Gresham has his GED and has largely worked in the food service industry. In 2015, he worked as a labor hand with a local construction company but was let go after about a year because he began having seizures on the job. Mr. Gresham went back to the food service industry and other service jobs, but has lost those jobs due to issues related to his seizures, including missing work.

141.    Mr. Gresham can work and would like to work. He is not working at this time because he has had trouble finding and keeping a job. He needs a flexible schedule because he may not be able to work all day, and he needs time for doctors' appointments.

142.    Mr. Gresham has medical conditions that require monitoring and treatment. He has a seizure disorder, asthma, and extreme social anxiety. His anxiety attacks, which occur on average three times per month, bring on shortness of breath, chest pains, a tingling sensation in his arms, and migraines. Some of these symptoms can last for days after the attack. With Medicaid coverage through Arkansas Works, he has been able to get the treatment and services he needs, including visits with doctors and therapists, as well as his prescription medications and inhalers. He has tests scheduled for November that he hopes will help confirm a diagnosis for his seizure disorder.

143.    Mr. Gresham has been covered by Medicaid through Arkansas Works since 2015. When he has had questions or needed help in renewing his coverage, Mr. Gresham has gone to the local Department of Human Services office in Boone County. He is not comfortable with

computers and generally requires help from other people when going online, especially to fill something out or submit information.

144.    Until recently, Medicaid coverage has been mostly easy for him to obtain. However, the Arkansas Works notices and materials he has received in the past few months have been confusing and difficult to understand.

145.    In May 2018, Mr. Gresham received a notice that he would be subject to the work requirement. He is not working right now, and he cannot meet the requirement through volunteering or searching for jobs consistently because he does not have his own transportation, is not comfortable with computers, and may not be able to do an activity as scheduled due to his health conditions.

146.    Around the same time Mr. Gresham received notice of the work requirement, he received a letter from DHS stating he was exempt from the work requirement until September 2018 because he was receiving unemployment benefits. However, Mr. Gresham's unemployment benefits terminated on May 31, 2018. He initially believed that DHS would automatically adjust his exemption status. However, in August 2018 he learned from Legal Aid that he should report changes in exemptions to DHS. With the help of Legal Aid and his fiancé, he did so through the Access Arkansas website, and DHS revoked his exemption.

147.    Towards the end of August 2018, his fiancé helped him report an exemption for short-term incapacity, which lasted until October 31, 2018. Recently, with help from Legal Aid, he learned that he also has an exemption because he is enrolled in SNAP and is exempt from that program's work requirement. Mr. Gresham is confused because the dates on the SNAP exemption do not match his understanding of his SNAP benefits. In late October, Mr. Gresham again reported an exemption for short-term incapacity, which is scheduled to expire on December 31, 2018. Mr.

Gresham has difficulty keeping up with these different reporting requirements. He would not be able to navigate the website, report work activities or exemptions, or keep track of his compliance status on his own.

148.    Mr. Gresham has previously had gaps in health care coverage that caused him to go without the care he needed. In April 2018, he had a month-long gap that caused him to miss a visit with his therapist and three doctors' appointments. Although during that gap he had enough medications, if he were immediately cut off from his medications, his seizure disorder would be much worse and potentially harmful to him.

149.    Even with the exemptions, the threat of losing health coverage because of the work requirement has increased Mr. Gresham's anxiety. In August 2018, when he was dealing with reporting issues, he had more anxiety attacks than normal. He discusses the work requirements and potential loss of coverage at each appointment with his therapist. He worries that without medical coverage, his conditions will get worse and he may suffer irreversible harm or die.

150.    Plaintiff **Adrian McGonigal** is a 40-year-old man who lives with his brother in Pea Ridge, Arkansas.

151.    Mr. McGonigal has primarily worked in the food service industry. In August 2018, he left his job at McDonald's to work in the processing department at Southwest Poultry. Exposure to chemicals there aggravated his chronic obstructive pulmonary disease (COPD), causing him chest pressure, shortness of breath, and fatigue. The flare-ups eased when he moved to the shipping department. Though he continued to experience problems associated with his COPD and had to take frequent breaks, he could do his job and not miss much work as long as he had his medications. Mr. McGonigal worked between 30 and 40 hours per week in the shipping department and earned approximately $1200 per month before taxes. However, he lost his job in late October 2018.

152.    Mr. McGonigal enrolled in Medicaid when he was hospitalized for a medical emergency in 2014.  He did not have insurance at the time, so hospital staff helped him sign up for Arkansas Works.

153.    Mr. McGonigal has several medical conditions that require monitoring and treatment, including COPD, degenerative disc disease, depression, and an anxiety disorder. In the past, Medicaid coverage allowed him to access vital medical care, including the eight prescription medications he currently takes and regular visits to a primary care doctor and pulmonologist.

154.    When Mr. McGonigal received notice that the work requirement would apply to him beginning in June 2018, he had trouble understanding the new requirements. He tried to report his work activity by calling the local DHS office, but was told he could only report online.

155.    Mr. McGonigal is not comfortable with computers and has very little experience going online. He does not own a computer or smartphone. Because he has no driver's license or access to public transportation that will take him where he needs to go, he has no reliable way to get to the nearest library.

156.    Mr. McGonigal's family ultimately helped him report his work activities in June 2018. It was his understanding that this one report was all he needed to maintain his coverage.

157.    On October 5, 2018, Mr. McGonigal went to the pharmacy to refill his prescriptions, only to learn that he no longer had Medicaid coverage and would have to pay $800 just to fill his COPD medications. He could not afford to pay this, so he went without his medicine.

158.    Mr. McGonigal has called DHS multiple times to understand why his insurance was terminated. At first, DHS could not provide an explanation and told him to call his insurance company; the insurance company, in turn, told him to call DHS.

159.     On October 19, 2018, Mr. McGonigal again called DHS with the help of Legal Aid. After waiting on hold for about an hour, Mr. McGonigal was informed by a DHS caseworker that he lost his coverage for failing to meet work requirements for three months, and that he would not be eligible for Medicaid coverage until January 2019.

160.     When Mr. McGonigal explained to DHS that he thought he was in compliance and even received a letter confirming that he reported hours in June, the DHS caseworker explained that reporting was an ongoing, monthly requirement. When Mr. McGonigal explained that he had not understood the requirement and had trouble with computers and the Access Arkansas website, the caseworker responded that she could not help him. She told him that a good cause exemption was only available if he was in the hospital and unable to report. Nevertheless, with the help of Legal Aid, Mr. McGonigal continued to pursue a good cause exemption. DHS granted a good cause exemption on October 31, 2018 citing his lack of permanent address and extenuating health circumstances, despite these reasons not being listed as possible "good causes" in the approval or DHS written policies.

161.     When Mr. McGonigal lost his insurance due to the work requirement, he could not get his medications and then his COPD flared up. Since he no longer had health coverage, he had to go to the emergency room for treatment and missed several days of work. He had no choice but to recover at home because the hospital would not permit him to remain there without insurance. He expects to receive a bill for his hospital stay.

162.     Pursuant to Southwest Poultry's absence policy, Mr. McGonigal accrued a demerit for every day of work he missed. Mr. McGonigal's supervisor previously informed him that missing days could get him fired and that they might not be able to hold is position for him. On October 22, 2018 his employer fired him because of his absences.

163.     Although Mr. McGonigal is now in the process of restoring his Medicaid through the good cause exemption and filing income verification paperwork, Mr. McGonigal lost his coverage and his job. He could not get his medications and has been in the hospital twice for breathing treatments. Since losing coverage, his health conditions and anxiety have worsened. He struggles with the COPD, sleeps only two to three hours per night, and has more back pain.

164.     Mr. McGonigal believes there is no way that he can continue to work or to be productive without the medical assistance that Medicaid provides. He has already experienced the short-term outcomes of not having coverage. He is unsure how he will keep his coverage given that he no longer has a job and does not know how he will be able to meet the work or reporting requirements.

165.     Plaintiff **Cesar Ardon** is a 40-year-old man who lives in Siloam Springs, Arkansas.

166.     Mr. Ardon worked as a welder for 15 years until he had a tumor surgery in May 2017. Currently, Mr. Ardon works in construction as a self-employed handyman doing mostly outdoor work. His income and hours fluctuate greatly from month to month.  He earned about $1,200 in July 2018 but typically earns less during other times of the year.

167.     As a self-employed handyman, Mr. Ardon's work hours change from week to week based on the type of work he gets and the weather. Sometimes he is able to work 20 hours a week; other times, especially in the fall and winter when work is slower, he works significantly fewer hours.

168.     Prior to enrolling in Medicaid in 2017, Mr. Ardon often did not get the medical care that he needed because he could not afford it. With Medicaid, he is able to get treatment and care, as well as annual check-ups. In 2017, Medicaid covered a major operation to remove a baseball-

sized tumor on his side. He also receives treatment and monitoring for other medical conditions, such as high cholesterol, carpal tunnel syndrome, arthritis, and vision issues.

169.    In March 2018, Mr. Ardon received a notice stating he would have to work at least 80 hours a month to keep Medicaid coverage. In May 2018, Mr. Ardon received a letter informing him that the work requirements would apply to him starting in June. Even though Mr. Ardon worked enough hours in June 2018 to meet the requirement, he was unable to report his hours online because he had trouble figuring out the website. In July 2018, he received a notice from DHS that he failed to comply with the work requirements for June.

170.    In July and September 2018, Mr. Ardon was able to work enough hours to meet the work requirement, but he did not report his hours online. Mr. Ardon submitted other paperwork regarding his income and work activities to DHS and believed that had met the requirement.

171.    Specifically, as part of his eligibility redetermination in July 2018, Mr. Ardon submitted income information to DHS by filling out an "odd jobs form" asking him how much money he earned from odd jobs during July. During this process, Mr. Ardon went to the DHS office in Bentonville and believes he tried to use the reporting website. The website was difficult for him to use, and he had to go back and forth with the DHS workers to try to figure out how to use the site. Although Mr. Ardon believes he created an account, he thinks he submitted his work information on the odd jobs form related to his redetermination and does not think he reported his work hours on the website. He has not received confirmation that the work reported on this form rendered him compliant with the work requirement in July. He does not know his August compliance status.

172.    In September 2018, Mr. Ardon received a notice stating that his redetermination was complete, that he was approved for Arkansas Works, and that he is subject to the work

requirements. For September, he submitted another DHS form for odd jobs showing $800 earned for 80 hours of work. He did not report his work online and does not know if the work reported on this form rendered him compliant.

173.     In October 2018, Mr. Ardon worked fewer than 80 hours.

174.     Mr. Ardon does not expect to be able to get 80 hours of work every month, such that he will be able to meet the requirements. Mr. Ardon is concerned that he will lose his Medicaid coverage because he will not be able to meet the work requirements or because of problems reporting using the online portal. Mr. Ardon has struggled with the reporting website, as he has not always been able to log onto it when he tries. In addition, Mr. Ardon has a computer, but often does not have internet access.

175.     Mr. Ardon worries about getting sick, being unable to work, and losing access to health care if he loses his Medicaid coverage. He fears what will happen because he cannot predict his future or health. He depends on Medicaid to help him get through the ups and downs of life, especially when he has trouble finding work.

176.     Plaintiff **Marisol Ardon** is a 45-year-old woman who lives in Siloam Springs, Arkansas with her adult daughter. She is separated from her husband, Cesar Ardon, but he rents a room with a separate entrance to her home.

177.     Ms. Ardon previously worked answering phones and connecting people to social service agencies and other community resources. In 2013, her job changed slightly, and for the next four years she continued to do the same type of work, but she no longer had health care coverage. Ms. Ardon had a gap in health care coverage from about 2013 until 2015, when she started receiving Medicaid coverage from Arkansas Works. During that gap, she paid for basic

health care out of her pocket, such as when she had the flu. She did not go to the doctor for an annual physical, get any blood work, or receive other services.

178.   Ms. Ardon has several medical conditions that need to be treated and monitored. She has a hernia in her abdomen, thyroid problems, asthma, anxiety attacks, and chronic back pain. Her back pain is associated with a 25-pound non-cancerous tumor that she had removed from her midsection in July 2017.

179.   Ms. Ardon uses her Medicaid coverage for four daily medications, regular visits with her primary care doctor and specialists, and annual checkups.

180.   Ms. Ardon has not worked since her health issues caused her to quit work in or about March 2017. She does not currently have income from work and relies on her adult daughter to pay rent and other household expenses.

181.   Ms. Ardon confirmed with DHS that she needed to meet the work requirement starting in June and was not exempt.

182.   Ms. Ardon tried to create her account on the online portal but had difficulty navigating the website. The portal rejected her attempts to create an account several times.  Ms. Ardon found the long letters from DHS confusing and does not fully understand the requirements and exemptions. In July 2018, she went to the DHS office for assistance and submitted a paper about not working because of her back, but she did not hear back from DHS about that submission.

183.   Ms. Ardon did not meet the work requirement in June and July 2018. Because she was concerned about whether she would keep her health coverage under these work requirements, Ms. Ardon began to have multiple panic attacks a day throughout July and August 2018. During these attacks, Ms. Ardon has great difficulty breathing and loses control of her emotions.

184.    After Ms. Ardon secured legal representation, she filed for and was granted a short-term incapacity exemption in late August or early September that lasted until October 31, 2018

185.    Around October 9, 2018, Ms. Ardon received a letter from DHS stating that her annual Medicaid eligibility redetermination was approved and that her exemption would expire on October 31, 2018. Because her health has not improved, she tried to go online to file for an exemption, but she could not log onto the website or see her account. She went to the local DHS office in Bentonville for help but the DHS employee told her that she could not help her and that Ms. Ardon would have it do it herself online.

186.    Ms. Ardon plans to try again to file for the short-term incapacity exemption for November and December before the December 5th reporting deadline. Ms. Ardon is worried, and the prospect of losing coverage weighs on her mind. If Ms. Ardon loses her Medicaid, she will not be able to get the care she needs for her health conditions.

187.    Plaintiff **Anna Book** is a 38-year-old woman who lives in Little Rock, Arkansas. She has been homeless for most of the last eight years. Since August 2018, she has been renting a room in an apartment.

188.    In July 2018 Ms. Book began working as a dishwasher at a restaurant in July 2018. Ms. Book's wages cover her rent, child support, and basic necessities. Prior to her dishwashing job, Ms. Book had been unemployed for two years. Her previous employment includes being a manager of a fast food restaurant.

189.    Ms. Book signed up for Medicaid in 2014 or 2015 with the help of a pastor when she was homeless.

190.    For several months, she has been experiencing a respiratory condition that makes it difficult for her to breathe. With Medicaid coverage through Arkansas Works, Ms. Book was

able to see a doctor and obtain prescription medications in September 2018. Because the condition persists and could develop into pneumonia, she will continue to seek treatment. In the past, Ms. Book also used Medicaid to cover surgery and overnight hospitalization to treat a tooth abscess.

191.     Ms. Book is currently scheduled to work four 6-hour shifts per week. In August 2018, she had to miss work when she was sick, which nearly caused her to fall below 80 hours.

192.     In August 2018, Ms. Book received notice that she had not complied with the work requirement for the month of July. She believes she met the requirement in August and September.

193.     Ms. Book does not have reliable access to the internet. Because she does not have a data plan, she can only access the internet on her cellphone using a wifi connection, which she does not have at home. When she has used the internet on her cell phone, she found it difficult to see and navigate government websites. She does not own a computer or a tablet.

194.     Ms. Book relies on a pastor — the same one who helped her enroll online in Arkansas Works when she was homeless — to document her work hours online. She visits his church each month to report her hours. Because she does not have a car, transportation is difficult, and it is a challenge to maintain the check-ins with the pastor.

195.     Because she already has one month of noncompliance, even a brief time without a job or the ability to report hours will cause her to lose medical assistance. While Ms. Book hopes to keep her dishwashing job, she is uncertain how long it will last. Even if she is working, she fears that unforeseen circumstances will cause her to dip below 80 hours a month. Furthermore, she is concerned that she might not be able to visit the pastor each month to report her works hours. She does not believe she is entitled to claim any exemption from the work requirement.

196.    Ms. Book frequently talks with people who are homeless, trying to help them. She thinks the work requirement is harmful to her and, based on her conversations with others, that the requirements are hurting other homeless people who are worse off than she is.

197.    Plaintiff **Russell Cook** is a 26-year-old man who lives in Little Rock, Arkansas. He is homeless and lives in a camp when he cannot stay with a family member. He has been homeless several other times in his life.

198.    When he moved to Little Rock in November 2016, Mr. Cook began working as a landscaper. He could not work on days when it had rained or even recently rained because yards were too wet. As a result, he worked only 40 to 50 hours in rainy months, sometimes earning less than $300 per month. In months with better weather, he would work full-time.

199.    While Mr. Cook worked as a landscaper, he was denied SNAP benefits because he did not meet that program's work requirements.

200.    Mr. Cook is currently unemployed. He lost his job as a landscaper in August 2018, when the foreclosure of his apartment complex and a family emergency forced him to move to De Queen, Arkansas. Unable to find work in De Queen, he returned to Little Rock in October 2018 but was not able to get his landscaping job back. His former boss informed him that no positions would be available for at least a few months. Mr. Cook has no other job prospects.

201.     Mr. Cook has been covered by Medicaid since he was a child. Until he was 26 years old, he received coverage for being in foster care as a child. He believes his coverage transitioned to Arkansas Works in March 2018.

202.    In the past, Mr. Cook has primarily used Medicaid coverage to access dental care for several cavities and damage to the roots and nerves of his teeth. He has taken prescription antibiotics for tooth infections and related inflammation. In September 2018, Mr. Cook was in the

hospital for four days to be treated for a torn Achilles tendon and microfracture to his ankle sustained in an accident.

203.    Without Medicaid, Mr. Cook will go without the dental care he needs, including the removal of a wisdom tooth that is lacerating his mouth. He will miss general check-ups. He will not be able to pay for emergency medical services, such as those he needed following his recent leg injuries. He needs to see a doctor about problems keeping his weight up but will not be able to do so without Medicaid coverage.

204.    Beginning on January 1, 2019, Mr. Cook will be subject to the work requirement. He believes he will not be able to comply with the requirement because he is unemployed and not eligible for an exemption. Even if he can get his landscaping job back, that job does not provide a steady 80 hours of work per month throughout the year. It is difficult for Mr. Cook to find other work because he has no home, phone number, or clean clothing.

205.    Mr. Cook is also concerned he will not be able to consistently report his work hours. He has a cell phone but no functioning phone number or data plan. If an open wifi network is available, he can use his phone to access the internet. He does not have a computer or tablet. He sometimes accesses the internet at the library.

206.    The loss of health insurance could be catastrophic for Mr. Cook, as he is presently living on the streets, where deteriorating health can have especially severe consequences.

207.    Plaintiff **Veronica Watson** is a 36-year-old woman who lives alone in Moro, Arkansas. She inherited her home. She pays around $100 a month in utilities.

208.    Since 2013, Ms. Watson's primary job has been cleaning motel rooms and homes. When she was cleaning homes most recently, from December 2017 to June 2018, she found only three hours of work per week.  She briefly worked on a factory assembly line, leaving after one

month because she lacked the physical strength to perform the job. Though she returned to the same factory as a janitor in June and July 2018, she ultimately could not afford the 90-mile round-trip commute. Ms. Watson was unemployed for most of August 2018.

209.    In late August, Ms. Watson started working at a shirt factory closer to Moro. She is currently under a three-month probationary period through early December 2018. Her weekly income before taxes is $340.

210.    Ms. Watson suffers from gastroesophageal reflux disease, which causes burning and sharp pains in her chest. She sees a gastrointestinal specialist for treatment and monitoring and is prescribed a generic form of Prilosec. She also gets annual check-ups.

211.    Since Ms. Watson enrolled in 2014, Medicaid has covered these medical services. Before she had Medicaid, Ms. Watson went without necessary care. She paid out of pocket for acid reflux medication and doctor's appointments when she was sick. She could not afford regular check-ups, bloodwork, or other medical care.

212.    Ms. Watson has confirmed with DHS that she is subject to the work requirement and does not meet any exemptions. She did not complete 80 hours of work activities in August.

213.    Because Ms. Watson does not have a home computer or internet access, she was not able to create an Access Arkansas account to report her work hours for August. Her cell phone has a limited, pre-paid data plan, but cell reception is often unreliable. The nearest library or DHS office where she can access a computer is a 40-mile round-trip from her home.

214.    The uncertainty around the work requirement causes Ms. Watson stress. She already has one month of noncompliance. She worries that she will lose Medicaid coverage if she is not able to maintain her job at the shirt factory. Without insurance, Ms. Watson will not get the

treatment she needs for her gastroesophageal reflux disease, including the daily medication necessary to manage her condition so she can work and live a normal life.

215.    Plaintiff **Treda Robinson** is a 42-year-old woman who lives in Searcy, Arkansas.

216.    Ms. Robinson has iron deficiency anemia that causes her to have fatigue, weakness, and heavy menstrual bleeding. In addition to seeing a hematologist, Ms. Robinson is prescribed ferrous sulfate, polyethylene glycol, and vitamin C tablets. Medicaid covers all of her treatments and annual check-ups.

217.    Complications from her iron deficiency anemia forced Ms. Robinson to leave her job as a data entry clerk at the end of 2015. Since April 2016, she has worked as a scoring assessment rater for Educational Testing Service. This job permits her to work from home and earn an income even when anemia leaves her too weak to leave home.

218.    Ms. Robinson's work hours vary according to the volume of work available. Her employer may provide her with only 24-hour notice of the reduction or cancellation of scheduled work hours. Recently, she has been able to work 80 hours per month, but the inevitable fluctuation in hours means there is no guarantee that she will complete 80 hours of work every single month.

219.    Ms. Robinson's income, when she is able to work, ranges from $150 to $300 per week, at $15 an hour. Her rent, utilities, and other living expenses amount to $725 per month.

220.    In September 2018, Ms. Robinson had surgery to remove tumors. She took September and October off from work to recover. Although she requested to work in November, she will not know her preliminary schedule until the end of October. She worries that November may be a slow month or that she may not receive daily assignments because of her recent extended absence.

221.   Before Ms. Robinson enrolled in Medicaid in 2014, she frequently did not seek needed medical care. She paid out of pocket for anemia medications and doctor's visits when she was sick but could not afford regular visits to monitor her condition or to receive annual physicals, blood tests, or other care.

222.   Ms. Robinson became subject to the work requirement in September 2018. She qualified for the short-term incapacity exemption in September and October due to her surgery. However, the exemption expired on October 31, 2018, and she no longer qualifies for an exemption to the work requirement.

223.   Even though Ms. Robinson has computer skills, she was unable to make her Access Arkansas account work at home. Despite being ill, she drove to a local Arkansas Department of Workforce Services to report her exemption for September and October.

224.   Ms. Robinson worries she will lose Medicaid if she cannot maintain 80 hours of work per month due to her fluctuating schedule. Because her anemia often makes her too weak to leave her home, she has found it difficult to find work or do other activities. The effects of her anemia could also make it difficult for her to go out to report work activities or request an exemption.

225.   Without Medicaid, Ms. Robinson will not be able to afford to treat her health conditions. If she is not able to take her daily anemia medication, she will not be able to work at all. Untreated, her anemia could progress into a life-threatening condition.

226.   Plaintiff **Jamie Deyo** is a 38-year-old woman who lives in Lonoke, Arkansas, with her parents.

227.   Ms. Deyo's last regular job was at a daycare in 2011. Thereafter, she was a stay-at-home spouse until her divorce in 2014. She is currently unemployed.

228.    Ms. Deyo's parents provide her with financial support and transportation. She has no driver's license, and there is no public transportation where she lives.

229.    In 2013, Ms. Deyo seriously injured her back in a car accident. Surgeons had to implant several rods and screws to repair her back.

230.    Ms. Deyo did not have health insurance before enrolling in Arkansas Works with the assistance of her insurance company, Ambetter, in 2017. Before enrolling in Arkansas Works, she incurred over $30,000 in medical debt and often went without health care when she needed it.

231.    Ms. Deyo has several medical conditions that must be monitored and treated. She has a broken screw in her back that interferes with a nerve. She also has fibromyalgia and rheumatoid arthritis.

232.    Ms. Deyo's Medicaid coverage has allowed her to obtain treatment through visits to a primary care physician, a physical therapist, and a surgeon. The surgeon is evaluating options for fixing the broken screw in her back. She currently takes three prescription medications.

233.    On September 17, 2018, Ms. Deyo went to the pharmacy to fill her prescriptions and was told that her coverage had ended. She left without her medications.

234.    Ms. Deyo changed addresses during the last year and informed her insurance company for Arkansas Works, Ambetter, about the change. She believes that Ambetter did not transmit her address change to DHS. She never received any notices from DHS that she was subject to work requirements or had failed to comply with them. When she called Ambetter to inquire about her coverage ending, Ambetter told her to call DHS. This confused her, because she had never before dealt with DHS concerning her health insurance.

235.    When Ms. Deyo called DHS in September, staff told her that she had been terminated as of August 31, 2018 because she did not comply with the work requirements.

However, because DHS found that Ms. Deyo had not received notice of the work requirements, it granted her a good cause exemption to reinstate coverage as of November 1, 2018.  DHS did not explain whether the good cause exemption cleared all three months of her non-compliance. Also, DHS did not explain whether Ms. Deyo would have coverage for September and October 2018.

236.    Around October 8, 2018, Legal Aid assisted Ms. Deyo in calling DHS to request Medicaid coverage before November 1, 2018. DHS gave her a Medicaid number for the state's traditional Medicaid program. This coverage differs from her Arkansas Works coverage, which is scheduled to resume on November 1, 2018.

237.    Between September 1 and October 8, 2018, Ms. Deyo had no active health insurance. She could not fill any prescriptions and suffered more pain and slept less as a result. She had to miss an appointment with the back surgeon, who would not see her without insurance, thus delaying her possible back surgery. For the first time since she had enrolled in Arkansas Works, her physical therapist charged her directly for services performed, totaling $543.

238.    Between October 8, 2018 and November 1, 2018, Ms. Deyo was able to get some of her medications covered by Medicaid. However, because her coverage was not through Arkansas Works, she had to pay $108 out of pocket. Her parents covered these costs because she has no income, but they cannot afford to do that regularly.

239.    Because Ms. Deyo cannot currently work or volunteer, she worries it is only a matter of time before she loses her Medicaid coverage again as a result of the work requirement. Experiencing two months without insurance has only heightened this fear. Without access to her doctors and medications, Ms. Deyo has little hope she will recover and work again.

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (STATE MEDICAID DIRECTOR LETTER)

240.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

241.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

242.    The approval of the Arkansas Works Amendment was explicitly based in substantial part on the policy announced in the January 11, 2018 State Medicaid Director Letter. Ex. 2, Amendment Approval, at 2.

243.    The State Medicaid Director Letter was required to be, but was not, issued through notice and comment rulemaking. *See* 5 U.S.C. § 553.

244.    In issuing the State Medicaid Director Letter, the Federal Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

245.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

246.    In the State Medicaid Director Letter, the Federal Defendants relied on factors that Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

247.    The Federal Defendants' issuance of the State Medicaid Director Letter exceeded the Secretary's Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (ARKANSAS WORKS AMENDMENT APPROVAL)

248.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

249.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

250.    The Secretary's decision to approve the Arkansas Works Amendment as described herein exceeded his authority under 42 U.S.C. § 1315, otherwise violated the Medicaid Act, was arbitrary and capricious and an abuse of discretion, and ran counter to the evidence in the record.

251.    Plaintiffs will suffer irreparable injury if the Secretary's actions approving the Arkansas Works Amendment are not declared unlawful because those actions have harmed and will continue to harm Plaintiffs.

252.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## COUNT THREE: VIOLATION OF THE TAKE CARE CLAUSE,
### ARTICLE II, SECTION 3, CLAUSE 5

253.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

254.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

255.    The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized

to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id.* §§ 1, 8.

256.    The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

257.    Accordingly, the Defendants' actions are in violation of the Take Care Clause and are ultra vires.

258.    Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Orders are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

259.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.    Declare that Defendants' issuance of the January 11, 2018 State Medicaid Director Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

2.    Declare that Defendants' approval of the Arkansas Works Amendment violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.    Enjoin Defendants from implementing the practices purportedly authorized by the January 11, 2018 State Medicaid Director Letter and the Arkansas Works Amendment.

4.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C.

§ 2412; and

5.      Grant such other and further relief as may be just and proper.

November 5, 2018                                          Respectfully submitted,

Thomas J. Perrelli                                       By: /s/ Jane Perkins
        (D.C. Bar No. 438929)                            Jane Perkins
Ian Heath Gershengorn                                    Elizabeth Edwards
        (D.C. Bar No. 448475)                            Catherine McKee
Natacha Y. Lam                                           National Health Law Program
        (D.C. Bar No. 1030168)                           200 N. Greensboro Street, Suite D-13
                                                         Carrboro, NC 27510
Jenner & Block LLP                                       Phone: 919-968-6308 (x101)
1099 New York Avenue, N.W.                               perkins@healthlaw.org
Suite 900, Washington, DC 20001                          mckee@healhtlaw.org
Phone: 202 639 6004                                      edwards@healthlaw.org
TPerrelli@jenner.com
IGershengorn@jenner.com
NLam@jenner.com                                          /s/ Kevin De Liban
*Counsel to National Health Law*                         Kevin De Liban
*Program*                                                Trevor Hawkins
                                                         Legal Aid of Arkansas
                                                         310 Mid-Continent Plaza, Suite 420
                                                         West Memphis, AR 72301
                                                         Phone: 870-732-6370 (x2206)
                                                         kdeliban@arlegalaid.org
                                                         thawkins@arlegalaid.org

                                                         /s/ Samuel Brooke
                                                         Samuel Brooke
                                                         Emily C.R. Early
                                                         Neil K. Sawhney
                                                         Ellen Degnan
                                                         Southern Poverty Law Center
                                                         400 Washington Avenue
                                                         Montgomery, AL 36104
                                                         Phone: 334-956-8200
                                                         samuel.brooke@splcenter.org
                                                         neil.sawhney@splcenter.org

                                                         *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2018, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system, which will send an electronic notice to the author-

ized CM/ECF filer listed below:

> Vinita B. Andrapalliyal
> U.S. DEPARTMENT OF JUSTICE
> Civil Division, Federal Programs Branch
> P.O. Box 883
> Washington, D.C. 20530
> (202) 305-0845
> vinita.b.andrapalliyal@usdoj.gov
>
> Matthew Charles Skurnik
> U.S. DEPARTMENT OF JUSTICE
> Civil Division, Federal Programs Branch
> 1100 L. Street, NW
> Washington, DC 20005
> (202) 616-8188
> matthew.skurnik@usdoj.gov
>
> *Counsel for Defendants*
>
> Nicholas Jacob Bronni
> Dylan L. Jacobs
> ARKANSAS ATTORNEY GENERAL'S OFFICE
> 323 Center Street
> Suite 200
> Little Rock, AR 72201
> (501) 682-6203
> nicholas.bronni@arkansasag.gov
> dylan.jacobs@arkansasag.gov
>
> *Counsel for the State of Arkansas*

By: /s/ Catherine McKee__
CATHERINE MCKEE