**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHARLES GRESHAM, et al.                                        PLAINTIFFS

v.                              No. 1:18-cv-01900JEB

ALEX M AZAR, et al.                                        DEFENDANTS

STATE OF ARKANSAS                        DEFENDANT-INTERVENOR

<u>REPLY IN SUPPORT OF ARKANSAS'S MOTION FOR</u>
<u>SUMMARY JUDGMENT</u>

**INTRODUCTION**

Last year, the Secretary of Health and Human Services approved the Arkansas Works Amendment, a Medicaid demonstration project requiring a portion of the Medicaid expansion population to meet a community engagement requirement in order to maintain coverage. In approving the Amendment, the Secretary reasonably interpreted the objectives of Medicaid to include beneficiary health, economic self-sufficiency, and independence from Medicaid itself. After determining that the Arkansas Works Amendment would further these objectives, and considering other factors such as a risk of loss of coverage, the Secretary reasonably predicted that this experiment would likely promote the objectives of Medicaid.

In arguing to the contrary, Plaintiffs misapprehend the applicable standard of review and offer a cramped reading of the Medicaid Act at odds with both the statutory text and demonstration projects approved under each of the prior three administrations. But the Secretary acted well within his statutory authority in approving the Arkansas Works Amendment, and his reasonable

decision is entitled to *Chevron* deference.  Plaintiffs' arguments to the contrary fail, and the Court

should grant Arkansas's motion for summary judgment.

## I.     The Secretary reasonably interpreted Section 1115 to authorize his approval of the Arkansas Works Amendment.

### A.     The Secretary's interpretation of Section 1115 is entitled to *Chevron* deference.

In his approval of the Arkansas Works Amendment, the Secretary determined that the

Amendment was "likely to assist in promoting the objectives" of Medicaid, 42 U.S.C. 1315(a), as

he understood them:  namely, improving Medicaid beneficiaries' health, promoting beneficiary

independence, and "encourag[ing] beneficiaries to obtain and maintain health coverage, even when

they are healthy." AR 7.  In making that determination, the Secretary necessarily made a judgment

call on what "the objectives" of Medicaid are, as Section 1115 of the Social Security Act expressly

calls for.  *See* 42 U.S.C. 1315(a) (authorizing the Secretary to approve experimental and demon-

stration projects which, "*in the judgment of the Secretary*, [are] likely to assist in promoting the

objectives" of Medicaid) (emphasis added).  As Arkansas explained in its summary-judgment

brief, the Secretary's gloss on Section 1115's Delphic reference to Medicaid's "objectives" is un-

debatably entitled to *Chevron* deference.  *See* Doc. 39-1 at 5–6.  Among other reasons, the D.C.

Circuit has squarely held that the Secretary's delegation of authority to approve *permanent* state

Medicaid plans is an "'express delegation of specific interpretive authority'" to interpret all provi-

sions of the Medicaid Act governing state plan approvals.  *Pharm. Research & Mfrs. Am. v.

Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004) (quoting *United States v. Mead Corp.*, 533 U.S.

218, 230 (2001)).  The same is logically true of his lesser delegation of authority to approve ex-

perimental state Medicaid plans.

In their response, Plaintiffs surprisingly contend that the Secretary's expressly delegated

judgment on Medicaid's objectives is not reviewed under *Chevron*.  Even if this Court finds the

2

Act ambiguous on this question (as it undeniably is), Plaintiffs argue that the Court must attempt to reconstruct Medicaid's objectives without the responsible agency's help. *See* Doc. 42 at 5–7. Most of Plaintiffs' arguments for *Chevron*'s inapplicability, however, are really just arguments that Plaintiffs would win under it.   Contrary to Plaintiffs' misunderstanding of the doctrine, whether the Secretary's interpretation of Section 1115 is unambiguously wrong or unreasonable, as Plaintiffs claim it is, *see id.* at 6, does not go to whether it is "not entitled to deferential *review*," *id.* (emphasis added), but only to what the outcome of that review should be.  Plaintiffs also attack straw men, claiming Arkansas argued "that all Section 1115 approvals are entitled to deference," *id.* at 7, even if unambiguously invalid.  Of course Arkansas agrees that "not . . . *every* approval receives deference." *Id.*  Rather, it is Arkansas's submission that every Section 1115 approval is entitled to deferential *review*, and that the Secretary's interpretations of Section 1115 rendered in *this case* are entitled to deference because they reasonably interpret an ambiguous statute.

Ultimately, Plaintiffs' only argument that *Chevron* review does not apply here is that the Secretary's understanding of the objectives of a program he administers falls within *Chevron*'s major-questions exception.  According to Plaintiffs, the question here is whether the Secretary may "'fundamentally transform Medicaid' . . . to a work program[.]" *Id.* (quoting Doc. 26 at 25 ¶ 110).[1] But by framing the question as one about the Secretary's supposed "fundamental transformation" of Medicaid, Plaintiffs have assumed what the major-questions exception requires them to prove. Framed in a less conclusory way, the questions in this case are whether the Secretary may interpret

---

[1] Plaintiffs deceptively claim that "the Secretary and CMS freely admit their intent to 'fundamentally transform Medicaid'" in this regard, *id.*, but the supposed admission of intent Plaintiffs quote is an op-ed by the Administrator of CMS in which the Administrator said that Medicaid could be transformed through "*congressional*" action.  That op-ed never even mentioned congressionally imposed work requirements.  Seema Verma, *Lawmakers have a rare chance to transform Medicaid. They should take it.*, The Wash. Post, June 27, 2017, https://wapo.st/2yQ9XIE (emphasis added).

Medicaid's objectives to include the health of Medicaid beneficiaries, and whether, having done so, he may then approve experimental, state-specific, time-limited incentives for beneficiaries to engage in healthy behaviors, such as work.  That is not, even remotely, a major question in the sense in which the Supreme Court uses the term.  *See King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015) (carving out an exception to *Chevron* for "extraordinary cases" involving questions of "deep 'economic and political significance' that [are] central to [a] statutory scheme") (quoting *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014)).   And it pales in comparison to questions that the D.C. Circuit has held do not meet the exception.  *See United States Telecom Ass'n v. FCC*, 855 F.3d 381, 383–88 (D.C. Cir. 2017) (Srinivasan, J., concurring in the denial of rehearing en banc) (explaining why the FCC's decision to treat broadband providers as common carriers and impose net neutrality regulation was not a major question under *King v. Burwell* and *Utility Air*), *cert. denied*, 139 S. Ct. 475 (2018).

Indeed, the Secretary's reading of Section 1115 is neither new nor profoundly significant. *Cf. Util. Air Regulatory Grp. v. EPA*, 134 S. Ct 2427, 2444 (2014) (suggesting the major-questions exception may apply when an agency discovers previously "unheralded power[s] to regulate 'a significant portion of the American economy'") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).   As Arkansas noted in its summary-judgment brief—and as Plaintiffs do not dispute—each of the last three administrations has approved experimental incentives and coverage-reducing penalties under Section 1115 that were engineered to encourage beneficiaries to adopt various healthy behaviors.  *See* Doc. 39-1 at 12 n.4 and accompanying text. Like the Arkansas Works Amendment, those incentives and penalties rest on the theory that Medicaid's ultimate objective is its beneficiaries' health, not the maximization of Medicaid coverage.

The Secretary's decision here to follow that bipartisan agency precedent about Medicaid's objectives presents no major question.

> **B.     The Secretary's interpretation of Medicaid's "objectives" is reasonable.**

>   1.     Section 1901 states only the purposes of Medicaid appropriations, not the purposes of Medicaid.

In approving the Arkansas Works Amendment, the Secretary unexceptionably interpreted Section 1115's reference to Medicaid's "objectives" to encompass "the ultimate objective of improving health and well-being for Medicaid beneficiaries," AR 2, and "beneficiary independence," AR 6.  Plaintiffs remarkably contend, however, that the Secretary unambiguously erred in determining that improving Medicaid beneficiaries' health is even *an* objective of Medicaid.  *See* Doc. 42 at 7 (denouncing the "new, broad, and open-ended objective[] of promoting health"); *id.* at 9 (denouncing "the unstated objective of 'improving health outcomes'").  According to Plaintiffs, the Secretary may not even consider beneficiary health as one objective to weigh in approving experimental Medicaid projects.

This response to Arkansas's arguments largely proceeds by mischaracterization.  It is not Arkansas's position that the Medicaid objectives recited in 42 U.S.C. 1396-1 (Section 1901 of the Act) "are no longer relevant."  *Id.* at 7.  Arkansas expressly conceded in its summary-judgment brief that furnishing medical assistance to Medicaid beneficiaries remains a vital Medicaid objective that the Secretary must weigh against its other objectives in determining whether a Section 1115 project is likely to promote the objectives of Medicaid.  Rather, Arkansas's position is that the Secretary may approve Section 1115 projects that might cause some coverage losses if those losses, in his judgment, would likely be outweighed by the project's health benefits for beneficiaries who retain coverage, or who become employed and gain independence from the program.  In-

deed, each of the last three administrations has approved such projects, which Section 1115 expressly contemplates.  *See* 42 U.S.C. 1315(d)(1) (requiring the Secretary to use notice-and-comment procedures for experimental projects "that would result in an impact on eligibility, enrollment, benefits, [or] cost-sharing").

In response to that eminently reasonable reading of the Act, Plaintiffs argue that Section 1901, an appropriations provision, states the sole objectives of Medicaid that the Secretary may consider under Section 1115: namely, furnishing medical assistance to eligible persons, and providing services that help beneficiaries attain what Plaintiffs refer to as "functional" independence.  Doc. 42 at 7, 15 n.8.  But nothing in Section 1901 or the rest of the Act remotely, let alone unambiguously, says so.  Unlike Medicaid, a panoply of other programs under the Social Security Act contain expressly entitled purposes sections that state, in their text, "the purpose of this program."  *See* Doc. 39-1 at 7 n.1 (collecting eight such provisions).  Section 1901, by contrast, is an "Appropriations" section that merely states "the purpose" for which funds are "hereby authorized to be appropriated[.]"  42 U.S.C. 1396-1.  Plaintiffs themselves acknowledge elsewhere that "courts 'presume differences in language like this convey differences in meaning.'"  Doc. 42 at 14 (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018)).  Besides, an appropriation provision is a strange place to look to for a substantive limit on the objectives the Secretary may pursue in approving Medicaid experimental projects.  That is because appropriations "measures have the 'limited and specific purpose of providing funds for authorized programs.'"  *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) (quoting *TVA v. Hill*, 437 U.S. 153, 190 (1978)); *see also* Doc. 39-1 at 10–11 [collecting other cases)].

In response, Plaintiffs say that *this* appropriations provision is special because Medicaid is a spending program; therefore, "the purposes for the appropriations are the purposes of the program." Doc. 42 at 10. But they cite no case for the proposition that a spending program's purposes or "objectives" (which is Section 1115's term) are simply whatever services for which program funds are appropriated. A program's "objectives" are not the same thing as the means chosen by Congress to achieve those objectives. On Plaintiffs' view, the Secretary may only approve demonstration projects designed to increase the ranks of those receiving Medicaid coverage; whether a project would improve or harm the health of those beneficiaries would be wholly irrelevant. Such a reading of the Secretary's Section 1115 authority borders on the absurd.

In any case, Plaintiffs miss the point. Even if the canon that appropriations provisions merely appropriate did not apply to appropriations provisions of spending programs, the fact remains that many of the Social Security Act's other spending programs contain expressly denominated purpose provisions, while Medicaid does not—a point to which Plaintiffs make no response. Indeed, those other spending programs carefully delineate between their purposes and the purposes of their appropriations, belying Plaintiffs' insistence that the purpose of an entitlement spending program is whatever its funds are appropriated for. *See, e.g.*, 42 U.S.C. 601(a) (stating "[t]he purpose" of TANF); 42 U.S.C. 603(a)(C) (appropriating funds for TANF grants); 42 U.S.C 621 (purpose section of Stephanie Tubbs Jones Child Welfare Services Program, stating "[t]he purpose of this subpart"); 42 U.S.C 625 (appropriating funds "[t]o carry out th[at] subpart"); 42 U.S.C. 1397aa(a) (stating ("[t]he purpose of" SCHIP); 42 U.S.C. 1397dd(a) (appropriating SCHIP funds *and* stating "the purpose" of SCHIP appropriations). To read Section 1901 as furnishing an un-

ambiguously exhaustive statement of Medicaid's objectives requires ignoring these textual differences between Medicaid and other Social Security programs, along with Congress's own clear understanding that appropriations "purposes" are not the same thing as a program's objectives.

2.      Read as a whole, the Medicaid Act's purposes transcend the furnishing of "medical assistance."

On top of this, treating Section 1901's statement of the purposes of Medicaid appropriations as exhausting Medicaid's purposes would ignore how the Medicaid program has evolved since Section 1901's enactment in 1965.  When Section 1901 says that funds are appropriated "to furnish . . . medical assistance," it does not state the sort of broad program "objective" Section 1115 had in mind.  42 U.S.C. 1396-1.  Given the Act's definition of "medical assistance," that statement of purpose in Section 1901 is really an appropriation for payment for a detailed list of at least thirty-nine varieties of care and services, such as dentures, prosthetic devices, and eyeglasses (provided that they are prescribed by an ophthalmologist or optometrist).  *See* 42 U.S.C. 1396d(a); Doc. 39-1 at 12 (discussing the incompatibility of the reticulated definition of medical assistance in Section 1396d with Plaintiffs' claim that the furnishing of medical assistance as defined is a broad program "objective").

Treating that detailed list as a broad "objective" is also inconsistent with the Act as it exists today.  For while the definition of medical assistance has remained more or less static, in 2006 Congress provided, for some populations, for the overthrow of the provision of medical assistance as defined altogether in favor of a form of "benchmark coverage" under which the Secretary may approve "[a]ny . . . health benefits coverage that the Secretary determines [is] appropriate[.]"  42 U.S.C. 1396u-7(b)(1)(D).  As one of Plaintiffs' amici has written, this provision transformed "not only the structure of Medicaid but the nature of the entitlement itself" from "an entitlement to coverage encompassing a broad array of specified benefits" to, "at most, a defined contribution

8

toward health coverage, with almost total discretion over actual benefit design left to insurer discretion rather than legally enforceable standards[.]"  Sara Rosenbaum, *Medicaid at Forty: Revisiting Structure and Meaning in a Post-Deficit Reduction Act Era*, 9 J. Health Care L. & Pol'y 5, 41 (2006).  Meanwhile, other amendments to Medicaid, including ones enacted at the time of the Medicaid expansion, mandated that the Secretary experiment with demonstration programs similar to this one.  Such mandated demonstration programs included incentives for patients to seek preventive care or engage in a variety of healthy behaviors having nothing to do with the use of medical assistance at all, such as weight loss, exercise, or quitting smoking.  *See* Doc. 39-1 at 15–16.

Plaintiffs wave away these structural transformations to Medicaid.  Regarding "benchmark coverage," they say it merely permits "[v]ariation in what specific 'medical assistance' must be furnished."  Doc. 42 at 12.  They are simply wrong on this point.  The definitions section of the Medicaid subchapter states that "[f]or purposes of this subchapter . . . [t]he term 'medical assistance' means" what that section specifically says it does, not what it means in some ordinary-language sense.  42 U.S.C. 1396d.  Congress's widespread authorization of coverage within Medicaid that diverges diametrically from that section's definition of medical assistance shows that Medicaid's objectives are no longer exclusively limited (if they ever were) to the furnishing of medical assistance.  *See* Doc. 39-1 at 13–16.

Regarding the various demonstration projects with behavior incentives Congress has mandated, Plaintiffs suggest that these somehow imply that the Secretary may only approve the precise healthy behavior incentives that Congress mandated.  Doc. 42 at 12 n.5.  But many of these congressionally mandated projects do not even pertain to the consumption of medical assistance in a colloquial sense.  This shows that Medicaid's purposes transcend merely providing specific kinds of medical assistance to include the pursuit of medical assistance's own ultimate *objective—*

namely, health.  Finally, Plaintiffs are mistaken to suggest that Congress impliedly withdrew the Secretary's *permission* to approve healthy-behavior-incentive projects under Section 1115 by *mandating* the Secretary to approve similar projects under other statutory provisions.  The only thing that Congress has "tightly circumscribed" in this regard, Doc. 42 at 12 n.5, is the extent of the healthy-behavior-incentive projects that it has mandated.  That limited mandate does not limit the extent of the Secretary's permissive authority to approve similar projects under other provisions.  In fact, insofar as it bears on that permissive authority at all, it implies that healthy-behavior-incentive demonstration projects pursue Medicaid's objectives, and that such projects are congressionally encouraged.

3.     Section 1901 does not state the Medicaid expansion's purposes.

The Arkansas Works Amendment solely applies to Arkansas's version of the Medicaid expansion, Arkansas Works.  Arkansas Works expanded the state's Medicaid program far beyond the various discrete populations traditionally covered to broadly cover low-income individuals.  But Section 1901's stated purpose of Medicaid appropriations is to "furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals . . . and (2) rehabilitation and other services to help *such* families and individuals attain or retain capability for independence or self-care[.]"  42 U.S.C. 1396-1 (emphasis added).  As Arkansas explained in its summary-judgment brief, Section 1901 simply states no purpose to serve the broader Medicaid expansion population whatsoever.  It therefore cannot provide an unambiguous limit on the Secretary's discretion to identify the Medicaid expansion's objectives.  *See* Doc. 39-1 at 17–19.  Any claim that it does is, in essence, a claim that the Medicaid expansion's objectives are *unambigu-*

*ously*, albeit implicitly, the same as Congress's stated purposes for authorizing traditional Medicaid appropriations in 1965.   But there is nothing unambiguous about that; such a claim is pure guesswork.

In response, Plaintiffs flatly assert that it is inconceivable that the Medicaid expansion's purposes differ from traditional Medicaid's purposes.   In support, they note only that a substantive provision of the Medicaid Act provides that states that accept Medicaid funds must provide "medical assistance" to the Medicaid expansion population.   *See* Doc. 42 at 13.   In other words, they state without support that it is inconceivable that the 1965 and 2010 Congresses could have had differing purposes in providing Medicaid coverage to, on the one hand, the families of dependent children and aged, blind, and disabled individuals, and on the other hand, everyone below 133% of the poverty level.   But merely stating that proposition does not make it so.   Indeed, the Supreme Court held in *NFIB v. Sebelius* that the Medicaid expansion was "a new health care program."   567 U.S. 519, 584 (2012).   It was not a mere "modification of the existing Medicaid program," notwithstanding "Congress's decision to so title it[.]"   *Id.* at 582.   Section 1901 does not contain an exhaustive statement of the objectives of pre-expansion Medicaid.   So it certainly does not exhaustively state the objectives of an entirely new program enacted forty-five years later.   Assuming that it does repeats the error of conflating the two programs because they share the same name that the Supreme Court rejected in *NFIB*.[2]

---

[2] Likewise, just because incremental expansions of Medicaid to, e.g., low-income pregnant women most likely shared the same purposes as the original program despite going unmentioned in Section 1901, it does not follow that the Medicaid expansion must have shared the same purposes as the original program, too.   *See Stewart v. Azar*, 313 F. Supp. 3d 237, 270 (D.D.C. 2018).   This reasoning is in profound tension with *NFIB*.   The *NFIB* Court specifically addressed this and the other incremental expansions identified in *Stewart*.   The Supreme Court wrote that they "simply d[id] not fall into the same category" as the Medicaid expansion; they truly were, unlike the Medicaid expansion, mere "modification[s]."   *NFIB*, 567 U.S. at 585.

Plaintiffs finally point to the fact that Congress required states that opted into Medicaid to provide "medical assistance" to the Medicaid expansion population (a requirement that the Court held unconstitutional in *NFIB* for the very reason that the Medicaid "expansion" was really a new program, *see NFIB*, 567 U.S. at 585).  *See* Doc. 42 at 13.  But this fact merely shows what Defendants have always granted: that furnishing medical assistance is *an* objective of the Medicaid expansion that the Secretary must weigh in approving Medicaid expansion demonstration projects. It does not show or even begin to suggest that the health of Medicaid expansion beneficiaries is not a Medicaid expansion objective.  Nor does it show that by considering whether the Arkansas Works Amendment would make beneficiaries healthier, the Secretary somehow unambiguously violated the Medicaid Act.

4.     The Secretary reasonably interpreted Section 1901's stated purpose of helping beneficiaries attain "independence or self-care" to encompass the objective of independence from Medicaid.

Section 1901 states, as one of its purposes of Medicaid appropriations, the furnishing of "rehabilitation and other services to help [beneficiaries] attain or retain capability for independence or self-care[.]" 42 U.S.C 1396-1.  The Secretary understood that language to state an objective of "economic self-sufficiency," AR 4, and "beneficiary independence" from the program.  AR 6. That interpretation was, at the very least, reasonable.

As Arkansas discussed in its summary-judgment brief, Section 1901's language mirrors the language of AFDC's former purpose section, which included the purpose of "self-support and personal independence."  42 U.S.C. § 601 (1994).  Two circuits, including the Second Circuit in an opinion by Judge Friendly, interpreted that language to mean that one purpose of AFDC was independence from the program itself.  *See* Doc. 39-1 at 20–21 (citing *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973)); *see also C.K. v. N.J. Dep't of Health & Human Servs.*, 92 F.3d 171,

184 (3d Cir. 1996) (interpreting AFDC to state the purpose of "aid[ing] AFDC recipients in 'slaying their own personal welfare dragon'") (quoting *C.K. v. Shalala*, 883 F. Supp. 991, 1006 (D.N.J. 1995)).   Plaintiffs suggest that Section 1901's similar language cannot carry a similar meaning because AFDC's successor program, TANF, states the purpose of program-independence more explicitly.   *See* Doc. 42 at 14 (citing 42 U.S.C. 601(a)(2)'s stated purpose of "end[ing] the dependence of needy parents on government benefits").   The argument proves too much; AFDC's purpose section, which is virtually identical to Section 1901, could also have been more explicit.   Yet the courts of appeals unanimously held that it stated a purpose of program independence.   At the least, their interpretation was reasonable—and so, therefore, is the Secretary's interpretation of virtually identical language in Section 1901.

Plaintiffs alternatively argue that there are critical differences between the phrases "independence or self-care" and "self-support and personal independence."   These differences supposedly make it clear that the former refers to the "capacity to accomplish activities of daily living" without the help of aides, while the latter refers to independence from welfare.   Doc. 42 at 15 n.8. Of course Arkansas agrees with the general maxim that sufficiently different language should be interpreted differently, *see id.* at 14 (collecting cases so holding), but it is also true that "similar language is to be read similarly."   *Smith v. City of Jackson*, 544 U.S. 228, 262 (2005) (O'Connor, J., concurring in the judgment); *see also Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2 (1989) ("statutes' similar language is a 'strong indication' that they are to be interpreted alike") (quoting *Northcross v. Memphis Bd. of Educ.*, 412 U.S. 427, 428 (1973)).   The use of "support" in AFDC and "care" in Medicaid is readily explained by the fact that AFDC is a program about support, while Medicaid is a program about healthcare.   Where AFDC's stated purposes

included self-support, i.e., support without the assistance of AFDC, Medicaid's (or its appropriations') stated purposes include self-care, i.e., healthcare without the assistance of Medicaid.

Plaintiffs vaguely insist that Arkansas's position "excises terms" from some unspecified aspect of the Medicaid "context."  Doc. 42 at 15.  But they persist in their failure to point to anything specific in Section 1901's context for which Arkansas has not accounted.  Plaintiffs had initially argued that because Section 1901's stated purpose is the *furnishing of services* to help beneficiaries attain independence, it cannot be that a work-or-volunteering requirement for retaining Medicaid coverage would further that purpose.  *See* Doc. 27-1 at 17.  But as Arkansas explained in its summary-judgment brief, conditioning access to state medical assistance on work or volunteering *furnishes services* in a manner that helps beneficiaries attain independence.  *See* Doc. 39-1 at 21–22.  To this point, Plaintiffs offer no response.

Moreover, AFDC's former purposes section linked services to independence in just the same way and in just the same terms as Section 1901 does.  *Compare* 42 U.S.C. 601 (1994) (stating "the purpose of . . . enabling each State to furnish financial assistance and rehabilitation and other services . . . to help such parents or relatives to attain or retain capability for . . . self-support and personal independence"), *with* 42 U.S.C. 1396-1 (stating "the purpose of enabling each State . . . to furnish . . . medical assistance . . . rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care").  Again, the courts of appeals' unanimous interpretation of materially identical language to that of Section 1901 is not unambiguously wrong.  It is abundantly possible to read Section 1901 alone as authorizing the Secretary to weigh the objective of furnishing medical assistance against the objective of furnishing services that will help beneficiaries become independent from state-furnished medical assistance.  That (in

part) is what the Secretary did here.  It is also what his predecessor did in approving an experimental AFDC work requirement under Section 1115 and AFDC's materially identical purposes—an approval that the Second Circuit long ago held permissible.  *See Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973).

  5. The Medicaid Act does not forbid the experimental approval of work or volunteering requirements.

  Plaintiffs also contend that, however reasonable the Secretary's understanding of Medicaid's objectives may be, Section 1115 bars the Secretary from approving community-engagement requirements for coverage by limiting his authority to "waiv[ing] compliance with any of the requirements" of 42 U.S.C. 1396a.  42 U.S.C. 1315(a)(1).  That is wrong.  In permitting Arkansas to restrict Medicaid expansion coverage to those who satisfy the community-engagement requirement or are excepted from it, the Secretary waived the requirements of 42 U.S.C. 1396a that medical assistance must be made available "to all eligible individuals," 42 U.S.C. 1396a(a)(8), and permitted Arkansas to make it available to only a subset of eligible individuals.  *See* Doc. 39-1 at 32–33.

  In response, Plaintiffs say that this just cannot be what "waive" means; allowing states to impose eligibility conditions of any kind beyond those stated in the Medicaid Act itself "would give the Secretary the functional authority to write new statutory sections," a power that "the term 'waive' cannot encompass."  Doc. 42 at 37.  The Arkansas Works Amendment is not a "new statutory section," functionally or otherwise; it is an Arkansas-specific demonstration project.  But however melodramatically Plaintiffs mischaracterize Arkansas's demonstration project, the Secretary's authority under Section 1115 is not limited to the merely negative power of waiving compliance with provisions of the Act; he is authorized to approve "experimental, pilot, or demonstration project[s][.]" 42 U.S.C. 1315(a).  Such projects, of course, contain positive terms.  They have,

under past administrations, contained the positive term of disenrollment for failure to pay premiums, or the positive term of reduced coverage for failure to engage in healthy behaviors. *See* Doc. 39-1 at 12 n.4, 32. Approving substantive rules of various sorts that differ from those contained in the Act is just what the Secretary's grant of authority to both approve experimental projects, and, in doing so, waive compliance with the Act entails.

Plaintiffs also accuse Arkansas of "seek[ing] to evade the clear import" of *MCI*, Doc. 42 at 37, which held that the FCC's authority to modify statutory requirements was not a grant of authority to abolish them. *See MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 225 (1994). Plaintiffs accept Arkansas's distinction of *MCI* that it interpreted the word "modify," not the word "waive." They read it to bear on this case only insofar as it stands for the banal proposition that "an agency's authority is defined—and limited—by what words mean." Doc. 42 at 38. True as that is, it is Plaintiffs' position that does not respect what the words of Section 1115 mean. Section 1115 plainly states that the Secretary may waive compliance with any of the requirements of the heart of the Medicaid Act, and may approve any experimental project that in his judgment is likely to assist in promoting Medicaid objectives. Here, the Secretary waived compliance with the Act's requirement of universal coverage for Medicaid-eligible beneficiaries, and approved an experiment in healthy behavior incentives that he believed was likely to promote the Medicaid objectives of health and independence. Plaintiffs attempt to distinguish between "narrow waiver[s]" and ones that "transform Medicaid," or between waivers that are "untethered to any specific clause of Section 1396a" and ones that are, in some undefined sense, sufficiently tethered to the section that Section 1115 authorizes the Secretary to waive. Doc. 42 at 37. But those distinctions can simply not be found in Section 1115's text.

16

6.     Section 1115 permits the waiver of retroactive coverage, and the Secretary validly waived it.

Plaintiffs argue that the Secretary cannot waive retroactive coverage because retroactive coverage is required by the definition of medical assistance, which the Secretary lacks authority to waive.  It is true that the Secretary only has authority to waive the substantive provisions of 42 U.S.C. 1396a, not the definitions of 42 U.S.C. 1396d.  *See* 42 U.S.C. 1315(a)(1).  But by the same token, it is unnecessary to waive a definitional section equating medical assistance with retroactive coverage in order to waive the *requirement* of medical assistance and thus retroactive coverage. The requirement of retroactive coverage derives from the substantive provisions of Section 1396a that require the furnishing of medical assistance, not from the definitional section equating medical assistance to retroactive coverage.

Plaintiffs also argue that the Secretary failed to waive all the necessary provisions of section 1396a because, while he waived 42 U.S.C. 1396a(a)(34), which requires retroactive coverage at length, he failed to waive 42 U.S.C. 1396a(a)(10), which requires the furnishing of medical assistance, which in turn is defined to include retroactive coverage.  On Plaintiffs' interpretation of the statute, 42 U.S.C. 1396a(a)(34)'s lengthy exposition of the requirement of retroactive coverage is a redundant nullity because the requirement is already safeguarded by section 1396a(a)(10).  Even if Plaintiffs were correct about that, the Secretary's intent is entirely clear; he expressly approved Arkansas's waiver of retroactive eligibility and waived the most germane provision of section 1396a in doing so.  Any failure to also waive section 1396a(a)(10), if it were a failure, is a mere scrivener's error.

II.     **The Secretary's determination that the Arkansas Works Amendment likely would promote Medicaid's objectives was not arbitrary or capricious.**

A.     **The Secretary reasonably determined that the Arkansas Works Amendment would likely promote beneficiary health and independence.**

In his approval of the Arkansas Works Amendment, the Secretary found, based on studies in the record, that work and volunteering are "positively correlated with improvements in individuals' health," and could at least "potential[ly] benefit[]" beneficiary health.  AR 4.  Finding that Arkansas's prior voluntary work-referral program had not been an effective incentive for Arkansas Works beneficiaries to obtain employment or volunteer, he "allow[ed] Arkansas to test whether the stronger incentive model" of a community-engagement requirement for coverage "is more effective in encouraging participation."  AR 5.  And though he could not foretell the precise results of that experiment before it was tested, the Secretary predicted that the experiment would be a success, stating that he "believe[d] that the overall health benefits to the effected population through community engagement" incentivized by the community-engagement requirement "outweigh the health-risks with respect to those who fail to respond and who fail to seek exemption[s]" from the requirement.  AR 7.

Plaintiffs claim that the Secretary could not rationally make these findings given the record. They first suggest that the studies on health and work on which the Secretary relied "show only correlation or describe a very complex relationship between employment and health."  Doc. 42 at 34.  The "complex relationship" to which Plaintiffs vaguely allude, however, is a causal one.  The Waddell and Burton study states that the "strong association between worklessness and poor health . . . may be partly a health selection effect, but it is also to a large extent cause and effect."  AR 1759.  It identifies "strong evidence that unemployment is generally harmful to health."  *Id.*.  And it left no doubt about the existence of "a cause-effect relationship" linking "unemployment and

poorer physical and mental health and mortality."  AR 1774; *see* AR 1780 (finding that "re-employment leads to improved health"); *id.* (concluding that eight of the eleven studies reviewed on the subject showed no health selection effects, and that "the balance of the evidence is that health improvements are . . . a direct consequence of re-employment").  The Secretary did not confuse correlation with causation; the record supports a finding that work causes health improvements and unemployment causes mortality and sickness.

Plaintiffs next argue that it was irrational for the Secretary to conclude that conditioning valuable free health insurance on work and volunteering would successfully incentivize beneficiaries to work or volunteer.  To the contrary, the Secretary's prediction only assumes that the healthy individuals to whom Arkansas's community-engagement requirement applies are rational actors.  Even if some beneficiaries might struggle to find work, there is nothing to prevent any non-exempt beneficiary who wishes to retain his coverage from choosing to volunteer.

The evidence marshaled by commenters opposing the Amendment does not come close to showing that it was irrational for the Secretary to predict that Arkansas Works beneficiaries would behave rationally.  What the evidence in the record shows is that it is universally agreed that after work requirements were enacted in TANF, "employment grew among the TANF population."  AR 1404.  There is some disagreement among researchers about "the extent to which gains in employment can be attributed to welfare reform or general economic trends."  *Id.  See also* AR 1269 (linking to policy paper acknowledging that some researchers interpret "rigorous, random assignment studies" as proving that TANF work requirements "have been a major success," while offering differing interpretations of the data).  Whatever the relevance of the expert assessments of TANF work requirements to the Secretary's predictions on the efficacy of Medicaid work requirements, choosing a side in these sorts of disagreements among experts is an archetypal instance of

the policy judgments to which this Court must defer.  *See Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 98–105 (1983) (holding that courts were required to defer to FERC's "policy judgment" in assuming that zero stored nuclear waste would be released, notwithstanding that that prediction was "based, in part, on assumptions which involve substantial uncertainties" that "no one suggest[ed] . . . [we]re trivial").

**B.**     **The Secretary did not fail to consider the risk of coverage loss.**

Plaintiffs argue at length that the Secretary ignored evidence that the Amendment would result in coverage loss and failed to address whether the Amendment would promote coverage. As to coverage promotion, the Secretary was simply not required to determine that the Amendment would increase the ranks of the covered.  Nothing in Section 1115 limits the Secretary's discretion to approving projects that he believes will increase coverage; indeed, Section 1115 explicitly contemplates approvals of projects that cause coverage "impact" in both directions.  42 U.S.C. 1315(d)(1).  Rather, Section 1115 authorizes the Secretary to approve demonstration projects that are likely to promote Medicaid objectives, only one of which is Medicaid coverage.  If the Secretary finds that conditioning access to Medicaid on a healthy behavior will cause a substantial majority of beneficiaries to engage in that behavior and thereby become healthier, while causing a small minority of beneficiaries to lose coverage, he may find that that condition, on net, is likely to promote Medicaid objectives.

As to the risk of coverage loss, for the reasons given above, the Secretary reasonably predicted that the harms of coverage loss would be outweighed by the benefits of successfully incentivized community engagement.  *See* AR 7; *see also* AR 6 (stating his approval was conditioned on his expectation that the community-engagement requirement would "adequately incentivize beneficiary participation").  Plaintiffs suggest that it was irrational for the Secretary to predict that

the Amendment's community-engagement incentives would, in the main, work.  They point to commenters' citations to mixed research on work requirements in TANF and food stamp programs, and commenters' observations of "problems regarding access to regular work, transportation, and the internet."  Doc. 42 at 26.  These sorts of anecdotal observations and analogies from mixed research on work requirements in other programs do not suffice to show that the Secretary's predictive judgment was irrational.  It is undeniably the case that not each and every Arkansas Works beneficiary who sought a job would obtain one.  But Plaintiffs point to nothing in the record to show that *even one* non-exempt Arkansas Works beneficiary would be unable to find volunteering opportunities, and nothing in the record that quantified what share of beneficiaries commenters predicted would be unable to satisfy the community-engagement requirement.  Given the record, the Secretary was justified in predicting that the number of non-exempt beneficiaries who would fail to satisfy the requirement would be insufficient to outweigh the "health benefits . . . through community engagement" for those who did comply with the requirement.  AR 7.

### III.    Plaintiffs lack standing to challenge the Secretary's approval of online-only reporting.

In his approval, the Secretary approved Arkansas's proposal to only make reporting of community-engagement compliance available online, rather than online, in person, by phone, or by mail, as he interprets a provision of the Affordable Care Act to require.  However, before Plaintiffs brought this action, Arkansas chose to allow in-person reporting to the responsible state agency and telephonic reporting to beneficiaries' private insurance carriers, who provide the coverage that Arkansas Works beneficiaries receive.  The only method of reporting Arkansas has not made available is mail.  None of the Plaintiffs claim that they are unable to report their community-engagement compliance for lack of a mail option; indeed many attest in their declarations to owning telephones.  Therefore, Plaintiffs are not injured by the Secretary's approval of online-only

reporting, which on the ground has functioned only as a waiver of the Affordable Care Act's mail-reporting requirement.

In response to that point, Plaintiffs do not argue that a single one of them has been thwarted from reporting compliance because of the unavailability of mail reporting, or that any of them have been unable to report compliance to their insurance carrier.  Rather, they bewilderingly claim that regardless of whether the online-only reporting requirement remains in practical effect, Plaintiffs will continue to suffer injury because the Secretary approved online-only reporting in theory.  *See* Doc. 42 at 4.  Their only citation for this self-refuting proposition is a case holding that the mere "possibility of an alternative remedy, of uncertain availability and effect," does not defeat standing. *Okla. Dept' of Envtl. Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014).  Telephonic reporting is not a mere possibility, and its availability is not uncertain; the responsible official of the responsible state agency has declared to this court that it exists, providing examples of carrier phone numbers that Plaintiffs may call.  *See* Doc. 39-2 at 4.  And as of December 19, 2018, the Arkansas Department of Human Services  "began accepting telephone attestations for work and community engagement exemptions and work activities."  Exhibit A, Franklin Decl. at ¶ 3.  Plaintiffs' failure to argue that the unavailability of mail reporting, the only form of reporting that the Secretary's waiver has effectively denied to Plaintiffs, causes them injury denudes them of standing to challenge the Secretary's initial approval of online-only reporting.

## IV.    Should Plaintiffs prevail, the proper remedy is remand without vacatur.

As Arkansas explained in its summary-judgment brief, if this Court grants Plaintiffs relief, the proper remedy is remand without vacatur.  Any deficiencies in the Secretary's approval are, at worst, ones of insufficient reasoning, not a want of legal authority.  Because the Secretary likely can adequately explain its decision on remand in the event Plaintiffs prevail, and because vacatur

of the Arkansas Works Amendment would be extremely disruptive, remand without vacatur is appropriate.

In response, Plaintiffs initially argue that the Secretary lacks statutory authority to ever approve a community-engagement requirement or a waiver of retroactive coverage. As explained above, *see supra* Part I, Plaintiffs are simply wrong about that. They next argue that vacating the Amendment would not be disruptive, because Arkansas could easily make coverage available to those beneficiaries who had failed to comply with the community-engagement requirement, and could easily reinstate the normal period of retroactive coverage. *See* Doc. 42 at 42–43. This misses the point. To the extent the Secretary's approval of the Amendment was flawed, it was insufficiently reasoned, not wanting in authority. The probable result of a vacatur would be a reinstatement of the Secretary's approval with elaborated reasoning, as was the case in *Stewart*. The course Plaintiffs chart is one where the community-engagement requirement would be vacated and then reinstated. This would serve only to confuse the beneficiaries Plaintiffs seek to help. If the community-engagement requirement is to work, Arkansas must be able to communicate a consistent message about whether or not it even applies. Inasmuch as Plaintiffs are correct that "many beneficiaries do not currently understand the new work or reporting requirements or the consequences of failure to comply," *id.* at 42 n.23 (internal quotation marks omitted), vacating and then reinstating those requirements will not help matters; it will only exacerbate beneficiary confusion. If Arkansas is permitted to continue administering the Amendment during any remand that the Court may order, Arkansas's outreach efforts will continue and beneficiaries that do not currently understand the Amendment's requirements will be educated. Any remand should be without vacatur.[3]

---

[3] Arkansas incorporates the federal defendants' reply's arguments with respect to Plaintiffs' Take Care claim, challenge to the Dear State Medicaid Director letter, and his statutory authority to approve online-only reporting.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for summary judgment and grant Arkansas's motion for summary judgment.


Respectfully submitted,

LESLIE RUTLEDGE
Arkansas Attorney General

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni
  Arkansas Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:    (501) 682-2007
Fax:   (501) 682-2591
Email: Nicholas.Bronni@arkansasag.gov

## CERTIFICATE OF SERVICE

I hereby certify that January 14, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Nicholas J. Bronni*

Nicholas J. Bronni
